IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

CLOW VALVE COMPANY,        )
                              )
    Plaintiff                 )
                              )
    v.                     )     Case No.  JFM 02-3136
                              )
MAYOR and CITY COUNCIL OF    )
BALTIMORE CITY             )
                              )
    Defendants.          )

**MEMORANDUM IN SUPPORT OF PLAINTIFF CLOW VALVE
COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Clow Valve Company, a division of McWane, Inc. ("Clow"), by its undersigned attorneys, files this memorandum in support of its motion for summary judgment.

**INTRODUCTION**

At base, this is a simple case:  a customer purchased goods, received the goods without any objection as to their quality or conformity, retained the goods, and now refuses to pay for them.  The fact that the customer is the City of Baltimore ("the City") does nothing to change the proper result.  Once a meal is ordered and eaten, there can be no justification for slipping out the back door and leaving the restaurant without paying the bill.  Clow sold valuable goods to the City, and Clow deserves to be paid.  The material facts here are undisputed and lead to one, inexorable conclusion:  Clow is entitled to judgment as a matter of law against the City for the almost $600,000 purchase price of the numerous valves ordered by and manufactured for the City in the fall of 2001.

Walter Blimline is the City's purchasing agent responsible for placing orders on behalf of the Department of Public Works ("DPW").  On September 7, 2001, Blimline placed an order on

behalf of the City with Clow, an Iowa-based company that has sold water valves, hydrants and related items to private and municipal customers for more than 125 years. Clow confirmed the order in writing (on two separate occasions) and Blimline signed the confirmations (on two separate occasions) on behalf of the City. During the weeks surrounding the orders, Blimline had several conversations with Clow to discuss specifications for the valves, which were in large part to be specially manufactured for the City.

The order that Blimline placed arrived in numerous separate truckload shipments over the course of a two-and-a-half-month period. In each instance, one of three trucking companies received instructions to give 24-hour advance notice to Blimline of the delivery. Yet, despite an almost four-month ordering and delivery process – which included discussions with Blimline of valve specifications, Blimline's written confirmation of the order, and the City's receipt of at least fifteen separate shipments of valves – Blimline now claims that he never placed the order. Inexplicably, Blimline never bothered to share that position with Clow during the nearly four months when Clow was specially manufacturing and shipping the valves at Blimline's request. The absurdity of Blimline's after-the-fact assertion is highlighted by his having told his supervisor, Warren Williams, in December 2001 that he had placed the order, *by mistake.* Williams did nothing in response to this revelation, leaving Blimline to create his own solution to the problem.

As the last Clow valves were being delivered, Blimline told a Clow salesman for the first time that he had not placed the valve order. When Clow provided documentation showing the contrary, Blimline began promising Clow payment. He did so repeatedly for a month-and-a-half after the end of the delivery process and, on at least two occasions during that time, he specifically represented to Clow that the City had issued payment for the valves. When it

became apparent that he could no longer keep up the charade, Blimline apparently convinced his supervisor, Williams, to support his patently unbelievable story that he had not placed an order with Clow.

Notably, the City did at one time accept responsibility for Blimline's actions and began paying the invoices relating to the September 7, 2001 valve order. After paying the second invoice, however, the City made no further payments. Although it refuses to pay the balance due, the City has for a year-and-a-half retained the valves that Blimline ordered in its inventory for potential or actual use. At this late date, the valves cannot be resold for any reasonable value. The City purchased the valves, and the City must pay for them.

**UNDISPUTED FACTS**[1]

Prior to the City's unexpected refusal to pay for the valves it ordered in September 2001 from Clow, Clow's dealings with the City had been amicable and seemingly consistent with its dealings with other municipal customers. On March 27, 2000, the City placed a telephone order for valves with Clow mid-Atlantic sales representative Rick Walston. (Ex. A (Pl.'s interrogatory responses) at 6.) Rick Walston received the verbal order and prepared a handwritten order based on the information the City provided, which he then faxed to the inside sales department at Clow's headquarters in Oskaloosa, Iowa. (*Id.*) Clow delivered the valves that the City had ordered and the City paid Clow for the order. (*Id.*)

In similar fashion, DPW purchasing agent, Walter Blimline, telephoned Tom Walston – who succeeded his brother, Rick Walston, as Clow's mid-Atlantic sales representative – in February of 2001 to place an order for several water valves. (*See* ex. B (Walston dep.) at 36-37.)

---

[1]    The facts contained herein are undisputed except as otherwise noted. As explained *infra*, the few remaining disputes of fact are either not genuine or immaterial to this motion and, therefore, do not impair the Court's ability to enter summary judgment in favor of Clow.

Clow subsequently attempted to confirm the order, but Blimline never responded. As a result, the order was never filled. (*See id.* at 37.) Neither Blimline nor anyone else from the City ever asserted that Blimline lacked the authority to place an order in February 2001.

In fact, as Blimline himself testified, a very significant part of his current job as a DPW Store Supervisor is placing orders for goods – large and small – to be used by the DPW. (*See* ex. C (Blimline dep.) at 40.) Blimline is not new to this job. He has held his current position since 1994 (*id.* at 15) and has been working for the DPW since 1971 (*id.* at 11). Blimline has unfettered authority to place orders on behalf of the City, by telephone or otherwise, up to $1,000. (*Id.* at 51.) For orders over $1,000, Blimline typically receives purchase orders – either a specific purchase order, a blanket purchase order, or an "emergency" purchase order – from the City's purchasing department giving him express authority to place the order. (*Id.*) When Blimline receives a blanket purchase order, he interprets that purchase order as conferring on him "general authority to purchase products on an as-needed basis." (*Id.* at 51-52.) Thus, when Blimline places an order over $1,000, he is not always doing so in response to receiving a specific purchase order.

