**ORIGINAL**　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 1

```
1            IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3    CLOW VALVE COMPANY,          :

4            Plaintiff            :

5    vs.                          :   Case No.:

6    MAYOR AND CITY COUNCIL OF    :   JFM 02-3136

7    BALTIMORE CITY,              :

8            Defendant            :

9            ------------------------

10       Deposition of WALTER L. BLIMLINE, called for

11   examination by Counsel for the Plaintiff, having been

12   sworn by Martin J. Giordano, Registered Merit Reporter,

13   and a Notary Public in and for the State of Maryland,

14   taken at The Law Offices of Venable, Baetjer and

15   Howard, 2 Hopkins Plaza, Suite 1400, Baltimore,

16   Maryland, at 11:15 a.m., on Wednesday, April 2, 2003.

17           ------------------------

18

19

20   Reported by:

21   Martin J. Giordano, RMR
```

**Page 10**

1   A. Yes.
2   Q. What years?
3   A. '60 -- April the 12th, 1964.
4   Q. '64 through '65?
5   A. Yes.
6   Q. Okay. So one year basically?
7   A. (Witness nodding head in the affirmative.)
8   Q. What did you do between 1958 and 1964?
9   A. Worked.
10  Q. Okay. What branch of the services were you
11  in?
12  A. Army.
13  Q. And where was your tour, or where were you
14  posted?
15  A. Fort Knox, Kentucky.
16  Q. Honorably discharged?
17  A. (Witness nodding head in the affirmative.)
18      MR. ANBINDER: Speak up.
19  A. Yes.
20  Q. I'm sorry. You have to answer audibly for
21  the court reporter.

**Page 11**

1   A. Yes. I'm retired.
2   Q. Retired from --
3   A. The Army.
4   Q. Okay. When did you begin working for the
5   City of Baltimore?
6   A. August the 24th, 1971.
7   Q. Okay. What were you doing between 1967 and
8   1971 after you left The Baltimore Institute and before
9   you began --
10  A. Work.
11  Q. -- work for the City?
12  A. Work.
13  Q. For whom?
14  A. Bethlehem Steel.
15  Q. Okay. Did you work for Beth Steel that
16  entire time?
17  A. No. Worked at Bethlehem Steel '69 and '70.
18  Q. Okay.
19  A. '69 into '70.
20  Q. What did you do at Beth Steel?
21  A. A scheduling clerk in the 56- and 68-inch hot

**Page 12**

1   strip mill.
2   Q. I'm sorry. I didn't --
3   A. Scheduling clerk in the 56-, 68-inch hot
4   strip mill.
5   Q. Okay. And what job did you hold between '67
6   and '69?
7   A. I worked for a magazine company.
8   Q. Okay. Doing what? Do you recall?
9   A. Sales. It was called Home Reader Service.
10  Q. Is that in Baltimore?
11  A. They were located in the -- they were located
12  on Harford Road and Hamilton Avenue.
13  Q. All right. And, when you were working at
14  Beth Steel, where were you? Where were you located?
15  A. Sparrows Point.
16  Q. Okay. When you came to work for the City of
17  Baltimore in 1971, what position did you receive?
18  A. Laborer.
19  Q. Okay. You were a laborer where?
20  A. 2695 West Franklin Street, Waste Water
21  Section.

**Page 13**

1   Q. All right. What was the next position that
2   you attained in the City?
3   A. Gang leader.
4   Q. Okay. What year?
5   A. I'm not positive. I think it was '73.
6   Q. Okay. Was this also in the Waste Water
7   Division?
8   A. Yes.
9   Q. Okay. And then -- let's see. You became a
10  Storekeeper I; is that right?
11  A. I became a storekeeper.
12  Q. Okay. When was that?
13  A. I'd say about '79 or '80. I'm not positive.
14  Q. All right. As a storekeeper, you were
15  working in the Waste Water Division also?
16  A. Yes, I was.
17  Q. What were your duties and responsibilities as
18  a storekeeper?
19  A. I took care of the storeroom, issued the
20  supplies and materials.
21  Q. Did you have any responsibilities that

**Page 14**

1  allowed you to order --
2  A. No. I did not order.
3  Q. -- products? Okay.
4  What's the difference between a Storekeeper I
5  and a Storekeeper II?
6  A. Storekeeper II has a little more
7  responsibilities, and -- that's about it. More
8  responsibilities.
9  Q. Okay. At some point, you became a
10 Storekeeper II, right?
11 A. Pardon?
12 Q. At some point, you became a Storekeeper II;
13 is that correct?
14 A. That is correct.
15 Q. When was that?
16 A. Maybe a year or two after I became a
17 Storekeeper I. I'm not positive of the date.
18 Q. All right. How did your duties and
19 responsibilities change from becoming a Storekeeper I
20 to becoming a Storekeeper II?
21 A. I would do the inventories, or help with the

**Page 15**

1  inventories, also would fill out the material tickets
2  and authorization tickets for materials to be ordered.
3  Q. Did you have authority as a Storekeeper II to
4  actually place orders?
5  A. No.
6  Q. What is an authorization ticket to place an
7  order?
8  A. I would make up the -- a requisition and send
9  it to the store supervisor, who would then do the
10 ordering.
11 Q. Okay. At some point, then, you became a
12 store supervisor; is that correct?
13 A. That's -- that was '94.
14 Q. 1994? Is that the same position you hold
15 currently?
16 A. Yes.
17 Q. Are you a Store Supervisor I, or a Store
18 Supervisor II?
19 A. I.
20 Q. Okay. Did you ever apply to be a Store
21 Supervisor II?

