215 F.3d 1321 (Table)  
**Unpublished Disposition**

(Cite as: 215 F.3d 1321, 2000 WL 718388 (4th Cir.(Md.)))

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

**SSDS, INCORPORATED, Plaintiff-Appellee,**
v.
**MAYOR and City Council of Baltimore City, Defendant-Appellant.**

No. 99-1178.

Argued Feb. 28, 2000.
Decided June 5, 2000.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, District Judge. (CA-97-1907-MJG).

William Rowe Phelan, Jr., Principal, Department of Law, Office of the City Solicitor, Baltimore, MD, for appellant.

Nell Berelson Strachan, Venable, Baetjer & Howard, L.L.P., Baltimore, MD, for appellee.

ON BRIEF: Frank C. Derr, Deputy City Solicitor, Jerome A. Nicholas, Jr., Associate City Solicitor, Department of Law, Office of the City Solicitor, Baltimore, MD, for appellant. Christine L. Romeres, Venable, Baetjer & Howard, L.L.P., Baltimore, MD, for appellee.

Before WILKINS, MICHAEL, and KING, Circuit Judges.

OPINION

PER CURIAM.

**\*\*1** In this diversity action alleging breach of contract and, alternatively, recovery in quantum meruit, the defendant Mayor and City Council of Baltimore ("City") appeals the final judgment and amending order of the district court awarding in excess of $170,000 to the plaintiff, SSDS, Inc. We affirm.

I.

By the latter part of 1995, the Baltimore City Public Schools system ("BCPS") had been embroiled for more than a decade in litigation designed to force its compliance with the reporting requirements of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1487 (IDEA). [FN1] Seeking to upgrade the tracking capabilities of its computer system so that it could comply with a consent decree entered by the district court, BCPS hired Craig Richburg as Director of Management Information Services ("MIS"). Richburg had most recently worked for SSDS, a Colorado company specializing in the design and installation of computer networks and software.

> FN1. *See, e.g.,* 20 U.S.C. § 1418(a) (mandating that states receiving federal assistance under IDEA provide data annually to the Secretary of Education with respect to, *inter alia,* the number of disabled children in various racial, ethnic, and disability categories who, variously, have been integrated into the mainstream educational system, have received early intervention services, have been removed from the mainstream or from special programs, or have been subjected to long-term suspensions or expulsions).

Richburg wanted SSDS to perform the consulting and design work needed to achieve the upgrade. Toward that end, Richburg signed a "Services Agreement" and six "Task Orders" purporting to retain the company's assistance. Beginning in October 1995, SSDS spent about six months evaluating the existing computer network, determining the school system's needs, developing a transition plan, and otherwise laying the necessary groundwork for the anticipated upgrade.

During this period, SSDS employees maintained an ongoing presence in the administrative offices of BCPS, and the company invoiced the school system monthly for its work. Upon receiving the initial invoices, Henry Raymond, the Chief Financial Officer for BCPS, convened a meeting with Richburg to discuss Raymond's concerns that SSDS was performing services without the prior authorization of the City's Board of Estimates ("Board"). Richburg assured Raymond that SSDS was performing the preparatory work for free and that the invoices were a mistake. At about the same time, however, Richburg was promising SSDS that it would be paid.

By April 1996, when Richburg's subterfuge was finally discovered, SSDS had billed BCPS a total of $148,822. The City refused payment, asserting that

215 F.3d 1321 (Table)  
(Cite as: 215 F.3d 1321, 2000 WL 718388, **1 (4th Cir.(Md.)))

Page 9

Richburg had no authority to contract on the school system's behalf and that, in any event, the Board had never approved any of the work.

On June 13, 1997, SSDS filed this suit in the district court, alleging that the City had breached the Services Agreement and Task Orders; alternatively, SSDS maintained that it was entitled to recover in quantum meruit. Following a four-day bench trial, the district court entered judgment for SSDS on the latter ground, concluding that the company was entitled to full restitution for its services, plus nearly $24,000 in prejudgment interest. The City appeals.

II.