Blimline received at least two blanket purchase orders for the purchase of Clow Valves, the first dated May 23, 2000 in the amount of $100,000 (then increased to $140,000 on March 6, 2001), and the second dated May 11, 2001 in the amount of $87,500. (Ex. D (5/23/00 purchase order); ex. E (5/11/01 purchase order).)[2] The May 23, 2000 and May 11, 2001 purchase orders were issued pursuant to two semi-annual Baltimore valve requirements contracts awarded to

---

[2]    The significance of these written purchase orders is in dispute; however, that dispute is immaterial to this summary judgment motion. What is undisputed is that neither Blimline's failed February 2001 Clow order nor his successful September 7, 2001 order, discussed *infra*, coincided in any way with the issuance of either of these purchase orders. In fact, when the City placed the telephone order for Clow Valves with Rick Walston on March 27, 2000, it appears that no written purchase order was in place. Nonetheless, the City placed and paid for the order without comment or protest. (*See* ex. A (Pl.'s interrogatory responses) at 6.)

Clow on May 12, 1999 and May 2, 2001, respectively. The May 12, 1999 contract had an accompanying "estimate" of $200,000 in valve purchases, and the May 2, 2001 contract had an "estimate" of $175,000. (*See* ex. F (5/12/99 Agreement); ex. G (5/2/01 Agreement).) Because the contracts were "REQUIREMENTS TYPE CONTRACT[S]," they obligated the City to purchase its valve requirements from Clow and "OBLIGATED [CLOW] TO SUPPLY THE QUANTITIES WHICH THE CITY OF BALTIMORE REQUIRES FOR ITS OPERATION." (Ex. H ("Special Conditions" page from the City's requirements contract).) The contracts also expressly provided that the "ACTUAL REQUIREMENTS ORDERED MAY BE MORE OR LESS THAN THOSE ESTIMATED HEREIN." (*Id.*)

Blimline is primarily – if not exclusively – responsible for placing orders on behalf of the DPW, including orders for valves (ex. C (Blimline dep.) at 48-49), and he has in fact placed "many thousands" of orders on behalf of the City (ex. I (Def.'s interrogatory responses) at 13), including several valve orders. (*See also* ex. J (Williams dep.) at 13, 43.) Once Blimline places an order on behalf of the DPW, he is solely responsible for any necessary follow-up, including ensuring that the order is fulfilled properly. (*Id.* at 19-20, 24-25.) No one at the DPW is assigned to oversee Blimline's placement of orders on behalf of the City. (*Id.* at 25-26.)

After the failed February 2001 order, Tom Walston (hereinafter, "Walston") continued to call Blimline periodically to inquire whether he would be placing an order for Clow valves. (Ex. B (Walston dep.) at 97-98.) Blimline repeatedly assured Walston that he would be placing an order soon. (*Id.* at 98.)

Blimline called Walston in July of 2001 to ask for price quotes on certain types of valves, and Walston faxed to him a handwritten document containing the requested information. (*Id.* at 73-76.) Encouraged by the attempted order in February 2001 and the price quote request in July 2001, Walston continued to call Blimline periodically over the next two months to see whether

Blimline would be placing an actual order for Clow valves.  (*Id.* at 98-99.)  Blimline continued to advise Walston that an order was forthcoming.  (*Id.* at 99.)[3]

Finally, on September 7, 2001, Blimline called Walston and said: "Tom, I have an order for you."  (*Id.* at 57-58.)  Walston asked Blimline to fax the order directly to Clow's inside sales department in Iowa, but Blimline insisted on giving Walston the order over the telephone (*id.* at 56) – just as Blimline had done in February, and just as the City had done when it ordered valves in 2000 through Rick Walston.  Walston took down the order, which totaled approximately $580,000 and included numerous large valves requiring custom manufacture, and then read it back to Blimline over the telephone.  (*Id.*)  Blimline confirmed Walston's recitation of the order, and Walston told Blimline that he would be faxing the handwritten order information (attached hereto as exhibit K) to Clow in Iowa for processing and that Blimline would be receiving confirmation of his order shortly.  (Ex. B (Walston dep.) at 57.)

Shelley Terrell Shepherd, a Clow inside sales representative in Iowa, received the faxed order information from Walston and immediately called Walston to confirm receipt of the order. (Ex. L (Shepherd dep.) at 27-28.)  There were several subsequent communications between Shepherd, Walston and Blimline to confirm certain specifications for the manufacture of the valves.  (*See id.* at 28, 30-31, 35-36; ex. B (Walston dep.) at 63, 99-100.)  At no time during these exchanges or during the ordering process itself did Blimline say or do anything to indicate that he lacked authority to place the order or that he did not intend to place an order with Clow. (Ex. B (Walston dep.) at 100.)  On the contrary, Blimline's clear and consistent message

---

[3]    Blimline has no recollection of the dates or sequence of events relevant to this case.  Indeed, he does not even recall any of these events leading up to the September 2001 valve order that is the subject of this lawsuit.  He does not deny that they occurred; he simply does not remember what happened.  (*See* ex. C (Blimline dep.) at 53-55.)  Therefore, Clow Valve's version of the events leading up to the September 2001 order, as set forth above, is undisputed.

throughout the ordering, clarification and confirmation process was that he wished to order the valves at issue and that he was authorized to do so.  (*See id.*)  Moreover, Blimline's actions in ordering the valves were consistent with his prior assurances to Walston that he would be placing an order for Clow valves on behalf of the City, and his prior action, in February 2001, of attempting to place an order with Clow.  At no time did Blimline respond to Walston's sales solicitations by saying that he was not the appropriate or authorized person to make purchases for the City.

After confirming the City's order verbally and obtaining clarification through Blimline of certain manufacturing specifications, Shepherd entered the order into Clow's computer system.  (Ex. L (Shepherd dep.) at 32.)  Clow then generated two separate order acknowledgement forms containing specific information about the order, including, among other things, the quantities, prices and delivery dates of the valves Blimline had ordered.  (*See id.* at 32-33.)  As an added precaution, Shepherd faxed the first of these two order acknowledgement forms to Blimline for his review and asked Blimline to "sign off" on the first part of the order.  (*Id.* at 33; ex. M (9/24/01 fax from Shepherd to Blimline).  Shortly thereafter, Shepherd faxed the second order acknowledgement to Blimline for his review and signature and, after a follow-up call from Shepherd to remind him to sign the order acknowledgements and return them to Shepherd so that Clow could proceed with the order, Blimline signed both order acknowledgements and returned them to Shepherd.  (Ex. L (Shepherd dep.) at 33, 36; ex. N (order acknowledgments signed by Blimline).)