**Page 16**

1  A. No.
2  Q. Never did?
3  A. No.
4  Q. Didn't fill out an application to be a Store
5  Supervisor II?
6  A. No.
7  Q. Didn't file an application to be a Store
8  Supervisor II?
9  A. Not to my knowledge.
10 Q. Okay.
11 MR. MANECHE: Mark that as 1.
12 (Whereupon, Blimline Deposition Exhibit
13 No. 1, application, was marked for identification.)
14 BY MR. MANECHE:
15 Q. Mr. Blimline, let me show you what's been
16 marked as Exhibit 1, and let me ask you if you
17 recognize that document?
18 MR. ANBINDER: Take your time.
19 (Witness perusing document.)
20 A. Yeah. I recognize it.
21 Q. Is that your signature on the last page?

**Page 17**

1  A. Yes, it is.
2  Q. Can you tell me what this is?
3  A. It's the application for the Store Supervisor
4  II.
5  Q. Okay. So you did actually apply for a Store
6  Supervisor II position; is that correct?
7  A. Evidently.
8  Q. You don't recall that?
9  A. No, I don't.
10 Q. Okay.
11 A. Because I turned down the position.
12 Q. You turned down the position, or you were
13 turned down for the position?
14 A. I turned the position down.
15 Q. Why did you turn it down?
16 A. Well, the position makes you a salary
17 employee.
18 Q. Okay.
19 A. And, by being a salary employee, you weren't
20 eligible for overtime, or paid overtime, so I turned
21 the position down.

Page 46

1  A. No.
2  Q. No one from Kennedy called you to confirm the
3  order for $400,000?
4  A. No. They had a purchase order in hand.
5  Q. Okay. So that was the end of it as far as
6  you were concerned?
7  A. Well, they --
8      (Whereupon, Mr. Severn leaves the room.)
9  A. There was no need for me to talk to them.
10 Q. Okay. How did they know when to deliver the
11 valves, where to deliver them?
12 A. It's sitting right on -- it's right on the
13 purchase order where to deliver them.
14 Q. Is that always the case?
15 A. No.
16 Q. Okay. So, with regard to some purchase
17 orders, there is a need for subsequent telephone
18 conversation, isn't there?
19 A. Yes, because some purchase orders are on a
20 need basis.
21 Q. Okay.

Page 47

1  A. We have a blanket purchase order for a
2  million bags of cement. I call the company whenever
3  we're ready for a delivery --
4  Q. Right.
5  A. -- and we pay for it as it comes in.
6  Q. Okay. So, in the context of a blanket
7  purchase order, the actual order for a specific
8  delivery is placed by you, isn't it?
9  A. Yeah.
10 Q. Okay.
11 A. Now -- no. Hold on. I only fill out the
12 paperwork. If I want to order a million bags of
13 cement, I fill out the paperwork --
14 Q. No. I understand that.
15 A. -- and then it goes to Purchasing, and you go
16 out on bid, and then I get a copy of the purchase
17 order, which gives me authorization to start buying off
18 of that purchase order.
19 Q. Right. So, when you have authorization to
20 start buying off of a purchase order, in order to place
21 a specific order for, let's say, 500 bags of cement,

Page 48

1  then you have to call the vendor and say, send me --
2  A. Deliver it.
3  Q. -- 500 bags of cement; deliver it on X date
4  on X yard, right?
5  A. Right. Correct.
6  Q. Okay. Have you ever done that in connection
7  with a valve order? I mean, you told me about the --
8  let me start over. You told me about the Kennedy Valve
9  transaction.
10 A. Yeah.
11 Q. According to you, there were no telephone
12 calls at all?
13 A. No.
14 Q. It was all done by paperwork, correct?
15 A. Right.
16 Q. Have there ever been any valve orders in
17 which you have been involved that were not done
18 completely by paperwork, that involved telephone calls
19 or some other manner of communication?
20 A. Okay. We have -- we have a contract in place
21 with Clow Valve on as we need basis. Whenever we

Page 49

1  needed the valves, we would call and say, off of this
2  contract number, we need X amount of valves shipped to
3  our Washington Boulevard yard.
4  Q. And you're the one that would make that call,
5  right?
6  A. Yes.
7  Q. Okay. And you did make calls like that,
8  didn't you?
9      MR. ANBINDER: Objection.
10 A. To who?
11 Q. To anyone at Clow.
12 A. No.
13 Q. You never made that type of a phone call to
14 Clow?
15 A. No.
16 Q. Okay. Did anyone ever make that type of a
17 phone call to Clow that you're aware of?
18 A. Not that I'm aware of.
19 Q. Okay. Never spoke with anyone at Clow at
20 all?
21 A. Yeah. I've spoke to people at Clow.

### Page 50

1  Q. Okay. When is the first time --
2      MR. KING: Excuse me. Can we go off the
3  record and perhaps just talk to Bob for one minute?
4      MR. ANBINDER: Yeah. I -- there is --
5      MR. KING: I think there is a little
6  misunderstanding, at least from this person's point of
7  view.
8      MR. ANBINDER: The misunderstanding is that
9  deals with order and authority, and I think you're --
10     MR. KING: No. That's not what I'm --
11     MR. ANBINDER: Okay. We're talking about
12 different things, but can I take a break?
13     MR. MANECHE: All right.
14     (Recess taken.)
15     MR. MANECHE: Martin, could you read the last
16 question and answer back?
17     (The record was read as requested.)
18     MR. ANBINDER: Now are you going to clarify
19 in your question, or do you want me to -- we -- I'll
20 put this on the -- try and put this on the record.
21     Counsel had an opportunity to talk during the

### Page 51

1  short break to indicate the City's concern that the
2  question might have been unclear as to whether or not
3  it was a hypothetical or not, or whether we're talking
4  about something actual, and Mr. Maneche is aware of
5  that, and I think we'll try and clarify that.
6      MR. MANECHE: Well, I think that it will be
7  clarified by my subsequent questions. If it's not, you
8  all of course are welcome to clarify it on redirect.
9      BY MR. MANECHE:
10 Q. Let me just be certain I understand your
11 testimony, Mr. Blimline, as to what your authority to
12 place orders is. My understanding from what you told
13 me is your understanding is you have authority up to
14 $1,000 to place a direct order for a product or
15 products with a third-party vendor; is that correct?
16 A. That's absolutely correct.
17 Q. Okay. Beyond a thousand dollars, you can
18 only operate pursuant to a purchase order; is that
19 correct?
20 A. That's correct.
21 Q. And then, within the world of purchase