A.

To the extent that the district court's judgment rests on its determination of the facts, we must accept the court's findings unless they prove to be clearly erroneous. Fed.R.Civ.P. 54(a). However, "mixed questions of law and fact that require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles are reviewed de novo." *See Estate of Waters v. Commissioner, IRS,* 48 F.3d 838, 841-42 (4th Cir.1995) (holding that standard of review employed with regard to "civil bench trials in United States district courts" also applies to Tax Court decisions) (citations omitted). The district court's resolution of pure questions of law is, of course, also subject to de novo review. *Williams v. Sandman,* 187 F.3d 379, 381 (4th Cir.1999).

B.

**2 The district court found that Richburg had no actual or apparent authority to bind the City, and thus no contract existed between it and SSDS. The court's conclusion in this regard is no longer contested by either party; SSDS may therefore only recover if an alternative theory of liability applies.

The court determined that restitution was payable to SSDS under the doctrine of unjust enrichment. [FN2] This equitable recovery vehicle has been applied in Maryland against municipal defendants, including the City. In *Konig v. Mayor & City Council of Baltimore,* 128 Md. 465, 97 A. 837 (Md.1916), for example, the City was required to disgorge monies due a contractor for completing construction and installation of water filtering equipment, notwithstanding a prior judicial determination that the underlying contract was void *ab initio*. In so holding, the Court of Appeals of Maryland observed:

> FN2. "Restitution" refers to any relief designed to remedy the situation where a benefit is unfairly accorded one party at the other's expense. E. Allan Farnsworth, Contracts, § 2.20 (3rd ed.1999). Where only money is sought (as here), the remedy is "quasi-contractual" in nature. *Id.* In effect, a contract "implied in law" (a legal fiction) is created between the parties. *Mass Transit Admin. v. Granite Const. Co.,* 57 Md.App. 766, 471 A.2d 1121, 1125 (Md.Ct.Spec.App.1984). The specific procedure is an action in "quantum meruit." *Granite Const.,* 471 A.2d at 1126.
> By contrast, a contract "implied in fact" is a "true contract." *Granite Const.,* 471 A.2d at 1125. A contract implied in fact "means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words. In other words, the [implied in fact] contract is proved by circumstantial evidence." *Id.* (citation omitted).

[I]t must be conceded that the weight of authority precludes a recovery by one relying on a contract made with a municipal corporation contrary to the provisions of its charter.... There is considerable authority, however, to support the rule that a recovery may be had on a quantum meruit in such cases, upon the theory that it is not justice, where a contract is entered into between a municipality and another, in good faith, and the corporation has received benefits thereunder, to permit the municipality to retain the benefits without paying the reasonable value therefor, the same as a private corporation or individual would have to do.

*Id.* at 842 (citation and internal quotation marks omitted). [FN3]

> FN3. *See also Schiavi v. Mayor & City Council of Baltimore,* 40 F.Supp. 184 (D.Md.1941). The district court in *Schiavi* cited *Konig* among those cases supporting the Maryland rule that
> [W]here a contractor with a municipal corporation performs work or supplies materials which are not included in his contract, and they are accepted and retained by the municipal corporation and are beneficial to it, there arises an implied obligation on the corporation to pay therefor on the basis of the reasonable value thereof, that is, on a quantum meruit.
> *Id.* at 189 (additional citations omitted).

In order to prevail on its claim of unjust enrichment, SSDS must demonstrate that: (1) it conferred on the City a benefit; (2) that was appreciated or known by the City; and (3) the City's acceptance thereof was under such circumstances as to make it inequitable for

the City to retain the benefit without the payment of its value. *See, e.g., Mass Transit Admin. v. Granite Const. Co.,* 57 Md.App. 766, 471 A.2d 1121, 1125 (Md.Ct.Spec.App.1984) (citation omitted), *cited in County Comm'rs of Caroline County, MD. v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 747 A.2d 600, 607 n. 7 (Md.2000).