After receiving the signed order acknowledgements, Clow began manufacturing the valves that Blimline had ordered based on published City specifications, as well as the specifications that Blimline had conveyed.  The valves were manufactured on an expedited basis,

per Blimline's request.  (Ex. L (Shepherd dep.) at 68-69.)  Nearly all of the large and most expensive valves (16-inch and larger) were specially manufactured to the City's specifications, which specifications are incompatible with those of more than ninety percent of other potential customers, rendering these valves worthless to such customers.  (*See* ex. O (Bottenfield dep.) at 30-31; ex. P (Vore dep.) at 121-22.)  Additionally, the largest valves that Blimline ordered (30-inch and 36-inch) are today essentially obsolete and have no resale value.  (*See* ex. O (Bottenfield dep.) at 53-54.)[4]

In October, Clow began delivering the manufactured valves on a rolling basis to the City. Three different trucking companies unaffiliated with Clow made at least fifteen separate Clow deliveries between October 2 and December 18, 2001.  (Ex. I (Def.'s interrogatory responses) at 5-6; Ex. Q (Malloy aff.) at ¶ 3.)[5]  All fifteen of those deliveries were unloaded at the DPW yard on Washington Boulevard, although the delivery instructions that Clow provided to the trucking companies delivering the valves to the City instructed the driver to "PLEASE CONTACT WALT BLIMLINE 24 HRS PRIOR TO DELIVERY" and listed Blimline's Fulton Avenue office address and telephone number as the only delivery information.  (Ex. Q (Malloy aff.) at ¶ 4; ex. R (Clow invoice no. 98105971 and corresponding packing slip).)  In fact, Clow itself did not know where the City's valves were to be delivered.  (Ex. Q (Malloy aff.) at ¶ 4.)  Accordingly, the only

---

[4]    Although other municipalities also use 30-inch and 36-inch valves, they typically are less expensive butterfly valves, not the double-disk gate valves specified by the City.  (*See* ex. P (Vore dep.) at 133-34.) Additionally, until very recently, the City has stored the Clow valves that are the subject of this case outside, without protection.  This exposure to the elements, particularly ultraviolet rays, has caused the valves to deteriorate, in addition to any other physical damage they might have incurred from mishandling.  (Ex. O (Bottenfield dep.) at 43-44.)  Such physical deterioration significantly reduces the value of the valves.  For this and other reasons, even the smaller, more generic valves that the City ordered and has since retained have little or no resale value.  (Ex. P (Vore dep.) at 118-122.)

[5]    It appears as though there were actually eighteen separate deliveries of Clow valves to the City during this time period; however, the City in its interrogatory responses identified only fifteen such deliveries.  (See ex. I (Def's interrogatory responses) at 5-6.)  Resolution of this minor discrepancy is unnecessary because it is undisputed that there were at least fifteen individual deliveries of Clow valves to the City between October and December 2001.

possible way that a particular truck driver would have known to deliver the valves to the

Washington Boulevard DPW yard would have been by obtaining that information from

Blimline.[6]

It is undisputed that the City accepted all fifteen of the valve deliveries.  In fact, it was

not until December 2001 – at the end of the two-and-a-half month delivery process and after

Clow had manufactured all of the City's valves – that Blimline called Walston and asserted for

the first time that, completely contrary to everything he had said and done up to that point, he

had not ordered any Clow valves.  (Ex. B (Walston dep.) at 78-79.)  Blimline asked Walston to

fax him a copy of the order, which Walston did.  Seemingly satisfied with the information that

Walston provided him, Blimline did not object further at that time and, on the contrary, began

promising payment.[7]

Both before and after the December call to Walston, Blimline engaged in numerous

communications with Clow accounts receivable representatives without making any suggestion

---

[6]    Blimline admits that on at least one occasion after he placed the Clow order, he received a telephone call
announcing the arrival of a delivery of Clow valves.  (Ex. C (Blimline dep.) at 78-79.)  Indeed, as set forth above, it
is a near certainty that Blimline received similar notice of other Clow valve deliveries as well during the course of
the two-and-a-half month delivery process – the instructions to the various delivery truck drivers were to contact
Blimline 24 hours before delivery and the Washington Boulevard delivery address appears nowhere in those
instructions.  (See ex. Q (Malloy aff.) at ¶ 4; ex. R (Clow invoice no. 98105971 and corresponding packing slip).)
With respect to the delivery announcement that Blimline undisputedly did receive, however, rather than refusing the
delivery or contacting Clow to inquire why Clow valves were being delivered, Blimline concedes that he "didn't do
anything" after receiving the announcement.  (Ex. C (Blimline dep.) at 79.)  This concession severely undermines
the credibility of Blimline's testimony that he never ordered any valves from Clow.

[7]    Blimline testified that this conversation with Walston occurred "at the end of October," while Walston
clearly testified that it occurred in December.  (Compare ex. C (Blimline dep.) at 59 with ex. B (Walston dep.) at 78-
79.)  In addition to the fact that Blimline's subsequent testimony calls into serious doubt his ability to recall any
significant dates (see ex. C (Blimline dep.) at 61-62), Blimline's testimony is in conflict with all of the other
evidence in the record.  First, Blimline testified that during this same conversation, Walston offered to fax him the
signed order acknowledgements as proof of the order, which fax Blimline admits he received.  (Id. at 60.)  That fax
(ex. S) is dated December 20, 2001.  Blimline also testified that upon receiving the fax (dated December 20, 2001),
he went to visit his supervisor, Warren Williams, to discuss the problem  (Ex. C (Blimline dep.) at 60-61.)  Williams
testified quite clearly that this conversation with Blimline occurred in December.  (Ex. J (Williams) dep. at 31-32.)
Moreover, Blimline's testimony that he advised Walston at the end of October that he had not ordered the valves is
completely inconsistent with Blimline's own testimony that when he learned that the valves were being delivered –
which delivery did not even begin until October – he did nothing.  (Ex. C (Blimline dep.) at 79.)

that he had not placed a valve order on September 7, 2001.  On the contrary, as set forth immediately below, Blimline indicated that the City would pay for the order and, on at least two occasions, told Clow representatives that the City had issued payment for the valves.