### Page 52

1  orders, there are two types of purchase orders; is that
2  right -- there is a specific purchase order for
3  specific products, and then there is what's called a
4  blanket purchase order, which gives you general
5  authority to purchase products on an as-needed basis;
6  is that correct?
7  A. That's correct.
8  Q. Okay.
9  A. And there is a third.
10 Q. What's the third?
11 A. That's the confirming purchase order, which
12 is under -- only used under emergency conditions.
13 Q. All right. Besides the Mueller transaction,
14 have you ever purchased valves on an emergency basis?
15 A. No.
16 Q. Okay. That was on an emergency basis,
17 though, yes?
18 A. Yeah.
19 Q. That's called a confirming order?
20 A. Yes.
21     MR. ANBINDER: It was a confirming purchase

### Page 53

1  order.
2      THE WITNESS: Confirming purchase order.
3      MR. MANECHE: Confirming purchase order.
4  Okay.
5      BY MR. MANECHE:
6  Q. Subsequent to your introductory meeting with
7  Tom Walston, when is the next time you recall having
8  any contact with anyone at Clow Valve, either in person
9  or by telephone?
10 A. I remember talking to Tom Walston again. I
11 mean, I remember talking to him again.
12 Q. Do you remember when that was -- the first
13 time you talked to him after that?
14 A. I don't know how long after I talked to him
15 the first time or met him the first time, which I can't
16 remember. I talked to him a couple times. I don't
17 know the sequence of time. I don't know how much time
18 was in between.
19 Q. All right. Do you recall talking to him on
20 the telephone sometime in 2001?
21 A. Pardon me? 2001?

### Page 54

1  Q. Yeah.
2  A. I'm not -- I'm not sure of dates -- of the
3  dates, but I know I called him. I called him.
4  Q. All right.
5      MR. ANBINDER: The question was: Do you
6  remember?
7  A. Yeah. I called him.
8  Q. Okay. And what do you remember about that
9  telephone call?
10 A. I asked him for price quotes on valves.
11 Q. All right. Did you ask him for price quotes
12 on specific types of valves?
13 A. Yes.
14 Q. All right. Do you remember how many types of
15 valves you asked for price quotes on?
16 A. Five. Five different valves.
17 Q. Five different types of valves?
18 A. Five different sizes of valves.
19 Q. Five different sizes of valves. Okay.
20     Did you ask him for price quotes on a
21 specific quantity of types of valves?

### Page 55

1  A. No. Just --
2  Q. Just give me a quote on a 30-inch valve?
3  A. Right.
4  Q. Okay. What else did you speak to him about
5  during that particular conversation?
6  A. That was -- that was it.
7  Q. And you don't recall when that conversation
8  occurred?
9  A. No, I don't.
10 Q. Do you recall if it was at or around, before
11 or after the time of the World Trade Center attack?
12 A. (Witness shaking head in the negative.)
13 Q. No recollection at all?
14 A. No.
15 Q. What did Mr. Walston state to you during that
16 conversation?
17 A. That he'd get back to me with a quote.
18 Q. And did he?
19 A. No.
20 Q. He never did?
21 A. Well, he did. Yes, he did, but it was a

### Page 56

1  couple weeks later. And I'm not positive it was a
2  couple weeks. It could have been ten days, or eight
3  days, or seven days, but it was a little while
4  afterwards. He called me back, and he asked me if I
5  got the price quotes, and I said, "No."
6  Q. And that was the end of it?
7  A. He said that he would get Shelley to fax me
8  the -- oh! He said Shelley told him that she faxed
9  them to me. I said, "Well, I never got them."
10 Q. Okay. Did you eventually get them after
11 that?
12 A. He said that he would have Shelley fax them
13 to me that day, and me to sign the fax that I received
14 the price quotes, and send it back to him.
15 Q. Is that something that other vendors have
16 asked you to do -- to sign price quotes and return them
17 to them?
18 A. No.
19 Q. Didn't you think that was unusual -- that
20 request?
21 A. No. No. I really didn't.

### Page 57

1  Q. Okay. And you complied?
2  A. Thought never entered my mind.
3  Q. Did you comply with the request?
4  A. Yeah.
5  Q. Has any other vendor ever asked you to do
6  that -- to sign a price quote and return the signed
7  price quote back to them? Anyone. It doesn't have to
8  be a valve vendor.
9  A. Not to my knowledge.
10 Q. Okay. After you signed the price quote, as
11 you say, and returned it to Shelley, then what
12 happened?
13 A. What do you mean? I don't know what you
14 mean.
15 Q. What was your next contact with Clow, or
16 their contact with you?
17 A. The next contact with Clow?
18 Q. Yes.
19 A. I don't recall. I don't know how all the --
20 after that, that I heard from him.
21 Q. Okay. At some point during the process, you

**Page 54**

1  Q. Yeah.
2  A. I'm not -- I'm not sure of dates -- of the
3  dates, but I know I called him. I called him.
4  Q. All right.
5     MR. ANBINDER: The question was: Do you
6  remember?
7  A. Yeah. I called him.
8  Q. Okay. And what do you remember about that
9  telephone call?
10  A. I asked him for price quotes on valves.
11  Q. All right. Did you ask him for price quotes
12  on specific types of valves?
13  A. Yes.
14  Q. All right. Do you remember how many types of
15  valves you asked for price quotes on?
16  A. Five. Five different valves.
17  Q. Five different types of valves?
18  A. Five different sizes of valves.
19  Q. Five different sizes of valves. Okay.
20     Did you ask him for price quotes on a
21  specific quantity of types of valves?