Only the last element is in dispute here. The question is simply whether, under the circumstances, permitting the City to retain the services performed by SSDS without paying for them would indeed be "unjust," such "that considerations of natural justice and equity require a recovery by plaintiff." *Granite Const.,* 471 A.2d at 1128.

The district court answered this question in the affirmative. The court noted (1) that BCPS employees accepted and participated in the extensive preparation work, all in the expectation that SSDS would be paid; (2) the particular actions of Richburg, who misled SSDS as to the scope of his authority and gave false assurances of payment; (3) the complex and inconsistently applied procurement policies of BCPS; [FN4] (4) that other companies providing goods and services in connection with the upgrade were paid, notwithstanding the lack of prior Board authorization; and (5) at least one SSDS invoice was approved for payment (though apparently not paid) by the BCPS Expenditure Contract Committee.

> FN4. For instance, Raymond admitted at trial that "confirming orders" were occasionally issued for goods and services for which BCPS was "forced to pay the invoice even though the appropriate approvals were never obtained." J.A. 45.

**3 The above facts militate strongly in favor of affirming the judgment below; in rebuttal, the City argues only that an SSDS vice-president, Paul Mauritz, had been informed by Raymond that the Board's approval was required before work could begin. The evidence was conflicting on this point, however, and the conflict was not specifically resolved by the district court (although the court observed Raymond to have been a credible witness).

For the purposes of our analysis, we fully credit Raymond's testimony that he warned Mauritz of the need to obtain the Board's authorization prior to commencing work; the balance of the equities nonetheless favors SSDS. Against the words of Mauritz stand the deeds of Richburg and others upon which SSDS reasonably relied in continuing to provide the City with valuable services for nearly half a year. "Saying is one thing and doing is another; we are to consider the sermon and the preacher distinctly and apart." Michel de Montaigne, *Of Anger, in* Essays (1588).

C.

The City relies almost exclusively on *Gontrum v. Mayor & City Council of Baltimore,* 182 Md. 370, 35 A.2d 128 (Md.1943), in which the plaintiffs were denied compensation for a right-of-way granted the City, despite the assurances of subordinate City officials nine years earlier that the subject property would soon be condemned for street construction. Maryland's highest court observed:

> It is a fundamental principle of law that all persons dealing with the agent of a municipal corporation are bound to ascertain the nature and extent of his authority. A municipal corporation is not bound by a contract made in its name by one of its officers or by a person in its employ, although within the scope of its corporate powers, if the officer or employee had no authority to enter into such a contract on behalf of the corporation.

*Id.* at 130 (citation omitted). Because the officials lacked the requisite authority, the court held that no contract binding the City existed. *Id.* at 131. For the same reason, the plaintiffs could not recover under the theory of equitable estoppel; in essence, the City itself had never taken a prior act with which its refusal to pay could be deemed inconsistent. *See id.* at 131-32.

Had the district court found the City liable to SSDS based on principles of equitable estoppel, we might be constrained to agree that, on the authority of *Gontrum,* the court's judgment ought to be reversed. But estoppel did not form the basis of the judgment below; the district court's decision was instead grounded firmly in the doctrine of unjust enrichment, as established and developed by *Konig* and its progeny, which the City fails to adequately distinguish. *Gontrum,* having nothing to do with unjust enrichment, is simply inapposite. [FN5]

> FN5. It is perhaps worth noting that, under the facts of *Gontrum,* a claim for unjust enrichment would likely have met the same fate as the contractual and estoppel claims actually asserted in that case. The City had requested the right-of-way with the express understanding that it would pay nothing therefor, and the plaintiffs had independently verified that the proposed street would likely be built. *Id.* at 131. In short, there was very little "unjust" about the plaintiffs' predicament.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

215 F.3d 1321 (Table) **Page 11**
(Cite as: 215 F.3d 1321, 2000 WL 718388, **3 (4th Cir.(Md.)))

III.

In light of the foregoing, the judgment of the district court is affirmed.

*AFFIRMED.*

215 F.3d 1321 (Table), 2000 WL 718388 (4th Cir.(Md.)), Unpublished Disposition

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works