Specifically, Clow credit analyst Jill Ferguson called Blimline on November 6, 2001 to inquire about the status of a past due payment on an invoice relating to the September 7, 2001 order.  (Ex. T (Ferguson dep.) at 18.)  Blimline asked Ferguson to fax him a copy of the invoice, which she did.  (*Id.* at 18-19.)  Ferguson again called Blimline on November 30, 2001 about that invoice and others related to the September 7, 2001 order, and Blimline advised that he would check the payment status and call Ferguson back on December 3, 2001.  (*Id.* at 19-20.)  Not having heard from Blimline on December 3, as promised, Ferguson called him again on December 7, 2001, and reached his secretary, Kathy Smith, who asked Ferguson to fax her copies of the past due invoices relating to the September 7, 2001 order.  (*Id.* at 23.)  Ferguson again faxed that information, along with proofs of delivery of the Clow valves.  (*Id.*)

Three days later, on December 10, 2001, Blimline called Ferguson and told her that the City had issued payment on the past due Clow invoices  (*Id.* at 21, 23.)  Another week later, having received no payment from the City, Ferguson called Blimline and reached Kathy Smith, who once again asked Ferguson to fax her all of the past due invoices and proofs of delivery of the Clow valves ordered on September 7, 2001, the exact same information that Ferguson had faxed to Smith ten days earlier.  (*Id.* at 23-24.)  Ferguson complied with Smith's request, yet again.  (*Id.* at 24.)  Ferguson called Blimline one final time on December 28, 2001 to check the status of the City's payment.  (*Id.* at 22-23.)

At around that same time, Blimline's supervisor, Williams, "found out that the [Clow valves] were being delivered and dropped off at Washington Boulevard."  (Ex. J (Williams dep.)

at 31.)  He did not learn this information from Blimline, however.  (*Id.*)  When Williams

questioned Blimline about the source of the valves, Blimline told him that "it was a mistake" (*id.*

at 30, 32), *i.e.*, that the Clow valves had been "[o]rdered by mistake" (*id.* at 30-31).  Blimline

then told Williams that "arrangements were being made for the valves to be picked up."  (*Id.* at

32.)  Blimline now admits that he never made any such arrangements.  (*See* ex. C (Blimline dep.)

at 71; *see also id.* at 128.)  Williams did not investigate the matter any further, nor did he bother

to contact anyone at Clow about the "mistake," instead leaving Blimline to resolve the problem

on his own.  (*Id.* at 32-33.)

Meanwhile, Clow's credit manager, Randy Malloy began calling Blimline regarding the

past due invoices and the payment that Blimline assured Ferguson had been issued.  On January

24, 2002, rather than informing Malloy of the "mistake," Blimline advised Malloy that he had

completed the necessary internal paperwork and that Clow would receive payment in about a

week.  (Ex. U (Malloy dep.) at 25.)  When Malloy spoke with Blimline again on January 30,

Blimline reiterated that he had completed and transmitted the necessary paperwork and that

payment was forthcoming.  (*Id.*)  It was not until sometime during the first week of February

2002 that Blimline advised Malloy that he had not intended to order the valves in dispute.  (*Id.* at

26.)[8]

The City offers no logical explanation for why Blimline continued until February 2002

not only to promise Clow's credit personnel that payment for the valves was forthcoming, but

also to advise that the City had, in fact, issued payment.[9]  In late December 2001, Blimline told

_____

[8]    Blimline does not dispute this testimony.  As with most other events relevant to this case, Blimline recalls
speaking with Malloy generally about valve payments, but he has no recollection at all of the timing or substance of
those conversations.  (Ex. C (Blimline dep.) at 105-06.)

[9]    The City has suggested and may argue that Blimline thought that the Clow Valve credit department calls
pertained to another Clow valve order, not the September 7, 2001 order that Blimline placed and later disavowed.
That argument lacks any basis in the summary judgment record.  First, there was no other open Clow valve order

Clow's outside sales representative Walston that he had not ordered any Clow valves.  (Ex. B

(Walston dep.) at 78-79.)  If Blimline's assertion was true, then Blimline was actively and

intentionally deceiving Malloy and Ferguson in December 2001 and January 2002 when he said

that the City had issued or was in the process of issuing payment for the Clow valves it received

in connection with the September 7, 2001 order.

Inexplicably, given the position it has adopted in this case, the City did tender two checks

in partial payment for the invoices relating to the September 7, 2001 order, although not until

several months after Blimline represented that payment had been issued, and for only a fraction

of the amount due.  The City issued the first check to Clow in the amount of $7,552.00 on April

15, 2002.  (Ex. V.)  The stub accompanying that check explicitly references a Clow invoice dated

September 24, 2001, one of several invoices relating to the September 7, 2001 order.  (*Id.*)  The

second check to Clow in the amount of $4,054 is dated April 30, 2002.  (Ex. W.)  The stub of

that check also references a Clow invoice (dated September 27, 2001) generated as a result of

Blimline's order.  (*Id.*)  The City has offered no explanation as to why it tendered those two

payments to Clow if, in fact, Blimline never ordered any Clow valves.

On April 30, 2002, at the same time the City was issuing these payments, Malloy,

Walston and Clow sales and marketing manager Michael Vore met with Blimline, his supervisor,

Williams, and two other DPW employees to discuss the September 7, 2001 order and the past

due invoices relating thereto.  At no point during this meeting or at any time prior to the

commencement of this lawsuit did anyone from the City assert that Blimline lacked the

---

pending in late 2001.  Someone other than Blimline placed an order with Clow on behalf of the City in March 2000,
a year-and-a-half earlier.  The City paid for that order in 2000 and, in any event, Blimline would have had no
knowledge of it.  The only other order that the City has placed with Clow since 2000 is Blimline's September 7,
2001 order.  Second, Ferguson faxed to Blimline and his secretary on *three separate occasions* between November 6
and December 17 the past due invoices relating to the September 7, 2001 order for Blimline's review.  (Ex. T
(Ferguson dep.) at 18-19, 23-24.)  Finally, only Blimline would have placed an order with Clow in 2001, as that was
(and is) his job responsibility.  (*See* ex. C (Blimline dep.) at 40.)

necessary authority to place the September 7, 2001 order. Rather, at the April 30, 2002 meeting,[10] Blimline reasserted that he had not ordered any Clow valves and also asserted that the September 7, 2001 phone call to Walston was merely a request for a price quote, not an order. (*See* ex. X (Vore 4/30/02 meeting minutes)).[11] The parties achieved no resolution of the dispute at the meeting, and the City issued no further payments to Clow.