**Page 55**

1  A. No. Just --
2  Q. Just give me a quote on a 30-inch valve?
3  A. Right.
4  Q. Okay. What else did you speak to him about
5  during that particular conversation?
6  A. That was -- that was it.
7  Q. And you don't recall when that conversation
8  occurred?
9  A. No, I don't.
10  Q. Do you recall if it was at or around, before
11  or after the time of the World Trade Center attack?
12  A. (Witness shaking head in the negative.)
13  Q. No recollection at all?
14  A. No.
15  Q. What did Mr. Walston state to you during that
16  conversation?
17  A. That he'd get back to me with a quote.
18  Q. And did he?
19  A. No.
20  Q. He never did?
21  A. Well, he did. Yes, he did, but it was a

**Page 56**

1  couple weeks later. And I'm not positive it was a
2  couple weeks. It could have been ten days, or eight
3  days, or seven days, but it was a little while
4  afterwards. He called me back, and he asked me if I
5  got the price quotes, and I said, "No."
6  Q. And that was the end of it?
7  A. He said that he would get Shelley to fax me
8  the -- oh! He said Shelley told him that she faxed
9  them to me. I said, "Well, I never got them."
10  Q. Okay. Did you eventually get them after
11  that?
12  A. He said that he would have Shelley fax them
13  to me that day, and me to sign the fax that I received
14  the price quotes, and send it back to him.
15  Q. Is that something that other vendors have
16  asked you to do -- to sign price quotes and return them
17  to them?
18  A. No.
19  Q. Didn't you think that was unusual -- that
20  request?
21  A. No. No. I really didn't.

**Page 57**

1  Q. Okay. And you complied?
2  A. Thought never entered my mind.
3  Q. Did you comply with the request?
4  A. Yeah.
5  Q. Has any other vendor ever asked you to do
6  that -- to sign a price quote and return the signed
7  price quote back to them? Anyone. It doesn't have to
8  be a valve vendor.
9  A. Not to my knowledge.
10  Q. Okay. After you signed the price quote, as
11  you say, and returned it to Shelley, then what
12  happened?
13  A. What do you mean? I don't know what you
14  mean.
15  Q. What was your next contact with Clow, or
16  their contact with you?
17  A. The next contact with Clow?
18  Q. Yes.
19  A. I don't recall. I don't know how all the --
20  after that, that I heard from him.
21  Q. Okay. At some point during the process, you

Page 62

1  A. I don't know. I can't answer that. I don't
2  know.
3  Q. So you don't recall when you told him?
4     MR. ANBINDER: Objection.
5  Q. Isn't that what you just said? You don't
6  recall the date?
7  A. I don't know the specific date. I don't
8  know. I really don't know.
9  Q. Okay.
10 A. I thought it -- I thought it was November.
11 Maybe it wasn't November. I -- it could have been
12 December. It could have been January. I don't
13 remember exactly.
14 Q. Could it have been even later than January?
15    MR. ANBINDER: Objection.
16 A. I don't know. I really don't know.
17    MR. ANBINDER: He's made that rather clear.
18 A. I don't know.
19 Q. So it could have been; yes?
20 A. I don't know.
21 Q. If you don't recall when you spoke with

Page 63

1  Warren Williams first about this mix-up with the Clow
2  Valve order, do you recall what you told him?
3  A. Yeah. I remember telling him that -- in
4  fact, I showed him the paper that Mr. Walston sent me.
5  Q. Okay.
6  A. I think I showed him that paper.
7  Q. All right. What did he say?
8  A. He asked me if I ordered them. I said, "No."
9  I said, "I can't order something that I can't pay for."
10 Q. Was there any more to the conversation?
11 A. I don't -- I really don't know. It's just
12 been so long, I can't remember.
13 Q. Okay. So you don't recall whether
14 Mr. Williams said, "Take care of the problem. Call --"
15 A. He might have. I don't remember.
16 Q. You don't remember anything he said after
17 that?
18 A. No. He could have said that. I don't know.
19 Q. So what did you do then? What did you do
20 after you received the fax copy of the order from Clow
21 Valve and then took it to Mr. Williams, as you say,

Page 64

1  although you don't recall the date? What did you then
2  do?
3  A. In the -- at that particular time, we got
4  another order of valves in for our contractor under one
5  of those purchase orders like I was telling you about.
6  Q. Was it an order that came from Clow?
7  A. I'm not positive.
8  Q. Okay. Some other order came in?
9  A. Kennedy valves and Clow valves have the same
10 name on them. Kennedy valves are made by Clow Valve.
11 Q. Okay. Well, that's your opinion.
12    MR. ANBINDER: Well, that's --
13    MR. MANECHE: Actually, that's --
14    MR. ANBINDER: That's what you're asking him.
15    MR. MANECHE: No. I didn't ask him that at
16 all. He's volunteering information at this point.
17 There is no question pending, but --
18    MR. ANBINDER: He's trying to work out the
19 confusion in his mind. I think he's still trying to be
20 responsive.
21    BY MR. MANECHE:

Page 65

1  Q. So I guess what you're trying to say is that,
2  at some point thereafter, an order of valves came in,
3  and you're not sure whether they were Clow valves or
4  Kennedy valves because they're similarly marked?
5  A. They're marked with the same name.
6  Q. Okay. Well, that -- whether that's true or
7  not, you thought that they -- it could be either a
8  Kennedy valve or a Clow valve; is that right?
9  A. Yeah.
10 Q. Okay. And you don't recall exactly which one
11 it was?
12 A. Right.
13 Q. Okay.
14    MR. ANBINDER: Just move your hand so you
15 don't block your words.
16    THE WITNESS: Oh!
17    BY MR. MANECHE:
18 Q. Okay. So, as I understand the sequence of
19 events as you describe them, you received the fax copy
20 of the order from Clow. You took it to --
21    MR. ANBINDER: Objection as to the term

Page 70

1  Q. Don't even have a ballpark figure?
2  A. My best guess, February, March. I really
3  don't remember.
4  Q. Okay. At this second meeting, who attended?
5  A. Myself, Mr. Williams, Mr. Vore, and this
6  gentleman here.
7  Q. You're indicating Randy Malloy?
8  A. Mr. Malloy, Mr. Severn, and Mr. Joe Bressi.
9  Q. Okay. What occurred at that meeting?
10 A. Mr. Williams said we were willing to -- we
11 weren't -- what we were willing to do was buy $120,000
12 worth of valves, which was up to 16-inch.
13 Q. Anything else?
14 A. That was really the crux of the whole
15 meeting.
16 Q. Did you speak at all during the meeting?
17 A. Yeah. I believe I did. I believe I -- I
18 believe Mr. Walston was there. I'm not positive.
19 Q. What did you say?
20 A. That I didn't place the order for the valves.
21 That's what I said.