On September 24, 2002, Clow filed a two-count Complaint in this Court. Count One of the Complaint seeks recovery for breach of contract based on the City's refusal to tender full payment for the September 7, 2001 order. Count Two seeks recovery on an equitable claim of unjust enrichment based on the City's retention of the Clow valves to this day.

## ARGUMENT

The undisputed facts present a clear case of contractual breach in a commonplace, unremarkable commercial transaction: Order, manufacture, delivery, acceptance, invoice, and non-payment. The City counters that no contract exists to be breached. Relying exclusively on Blimline's inconsistent and unreliable testimony, the City champions Blimline's "price quote" contention and denies that any order was ever placed. As set forth below in Part I, Blimline's testimony that the September 7, 2001 order was actually a price quote request is so patently incredible and so inconsistent with every other bit of objective and subjective evidence in the

---

[10]     This meeting had originally been scheduled for February 2002. Vore flew from Iowa to Baltimore to attend the meeting (along with Walston) only to be notified by Blimline at the scheduled start that the meeting could not take place because Williams was in the hospital for emergency surgery. (Ex. P (Vore dep.) at 112-113.) As it turns out, that explanation was false. (Ex. J (Williams dep.) at 43 (explaining that "[t]he day [Vore and Walston] came, or arrived [for the February 2002 meeting], unfortunately I was called away by my bosses . . . .")

[11]     Blimline had first asserted this "price quote" contention in January in a conversation with Walston, a few weeks after Blimline began denying having placed the order with Clow. (*See* ex. B (Walston dep.) at 80-81.)

record that no reasonable finder of fact would believe it.[12]   Indeed, the Court may and should

disregard Blimline's testimony, even on summary judgment, as it does not rise to the level of

competent evidence that can defeat a well-grounded summary judgment motion.   As discussed in

Part II, *infra*, the City by its undisputed post-order conduct has further ratified the September

2001 order and is therefore liable for the purchase price in full.   Finally, as discussed below in

Part III, even if the City is not contractually bound to pay for the valves, Clow is entitled under

equitable principles to receive compensation for the full value of the valves delivered to, and

retained by, the City.

I.     **Blimline's testimony that the September 7, 2001 order was merely a "price quote" is
       so patently unbelievable in light of the otherwise clear and undisputed record
       evidence to the contrary that the Court may reject it, even on summary judgment.**

       Although summary judgment is not typically the appropriate forum for findings of fact,

where, as here, a "rational trier of fact" could only reach one conclusion from the facts presented,

summary judgment is proper.  *Collier v. Service America Corp.*, 934 F. Supp. 168, 171 (D. Md.

1996); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (a trial is necessary

only if "there are any factual issues that properly can be resolved only by a finder of fact because

they may reasonably be resolved in favor of either party").   As the Supreme Court has noted in

the context of appellate review:

> [F]actors other than demeanor and inflection go into the decision whether or not
> to believe a witness.  Documents or objective evidence may contradict the
> witness' story; or the story itself may be so internally inconsistent or implausible
> on its face that a reasonable factfinder would not credit it.

*Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).  This principle applies equally in

the summary judgment arena, as Judge Posner recognized in *Seshadri v. Kasraian*, 130 F.3d 798,

---

[12]     Despite eventually claiming that he did not order the Clow valves that he knew were being delivered to the
Washington Boulevard DPW yard, Blimline admits that he never attempted to return the valves to Clow or to
arrange for their return.  (Ex. C (Blimline dep.) at 71.)

802 (7th Cir. 1997) (quoted with approval by this Court in *Church v. Maryland*, 180 F. Supp. 2d 708, 741 (D. Md.), *aff'd*, 2002 WL 31819679 (4th Cir. Dec. 17, 2002)).

Thus, "testimony can and should be rejected without trial if, in the circumstances, no reasonable person would believe it." *Seshadri*, 130 F.3d at 802. This case presents precisely such circumstances. Here, the testimony from the City's key – and essentially only – witness is so patently unbelievable in light of the remaining evidence in the record that no reasonable trier of fact would credit the testimony.

It is clear from the summary judgment record that Blimline asked for and received Clow price quotes in July 2001, two months prior to the order. Blimline's supervisor, Warren Williams, testified that he specifically asked Blimline "to get price quotes for various sizes of valves" in July of 2001. (Ex. J (Williams dep.) at 38-39.) Consistent with Williams' testimony, Walston testified that he received a call from Blimline asking for price quotes in July, not September. (Ex. B (Walston dep.) at 73-76.) Blimline's testimony on this point is so vague and inconsistent that it fails to create a genuine dispute of fact. First of all, Blimline had no recollection at all of the date when he requested the price quotes. (Ex. C (Blimline dep.) at 53-55.) Moreover, he specifically testified that he asked for price quotes only on 16-, 20-, 24-, 30- and 36-inch valves. (*Id.* at 111.) However, the order acknowledgement forms that Blimline received in September – which he dubiously contends he thought were price quotes – contain pricing information for four other valve sizes that Blimline had never requested. (*Id.* at 111-12.) Blimline has no explanation why Clow would have provided additional price quotes that he never requested. (*Id.* at 112.) In addition, the order acknowledgement forms address multiple valves of the same size, whereas a price quote obviously would address the price for only one valve of the specified size.