Page 71

1  Q. What happened at the conclusion of the
2  meeting?
3  A. Nothing was resolved.
4  Q. What was the next contact you had, if any,
5  with anyone at Clow?
6  A. I don't believe I had any contact with
7  anybody after that.
8  Q. So you never spoke with anyone at Clow
9  anytime after that second meeting?
10 A. Not to my recollection. I don't recall
11 talking to anybody after that.
12 Q. You never recall talking to them saying --
13 calling somebody at Clow saying, "Hey, come pick up the
14 valves"?
15 A. No. I don't recall saying that --
16 Q. Okay.
17 A. -- or I don't recall doing that.
18 Q. All right. Let me go back to what you call
19 the price quote. When you called up Tom Walston and
20 asked him for a price quote, as you say, who gave you
21 the authority to do that? Who asked you to do that?

Page 72

1  A. We have a consultant whose name is Nick
2  Nicolitis who asked me to get some prices on some
3  valves, and that's who asked me to do it.
4  Q. Did he call you on the telephone and ask you
5  to do that?
6  A. Yes.
7  Q. Had he asked you to do that before in other
8  areas?
9  A. Yes.
10 Q. Okay. So Mr. Nicolitis called you on the
11 telephone and said, "Get me price quotes on these five
12 different sizes of valves"?
13 A. Yes.
14 Q. And then you did that?
15 A. Yes.
16 Q. How long between the time he called you and
17 the time you called Tom Walston? How long was it?
18 A. A matter of days.
19 Q. Between the time that Mr. Nicolitis called
20 you and you placed the call to Tom Walston, did you
21 talk to anyone in your division about this price quote,

Page 73

1  as you say?
2  A. Did I talk to anyone --
3  Q. In your department.
4  A. About that?
5  Q. Yes.
6  A. I don't know if I did or not.
7  Q. But, as far as --
8  A. I might have.
9  Q. Who might you have talked to about it?
10 A. I might have talked to Augie, or I might have
11 talked to Joe Bressi.
12 Q. Okay.
13 A. I don't know if I did or not.
14 Q. Why would you have talked to them if you had?
15 A. Because they're more -- they're more
16 knowledgable about large valves and the type of valves
17 that we use.
18 Q. More knowledgable than you?
19 A. Much more.
20 Q. Okay. Why are they more knowledgable about
21 large valves than you?

Page 78

1     Q. Was it more than one?
2         MR. ANBINDER: Objection. Do you mean
3 individual truckloads, or do you mean -- what do you
4 mean by "shipments"? How would you define that?
5     Q. I would define a shipment as arriving -- you
6 know, if you got Clow valves on Monday, and you got
7 more Clow valves on Thursday, I would define that as
8 two shipments.
9     A. Do I know how many? No. I can't recall how
10 many.
11     Q. But was it more than one?
12     A. I would say yes.
13     Q. Okay. Was it more than ten?
14     A. I don't know that.
15     Q. And you don't recall when the first shipment
16 came in in 2001, do you?
17     A. No. I couldn't tell you exactly.
18     Q. Do you recall ever being notified by a
19 courier or a trucking company that a valve shipment was
20 coming in from Clow Valve?
21     A. I became aware of it through my secretary,

Page 79

1 who said that Clow Valve called and said they were
2 making a delivery.
3     Q. Okay.
4     A. But I don't know what date that was.
5     Q. All right. So, on at least one occasion in
6 2001, you got notification that a Clow Valve delivery
7 was on its way?
8     A. Right.
9     Q. Okay. What did you do in response to that
10 notification?
11     A. I didn't do anything.
12     Q. Okay. Did you make sure that there would be
13 someone from the City of Baltimore ready to receive the
14 delivery when it came?
15     A. Well, we have a facility that receives all
16 those on the other side of town, and there is always
17 somebody there to receive shipments. I'm never always
18 aware of when shipments are coming. Those people
19 there, that's their job. They're there 40 hours a
20 week.
21     Q. The yard you're talking about is on

Page 80

1 Washington Boulevard?
2     A. That's correct.
3     Q. So, at the Washington Boulevard yard, they
4 receive shipments of valves and other items on a
5 regular basis; is that right?
6     A. That's correct.
7     Q. When you know that a shipment for a
8 particular order that you may have placed is coming in,
9 you don't necessarily call them and say, "Here is the
10 delivery date. Here is when it's coming in"?
11     A. No, no, no.
12     Q. They handle that independently?
13     A. Yes.
14     Q. All right. Do you ever call over to the
15 Washington Boulevard yard just as a courtesy and say,
16 "By the way, Clow is delivering a bunch of valves
17 tomorrow. Just wanted to let you know"?
18     A. I have on occasion.
19     Q. Who do you typically call over there when you
20 do that?
21     A. Frank Rumney.