After Blimline placed the order in September 2001, he received two separate order acknowledgement forms. Shepherd asked him to review and "sign off" on these forms confirming the order. (Ex. M (9/24/01 fax from Shepherd to Blimline).) Blimline did so and returned the signed order forms to Clow. (*See* ex. N (order acknowledgements signed by Walt Blimline).) Blimline's testimony that he thought he was signing and returning price quotes is so contrary to common sense that it is wholly unbelievable. The forms that Blimline signed are clearly marked as "orders," and they contain specific quantities, delivery dates, and delivery instructions. (*See id.*) Anyone like Blimline who purchases items from third-party vendors on a daily basis would have realized that this was not a price quote.

Indeed, Blimline admits no vendor has ever asked him to sign and return a price quote. (Ex. C (Blimline dep.) at 57.) He also admits that he never even read the Clow order forms. (*Id.* at 113-14.) According to Blimline, the contents of the order acknowledgement forms were "immaterial" and "didn't make a difference to [him.]" (*Id.* at 112.) He simply signed the forms and returned them. In hindsight, reviewing the forms today, he admits that he "would have questioned" whether they were price quotes. (*Id.* at 113.) In fact, when pressed, even Blimline at this point concedes the obvious: "[I]t's an order." (*Id.* at 115.)

There is no other reasonable conclusion. If Blimline truly believed, as he now halfheartedly claims, that he had only asked for a price quote on September 7, 2001, then he affirmatively misled Clow into believing otherwise. Not only did he engage in several post-order specification and delivery discussions with Clow that would have no relevance to the simple task of obtaining a price quote, he then admittedly "didn't do anything" when he learned the following month that the Clow valves were being delivered. (Ex. C (Blimline dep.) at 79.) Even worse, if the Court were to accept Blimline's "price quote" story as true, then it would have

to believe that Blimline then induced Clow's credit department into inaction for almost four full months with empty promises of payment and false statements that payment had been issued for the valves.

The only plausible explanation in light of these events is that Blimline in fact placed an order with Clow on September 7, 2001. No rational finder of fact could interpret the summary judgment record otherwise.

**II.    In failing to repudiate the September 7, 2001 order promptly, in failing to refuse any of the at least fifteen separate valve deliveries, in failing to return to Clow the valves that Blimline had ordered, and in tendering partial payment for the order, the City ratified the order and, as a result, is liable for the entire amount of the purchase.**

**A.    No one from the City, including Blimline and his supervisor, repudiated even reasonably promptly the September 7, 2001 order and, in failing to do so, ratified the order.**

It is undisputed that on September 7, 2001, there was a requirements contract and blanket purchase order in place pursuant to which Blimline would have been generally authorized to purchase Clow valves. Blimline testified that under such circumstances, he understood that he had "general authority to purchase products on an as-needed basis." (Ex. C (Blimline dep.) at 51-52.) The City has taken the position in this case that even if Blimline was generally authorized to purchase Clow valves – which he clearly was – the scope of Blimline's authority was limited to the face amount of the requirements contract. That argument completely disregards several essential and undisputed details: (1) the City actually received approximately $580,000 worth of Clow valves over a two-and-a-half month period; (2) the City never refused any of the at least fifteen Clow valve deliveries; (3) the City (through Blimline or otherwise) did not actually repudiate the valve order until February of 2002 – four months after the valve deliveries began and almost two months after they concluded; (4) the City never attempted to

return the valves to Clow; (5) the City actually tendered two payments on the September 7, 2001 valve order; and (6) the City still has the valves in its possession.

Had Blimline truly lacked authority to place the September 7, 2001 order, either he, his supervisor or anyone else from the City who received notice of the order could have (and should have) promptly repudiated it, refused delivery of the valves – which arrived in at least fifteen separate shipments over a two-and-a-half month period – or returned the valves to Clow.  *See Maddux v. Bevan*, 39 Md. 485, 502 (1874) ("If the principal has received the proceeds, and does not disavow the acts of his agent, as soon as he can, after notice thereof, he makes them his own."); *Young v. Anne Arundel County*, 146 Md. App. 526, 597, 807 A.2d 651, 693 (he who does not promptly repudiate an allegedly invalid contract "may be deemed to have ratified the contract because of his silence and failure to act"), *cert. denied*, 372 Md. 432, 813 A.2d 259 (2002); *Progressive Casualty Ins. Co. v. Ehrhardt*, 69 Md. App. 431, 442, 518 A.2d 151, 156 (1986) ("Circumstances that suggest an intent to ratify include . . . a failure to make a timely disaffirmance of the unauthorized acts."); *see also Silling v. Erwin*, 885 F. Supp. 881, 895 (S.D. W. Va. 1995) ("Where with knowledge of the terms of the contract made by his agent, the principal accepts benefits thereunder under such circumstances as would make it his duty to promptly repudiate if he did not desire to be bound, he will be deemed to have ratified and confirmed the act of his agent" (internal quotation marks omitted)), *aff'd*, 83 F.3d 416 (4th Cir. 1996).  The City did not do any of these things.

Blimline himself admits that when he first learned that the Clow valves he ordered were being shipped to the Washington Boulevard DPW yard beginning in early October 2001, he "didn't do anything."  (Ex. C (Blimline dep.) at 79.)  In fact, he never undertook any efforts to refuse delivery of any of the many Clow valve shipments.  (*Id.* at 128.)  Even worse, for almost

four months thereafter, Blimline repeatedly promised Clow payment and went as far as twice

confirming that payment had been tendered for the valves.  (Ex. T (Ferguson dep.) at 18-24; ex.

U (Malloy dep.) at 25-26.)

Moreover, in December 2001, upon learning that Blimline had ordered almost $600,000

in valves "by mistake," Williams, too, did nothing.  (Ex. J (Williams dep.) at 30-33.)  Having

completely failed to act, let alone repudiating the order promptly, the City tacitly ratified the

order and cannot now disavow the order by claiming that Blimline lacked the authority to place

it.  The City's post-order conduct here completely undermines any such claim.[13]

> **B.    In accepting and retaining the benefits of the September 7, 2001 order, the City has ratified the order, whether it was authorized or not.**

It has long been the law in Maryland (and elsewhere) that where an agent acts without

actual or apparent authority, as the City claims Blimline acted here in placing the September 7,

2001 order, the principal may nonetheless ratify and become liable for the unauthorized conduct

by accepting the benefits thereof.  *See*, *e.g.*, *Citizens Bank of Maryland v. Maryland Indus.