Page 81

1     Q. Have you spoken with Frank Rumney at all
2 about the Clow valves that are the subject matter of
3 this lawsuit?
4     A. No.
5     Q. Not at all?
6     A. No.
7     Q. And you never called him ahead of time to
8 say, "Clow is getting ready to deliver some valves. Be
9 ready"?
10     A. I don't recall doing that.
11     Q. Have you been over to the Washington
12 Boulevard yard to see the Clow valves that were
13 delivered there?
14     A. Yes, I was.
15     Q. When?
16     A. On a couple of occasions.
17     Q. This year?
18     A. Just last week.
19     Q. All right. What was the purpose of your
20 visit last week?
21     A. I met Mr. Tom Wyatt over there from Hughes

**Page 102**

1  Q. Is it possible that there could have been a
2  payment with respect to those valves at Washington
3  Boulevard without your approval and Mr. Williams'
4  approval?
5  A. Is it a possibility?
6  Q. Yeah.
7  A. I don't know. I mean, I don't know. I never
8  heard of that being done, but I don't know.
9  Q. Okay. You mentioned Jack Davis is a buyer?
10  A. Yeah. He's the head buyer.
11  Q. For the City of Baltimore?
12  A. Yes.
13  Q. He works in the Purchasing Department?
14  A. Yes.
15  Q. Okay. Mr. Blimline, I had asked you earlier
16  about conversations you had with Warren Williams about
17  the Clow Valve price quote, order -- what you called a
18  price quote, what they took to be an order -- and you
19  mentioned to me there was one occasion where you took a
20  fax that you had received from Clow indicating --
21  A. No. The fax that I received from Tom

**Page 103**

1  Walston.
2  Q. Okay. All right. I consider him Clow, but
3  okay. You received a fax from somebody saying here is
4  the order that you placed, and you took it then to
5  Mr. Williams to discuss it, correct?
6  A. Yes, sir.
7  Q. And we talked about that conversation.
8  A. (Witness nodding head in the affirmative.)
9  Q. That was the first conversation, as I
10  understand it, you had with Mr. Williams --
11  A. That's correct.
12  Q. -- about the price quote, slash, order,
13  correct?
14  A. That's correct.
15  Q. Okay. Have you had any subsequent
16  conversations with him about it other than what
17  happened at that April meeting that you mentioned
18  earlier?
19  A. I don't recall.
20  Q. So the only two times you recall meeting with
21  Mr. Williams and/or discussing that issue was when you

**Page 104**

1  first brought him the fax -- F-A-X, fax -- and then
2  subsequently when you had the meeting with the Clow
3  representatives and the City representatives, including
4  yourself?
5  A. I just -- I don't remember.
6  Q. You don't remember any other conversation
7  with Mr. Williams about the valves that --
8  A. I mean, there could have been, but I just
9  don't remember. I don't remember. You know, it's --
10  Q. Okay.
11  A. I just can't remember that.
12  Q. I'm sorry. You cut me off, so let me finish
13  my question. It may seem as I'm repeating myself, but
14  you don't remember any other conversation with Warren
15  Williams regarding the valves that are the subject of
16  this lawsuit other than the meeting and the prior
17  discussion relating to the fax?
18  A. No. I don't remember.
19  Q. Okay. How about discussions on the same
20  topic with Mr. Severn? Do you recall any such
21  discussions?

**Page 105**

1  A. I -- we had a couple discussions, but I
2  couldn't tell you exactly when they were and what was
3  said. I can't remember that much.
4  Q. You don't remember anything about what was
5  said at all?
6  A. I mean, we talked about the fact that the
7  valves were wrong. I mean, other than that, I -- to
8  get into the specifics of it, I don't remember.
9  Q. And do you remember whether you spoke to
10  Mr. Severn after you went to Mr. Williams for the first
11  time?
12  A. Oh, I can't remember that. We speak every
13  day.
14  Q. How about conversations with Mr. Randy
15  Malloy, sitting next to me? Do you recall any
16  conversations with --
17  A. I had a couple conversations with Mr. Malloy.
18  Q. I'm sorry to keep -- you have to let me
19  finish my questions, though. Tell me about what
20  specific conversations you recall having with Mr. Randy
21  Malloy about the valves that are the subject in this

**Page 106**

1  lawsuit.
2  A. I can't remember. If I even had to tell you
3  the first conversation, I couldn't tell you that.
4  Q. So you're telling me you remember having
5  conversations with him.
6  A. Yes.
7  Q. You don't remember when those were.
8  A. I don't remember.
9  Q. You don't remember how many they were?
10 A. I know it was a couple, but I don't remember
11 when they were.
12 Q. And you don't remember anything about what
13 you talked about?
14 A. Well, we talked about the valves. I -- it
15 would have been the reason why he called.
16 Q. Anything more specific than that that you
17 remember?
18 A. And about payment.
19 Q. What about payment?
20 A. When we were going to pay for the valves.
21 Q. What did you say?

**Page 107**

1  A. I don't even remember exactly what I said,
2  but I said there was issues that had to be settled.
3  I'm sure I said something to that effect.
4  Q. But you don't remember what you said?
5  A. No, I don't.
6  (Whereupon, Blimline Deposition Exhibit
7  No. 3, 9/11 fax, Terrell to Blimline, was marked for
8  identification.)
9  BY MR. MANECHE:
10 Q. Mr. Blimline, please take a look at what's
11 just been marked as Exhibit 3, and let me know if you
12 recognize that.
13 A. No, I don't.
14 Q. You don't recall seeing that document ever
15 before?
16 A. I don't recall it.
17 MR. MANECHE: Let's do that as Number 4,
18 please.
19 (Whereupon, Blimline Deposition Exhibit
20 No. 4, 9/26/01 order, was marked for identification.)
21 MR. KING: Do you have the original of this

**Page 108**

1  document?
2  MR. MANECHE: I don't think we do. Do you
3  have it?
4  MR. MALLOY: I don't know.
5  MR. MANECHE: I'll check. Was it among the
6  stuff that we produced?
7  MR. KING: I don't know.
8  MR. MANECHE: This is from you all.
9  MR. KING: I know. Do you have the original?
10 MR. MANECHE: Yeah. I'll check.
11 MR. KING: Okay. Thanks.
12 BY MR. MANECHE:
13 Q. Mr. Blimline, let me ask you to take a look
14 at what's been marked as Exhibit 4, and please tell me
15 if you've ever seen that document before.
16 A. Evidently, I did. I signed it.
17 Q. That's your signature that appears on the
18 document?
19 A. That's correct.
20 Q. You don't recall signing it?
21 A. No. I don't recall signing it.