Finishing Co., Inc.*, 338 Md. 448, 464 n.9, 659 A.2d 313, 320 n.9 (1995) ("One way for a

principal to ratify an act by conduct is to accept a benefit that it would not have received but for

the previously unauthorized act."); *Smith v. Merritt Savings and Loan, Inc.*, 266 Md. 526, 537,

295 A.2d 474, 480 (1972) ("[T]he principal's retention of the fruits of an unauthorized act of the

agent serves as ratification of that act."); *Ehrhardt*, 69 Md. App. at 442, 518 A.2d at 156,

---

[13]    To the extent that the Uniform Commercial Code ("U.C.C.") applies here, the result is the same.  Under the U.C.C., the City's inaction also precludes it from arguing that it did not place an order for Clow valves.  *See* Md. Commercial Law Code Ann. § 2-602(1) ("Rejection of goods must be within a reasonable time after their delivery or tender.  It is ineffective unless the buyer seasonably notifies the seller."); *see also id*. § 2-606(1) ("[a]cceptance of goods occurs when the buyer . . . [f]ails to make an effective rejection (subsection (1) of § 2-602) . . . [or d]oes any act inconsistent with the seller's ownership"); *id*. at § 2-607(1) ("The buyer must pay at the contract rate for any good accepted.").

("receipt and retention of the benefits of the unauthorized transaction" evinces an intent to ratify).

The City clearly ratified the September 7, 2001 order by accepting at least fifteen separate valve shipments over the course of two-and-a-half months without any objection whatsoever, and by retaining the valves to this day. Indeed, the City's failure to refuse delivery of the valves or return the shipments promptly to Clow only exacerbated the situation. As noted above, many of the valves were manufactured to the City's specifications. Had Clow received prompt notice through refused delivery that there was a problem with the order, it could have ceased the manufacturing and shipment process. In light of the City's silence and acceptance of the initial orders, however, Clow dutifully and diligently worked to complete the valves and ship them to the City on the expedited basis that Blimline had requested. This lawsuit by Clow, seeking to recover from the City nearly $600,000 in full payment for Blimline's order, is the fruit of the seed sown by the City's inaction. At the very least, prompt return of the first shipment would have greatly minimized the damages Clow has incurred here.

### C.    In tendering partial payment for the September 7, 2001 order, the City has ratified Blimline's placement of the order.

Perhaps most significantly, the City actually tendered payments in April 2002 for the first two valve shipments before finally refusing to make any further payments. Thus, the City has undisputedly paid for part – albeit a small part – of the September 7, 2001 valve order. Those undisputed partial payments alone permit the Court to find as a matter of law that the City ratified Blimline's allegedly unauthorized order in its entirety:

> It is well settled in Maryland and generally that the liability of a ratifying principal, after knowledge of all of the relevant facts, is not limited to the extent of the benefits retained by him because the principal cannot ratify a transaction in part and repudiate it as to the rest. The principal must either adopt the whole transaction or none at all.

*Smith*, 266 Md. at 538, 295 A.2d at 481; *see also Maddux*, 39 Md. at 502 ("The general rule is

well settled, that the ratification in part, operates to confirm the whole."); *NYSA-ILA Med. and*

*Clinical Svcs. Fund v. Carco, Inc.*, 607 F. Supp. 1217, 1220 n.1 (D.N.J. 1985) (summarily

rejecting defendant's argument that contract was invalid where defendant "ratified the contract

by making six payments [thereon] after its execution").

Accordingly, even if Blimine lacked apparent authority to place the September 7, 2001

order – as the City contends, but Clow denies – the City's undisputed partial payment for the

order subsequently ratified Blimline's allegedly unauthorized placement of the order and

prevents the City from now arguing that the resulting contract for the purchase of approximately

$580,000 worth of Clow valves is either invalid or unenforceable.  *Cf. Kaskel v. Northern Trust*

*Co.*, 328 F.3d 358, 360 (7th Cir. 2003) (depositor ratified contract that bank breached in funding

loan by thereafter accepting partial payments on the loan) (Posner, J.).  Clow is therefore entitled

to judgment as a matter of law on its breach of contract claim set forth in Count I of the

Complaint.[14]

---

[14]     In arguing that the City ratified the September 7, 2001 order as a matter of law, Clow is not conceding in any way that Blimline lacked apparent authority to place the order.  However, the Court need not and should not address the apparent authority issue at the summary judgment stage given that some of the facts relevant to its resolution remain in dispute, including what Clow knew about Blimline's authority to order valves.  Nonetheless, the facts supporting an apparent authority argument at this stage of the case are compelling.  For example, throughout the entire process leading up to this litigation, even during the final April 30, 2002 meeting between the City and Clow, no one from the City (including Blimline) ever asserted that Blimline lacked the authority to place the September 7, 2001 order.  Rather, toward the end of that process, Blimline simply asserted that he did not place an order for Clow valves.  Additionally, the valve requirements contracts on which the City now so heavily relies provide only estimated requirements, not specific limits on the amount of valves that the City may or will purchase thereunder.  Other large municipalities with which Clow deals – including, for example, the City of Los Angeles – routinely exceed such estimates.  (Ex. P (Vore dep.) at 132.)  Similarly, the City itself apparently does not view written purchase orders as dictating the specific authority of a particular purchasing agent, having placed and paid for at least one verbal Clow order in the absence of any underlying purchase order.

III.    **Even if the City is not legally bound to pay for the Clow Valves currently in its possession, established principles of equity require that it pay Clow for these valves because the City has been unjustly enriched in receiving and retaining them.**

Particularly in light of Blimline's grossly negligent and even deceptive conduct, as well as his supervisors' utter failure to correct or mitigate the damage resulting therefrom, this is a case that cries out for imposition of an equitable remedy if the Court is unable to grant summary judgment on Count I. Clow's unjust enrichment claim, as set forth in Count II of the Complaint, provides a basis for such equitable relief, and *SSDS, Inc. v. Mayor and City Council of Baltimore*, 2000 WL 718388 (4th Cir. June 5, 2000) (attached hereto as ex. Y), makes clear that Clow is entitled to such relief given the undisputed facts of this case.