**Page 109**

1  Q. And you don't recall receiving this document?
2  A. I -- no, I don't.
3  Q. What is Exhibit 4, in your mind?
4  A. 30-inch valves, 36-inch valves.
5  Q. Right, but what does it represent to you --
6  Exhibit 4, that is?
7  A. I imagine it would be an order.
8  Q. Okay.
9  MR. MANECHE: Let's mark this as Exhibit 5,
10 please.
11 (Whereupon, Blimline Deposition Exhibit
12 No. 5, 9/24 fax with attachments, Terrell to Blimline,
13 was marked for identification.)
14 BY MR. MANECHE:
15 Q. Mr. Blimline, please take a look at what's
16 been marked as Exhibit 5, and let me know whether you
17 recognize that document.
18 MR. ANBINDER: Take your time.
19 (Witness perusing document.)
20 BY MR. MANECHE:
21 Q. I asked whether you recognize the document.

Clow Valve Company
v. Mayor and City Council of Baltimore City

Deponent: WALTER L. BLIMLINE
April 2, 2003

### Page 110

1   A.   Yes.
2   Q.   You recognize Exhibit 5?
3   A.   Pardon?
4   Q.   You recognize Exhibit 5?
5   A.   Yes.
6   Q.   Okay. What is Exhibit 5?
7   A.   Well, that's what I thought was the price
8   quote.
9   Q.   You thought Exhibit 5 was a price quote?
10  A.   Yes.
11  Q.   What led you to believe that it was a price
12  quote?
13  A.   Well, when my secretary brought it in to me,
14  she brought this part in.
15  Q.   She did not bring you the cover page?
16  A.   No.
17  Q.   Okay. So she only brought you Pages 2 and 3
18  of Exhibit 5?
19  A.   That's correct.
20  Q.   And is it your signature that appears on the
21  final page?

### Page 111

1   A.   That's absolutely my signature.
2   Q.   What did you think you were signing when you
3   signed Exhibit 5?
4   A.   What he told me that I would get -- he would
5   send me the price quote. Shelley would send it to me,
6   and sign it, send it back that I received the price
7   quote. In fact, I --
8   Q.   You were going to say something?
9   A.   I thought all three -- all -- both of those
10  were together. I thought the same thing.
11  Q.   Okay. Now, if I recall your testimony
12  before, Mr. Blimline, you mentioned that you had asked
13  for price quotes on five different sizes of valves; is
14  that right?
15  A.   That's correct.
16  Q.   And we had established that those sizes were
17  36, 30, 24, 20, and 16, right?
18  A.   Correct.
19  Q.   Okay. Would you look at the first line of
20  what you're calling the price quote and what is what I
21  call Page 2 of Exhibit 5.

### Page 112

1   A.   Yes, sir.
2   Q.   Okay. What size valve is listed there?
3   A.   3 inch.
4   Q.   Okay. How about the second line? What size
5   valve was listed there?
6   A.   Six.
7   Q.   And the third line?
8   A.   10.
9   Q.   And fourth?
10  A.   12.
11  Q.   Okay. You hadn't asked for price quotes on
12  any of those sizes of valves, had you?
13  A.   No, sir, I didn't.
14  Q.   Okay. Why did you think that Clow Valve was
15  providing you with quotes that you didn't ask for?
16  A.   I have no idea.
17  Q.   Okay. Why did you sign this supposed price
18  quote if it contained information that you didn't want?
19  A.   It was immaterial to me that they put it on
20  there. It didn't make a difference to me.
21  Q.   Okay.

### Page 113

1   A.   It was just a price quote. It wasn't an
2   order.
3   Q.   If it wasn't an order -- do you see where it
4   says "planned receive date" on Page 2 of Exhibit 5?
5       MR. ANBINDER: "Planned receive date"? Is
6   that what you're saying?
7       MR. MANECHE: Yeah.
8       BY MR. MANECHE:
9   Q.   Do you see that?
10  A.   No.
11  Q.   You don't see it?
12  A.   Oh, I see it. Yes, I do.
13  Q.   Okay. Did you see it at the time you signed
14  this document?
15  A.   No.
16  Q.   If you had seen the information that said
17  "planned receive date," would you have still thought it
18  was a price quote?
19  A.   I would have questioned it.
20  Q.   Okay. But you didn't notice it when you
21  signed it the first time?

29 (Pages 110 to 113)

IRWIN REPORTING & VIDEO, LLC
410-494-1880

Page 114

1  A. No, sir, I didn't.
2  Q. Okay. How about where it says "new order" at
3  the top of the document? Did you see that when you
4  signed it?
5  A. No, sir, because I thought it was what I
6  asked for, and I had never seen a Clow Valve quote on
7  any letter form head before, so I had just assumed that
8  this was what they looked like.
9  Q. Okay. But did you actually see the language
10 at the top of Page 2 --
11 A. No, sir. I didn't pay any attention to it.
12 Q. Okay. I think I know your answer, but let me
13 finish the question anyway. Did you actually see the
14 language at the top of Page 2 of Exhibit 5 that said
15 "new order" when you signed the document?
16 A. No, sir.
17 Q. Okay. Did you see the information to the
18 right of that that said "sales order number" when you
19 signed the document?
20 A. No, I did not.
21 Q. You just didn't pay attention to that

Page 115

1  information; is that correct?
2  A. That's correct.
3  Q. Okay. If you had seen it at the time, would
4  it have caused you to question whether this was a quote
5  or an order?
6     MR. ANBINDER: Objection.
7  A. Absolutely.
8     MR. ANBINDER: Objection, but --
9     (Whereupon, Blimline Deposition Exhibit
10 No. 6, 12/20 fax with attachments, Terrell to Blimline,
11 was marked for identification.)
12    BY MR. MANECHE:
13 Q. Mr. Blimline, please take a look at what's
14 been marked as Exhibit 6, and let me know whether
15 you've seen that document before.
16 A. Yes, I have.
17 Q. What is that? What was Exhibit 6?
18 A. I know what it -- yeah. I see what it is,
19 yes.
20 Q. What is it?
21 A. It said it's an order.