In *SSDS*, the Baltimore City Public Schools ("BCPS") hired a new Director of Management Information Services named Richburg to upgrade its computer system. As part of the BCPS computer system upgrade project, Richburg signed an agreement retaining his former employer, SSDS, as a consultant on the project. For the next six months, SSDS provided on-site consulting services to the BCPS in connection with the upgrade project and sent monthly invoices to the BCPS for its services. When the BCPS's Chief Financial Officer first questioned Richburg about the invoices, Richburg advised that the invoices were a "mistake" and that SSDS was actually providing its consulting services without charge. At the same time, however, Richburg was promising SSDS that the BCPS would pay its outstanding invoices. *Id.* at *1.

After six months, at which point SSDS had billed the BCPS nearly $150,000, Richburg was no longer able to maintain both stories, and the BCPS refused to pay SSDS's invoices on the grounds that "Richburg had no authority to contract on the school system's behalf and that, in any event, the Board [of Estimates] had never approved any of the work." *Id.* SSDS then filed suit in this Court.

Under these facts, Judge Garbis held that SSDS was entitled to recover the full amount of its services to the BCPS, plus prejudgment interest, pursuant to the equitable doctrine of unjust enrichment. *Id.* at *2. The Fourth Circuit affirmed, noting that full recovery under such circumstances is warranted

> 'upon the theory that it is not justice, where a contract is entered into between a municipality and another, in good faith, and the [municipal] corporation has received benefits thereunder, to permit the municipality to retain the benefits without paying the reasonable value therefor, the same as a private corporation or individual would have to do.'

*Id.* (quoting *Konig v. Mayor & City Council of Baltimore*, 128 Md. 465, 480, 97 A. 837, 842 (1916)); *see also Schiavi v. Mayor & City Council of Baltimore*, 40 F. Supp. 184 (D. Md. 1941) ("[W]here a contractor with a municipal corporation performs work or supplies materials which are not included in his contract, and they are accepted and retained by the municipal corporation and are beneficial to it, there arises an implied obligation on the [municipal] corporation to pay therefor on the basis of the reasonable value thereof, that is, on a quantum meruit.").

As the Fourth Circuit noted, "[i]n order to prevail on its claim of unjust enrichment, [a plaintiff] must demonstrate that: (1) it conferred on the City a benefit; (2) that was appreciated or known by the City; and (3) the City's acceptance thereof was under such circumstances as to make it inequitable for the City to retain the benefit without the payment of its value." *SSDS*, 2000 WL 718388, at *2. As was the case in *SSDS*, there is no question here that Clow conferred on the City a benefit in the form of approximately $580,000 in valves, and that the City had knowledge of this benefit.

In concluding that the final element of unjust enrichment had been satisfied as well, Judge Garbis in *SSDS* focused on the following facts:

> (1) that BCPS employees accepted and participated in the extensive preparation work, all in the expectation that SSDS would be paid; (2) the particular actions of

Richburg, who misled SSDS as to the scope of his authority and gave false assurances of payment; (3) the complex and inconsistently applied procurement policies of BCPS; (4) that other companies providing goods and services in connection with the upgrade were paid, notwithstanding the lack of prior Board [of Estimates] authorization; and (5) at least one SSDS invoices was approved for payment (though apparently not paid) by the BCPS Expenditure Contract Committee.

*Id.* at *2. The Fourth Circuit agreed that those facts "militate[d] strongly in favor of affirming the judgment" in favor of SSDS. *Id.*

The undisputed facts here are even more compelling. Specifically, the City and Blimline engaged in the following inequitable conduct:

(1) the City accepted and retained at least fifteen separate shipments of Clow valves in connection with the September 7, 2001 order over a two-and-a-half month period without any objection whatsoever;

(2) upon learning in October 2001 that Clow valves were actually being delivered to the Washington Boulevard DPW yard, Blimline admittedly "didn't do anything," even though he claims that he had not ordered any Clow valves, and even though at that point he could have halted the manufacturing and delivery process, thereby significantly mitigating the damages that Clow has suffered in this case;

(3) Williams, Blimline's supervisor, also did nothing at all upon learning that the Clow valves were being delivered to the Washington Boulevard DPW yard, even though Blimline had advised Williams that the valves had been "[o]rdered by mistake."

(4) from the beginning of October 2001 through the end of January 2002, Blimline repeatedly misled Clow with empty promises of future payment of Clow invoices relating to the September 7, 2001 order, and on at least two occasions, falsely represented to Clow that payment had in fact been issued – even more egregious conduct than what Richburg did in *SSDS*;

(5) even beyond approving certain invoices for payment, as the City did in *SSDS*, the City actually issued two separate payments to Clow expressly for invoices relating to the September 7, 2001 order;

(6) Blimline did not repudiate the valve order until February of 2002 – almost four months after the valve deliveries began and almost two months after they concluded;

(7) until this matter proceeded to litigation, no one from the City ever asserted that Blimline lacked the authority to place the September 7, 2001 order; and

(8) the City has never undertaken any effort to return the valves to Clow. [15]

All of these facts make it entirely unjust for the City to have retained the Clow valves in this case – which now have little or no resale value – for the past year-and-a-half.  Under these facts, and pursuant to *SSDS* and the equitable principles of unjust enrichment set forth above, Clow is entitled to summary judgment on Count II of the Complaint.

## CONCLUSION

For the reasons stated above, Clow is entitled to judgment as a matter of law on Counts I and II of its Complaint pursuant to Fed. R. Civ. P. 56.

Respectfully submitted,


_____/s/_____
Otho M. Thompson
Mark D. Maneche
Venable, Baetjer and Howard, LLP
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland  21201
(410) 244-7400

Jayna Partain Lamar
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2618
(205) 254-1000

*Attorneys for Plaintiff Clow Valve Company, a division of McWane, Inc.*

---

[15]     Further adding to the inequity of the situation that the City has created is the fact that Clow has spent approximately $400,000 in materials, manufacturing, delivery and related costs as a direct result of the City's conduct in this case.  (Ex. Q (Malloy aff.) at ¶ 6.)