Page 116

1  Q. Okay. Have you seen the cover page before?
2  A. Yes, sir, I have.
3  Q. Okay.
4  A. No. No, I haven't, until just now.
5  Q. Okay. So you've never seen Page 1 of
6  Exhibit 6 before today?
7  A. Say that again.
8  Q. You've never seen Page 1 of --
9  A. No.
10 Q. -- Exhibit 6 before today?
11 A. No.
12 Q. Is that because, as you said before, your
13 secretary's practice is to remove the cover pages of
14 faxes when she delivers them to you?
15 A. Yes.
16 Q. What happens to those cover pages after she
17 removes them?
18 A. I don't know what she does with it.
19 Q. What's your secretary's name?
20 A. Kathy Smith.
21 Q. How long has she been your secretary?

Page 117

1  A. Three years. Two years. Two years.
2  Q. Was she your secretary in 2001?
3  A. Yes.
4  Q. For the entire year?
5  A. I believe so.
6  Q. Mr. Blimline, let me show you again, because
7  I think I sort of rushed you through what was
8  Exhibit 4, and I think when I showed it to you and
9  asked you what it was, you said it was an order. Is
10 that right?
11 A. Well, I can read -- see it says it's an
12 order.
13 Q. Okay. And that's your signature at the
14 bottom, right?
15 A. Yes, sir.
16 Q. Okay. Thanks. What did you think you were
17 signing when you signed that document?
18 A. Price quote.
19 Q. Do you still believe that today?
20 A. Absolutely.
21 Q. Okay. Why do you believe that today that you

Clow Valve Company  
v. Mayor and City Council of Baltimore City

Deponent: WALTER L. BLIMLINE  
April 2, 2003

Page 126

1   A.  I think right before Christmas.
2   Q.  What did he -- why did he contact you?
3   A.  Somebody in his division or whoever, his boss
4   or whatever, wanted him to come look at the valves on
5   behalf of Clow, and I talked to Mr. Anbinder, and that
6   was not agreed upon.
7   Q.  Okay.  Did you have any subsequent
8   discussions with Mr. Burkhardt about that?
9   A.  I don't believe so.  Concerning the valves, I
10  don't believe so.
11  Q.  Do you know why Mr. Burkhardt wanted to look
12  at the valves?
13  A.  I have no idea.
14  Q.  He never discussed that with you?
15  A.  His question to me was that his company would
16  like to have approval for him to look at the valves,
17  and I said, "Well, I can't give you that.  I'll have to
18  find out," and I got back to him and told him no.
19  Q.  And that was the end of the exchange as far
20  as you were concerned?
21  A.  I think as far as the valves were concerned,

Page 127

1   yeah.
2   Q.  Do you know whether Mr. Burkhardt had any
3   discussions with anyone in your department besides you
4   about those valves?
5   A.  I have no idea.  Oh!  Yes.  I'm sorry.  Yes,
6   he did.  I believe he talked to -- I believe he talked
7   to Mr. Don Wright.  I believe he did.  I'm not
8   positive, but I think he did.
9   Q.  Who was that?
10  A.  Don Wright.  I think he went out to the yard.
11  Q.  W-R-I-G-H-T?
12  A.  G-H-T.
13  Q.  What is Don's position?
14  A.  Don is the acting -- I'll just say Don is a
15  supervisor at the Washington Boulevard yard.
16  Q.  You don't know what he and Mr. Burkhardt
17  discussed?
18  A.  I think Mr. Burkhardt stopped there to see
19  the valves, and Mr. Wright said he couldn't.
20  Q.  When you spoke to Mr. Walston back when you
21  were asking for what you recall as being a price quote,

Page 128

1   do you recall specifically what you told Mr. Walston
2   about your authority or your lack of authority to place
3   orders on behalf the City?
4   A.  No.  I've never discussed that with him or
5   anybody else.
6   Q.  All right.  Did you yourself undertake any
7   efforts at all to return the Clow valves sitting on the
8   Washington Boulevard --
9   A.  No.
10  Q.  -- site to Clow Valve?
11  A.  No.
12  Q.  Did you ever undertake any efforts at all to
13  refuse delivery of those valves?
14  A.  No.
15      MR. MANECHE:  If we can take about a
16  two-minute break, I think I might be done.
17      MR. ANBINDER:  Okay.
18      (Recess taken.)
19      BY MR. MANECHE:
20  Q.  Mr. Blimline, we're almost finished.  I just
21  have a couple more questions for you.  Just to

Page 129

1   clarify -- I think you may have said this earlier --
2   you don't recall having any conversations with anyone
3   at Clow about valve specifications, do you?
4   A.  No.
5   Q.  None at all?
6   A.  No.
7   Q.  And, again, you have no idea what Baltimore
8   City valve specifications are, do you?
9   A.  No, so -- no.
10      MR. MANECHE:  I think that's all I have,
11  Mr. Blimline.  Thank you for your time today.
12      THE WITNESS:  Thank you.
13      MR. ANBINDER:  Hold on a second.  I don't
14  think we have any questions.
15      MR. KING:  Read and sign.
16      MR. ANBINDER:  We'll read and sign, but we
17  have no -- off the record.
18      (Thereupon, at 2:39 p.m., the deposition was
19  concluded.)
20
21

33 (Pages 126 to 129)

IRWIN REPORTING & VIDEO, LLC  
410-494-1880