# TABLE OF CONTENTS

**Page**

MEMORANDUM IN SUPPORT OF MAYOR AND CITY
COUNCIL OF BALTIMORE CITY'S RESPONSE TO CLOW
VALVE COMPANY'S MOTION FOR SUMMARY JUDGMENT
AND MAYOR AND CITY COUNCIL OF BALTIMORE CITY'S
CROSS-MOTION FOR SUMMARY JUDGMENT……………………………… 2

INTRODUCTION……………………………………………………………………  2

UNDISPUTED FACTS………………………………………………………….. 4

I.      THE CITY DID NOT BREACH A CONTRACT WITH CLOW VALVE…….. 9

        A.      Walter Blimline did not order the valves at issue……………………  9

        B.      As a matter of law, the City's spending authority under the
                subject contract and purchase orders had expired before the
                 alleged order was placed……………………………………………… 11

        C.      As a matter of law, the City's spending authority was limited to
                $87,500--the amount of the un-expired purchase order……………  14

II.     CLOW VALVE MADE NO EFFORT TO INVESTIGATE THE
        EXTENT OF THE AUTHORITY OF THE EMPLOYEE ALLEGEDLY
        ORDERING THE VALVES…………………………………………………. 19

III.    MOST OF THE VALVES SHIPPED BY CLOW VALVE DO NOT
        CONFORM WITH SPECIFICATIONS SET FORTH IN THE
        CONTRACT……………………………………………………………….. 26

IV.     THE CITY SEASONABLY REJECTED THE VALVES……………………. 28

V.      AS A MATTER OF LAW, THE CITY WAS NOT UNJUSTLY
        ENRICHED BY THE ALLEGED ORDER………………………………… 29

VI.     CLOW FAILED TO EXHAUST ITS ADMINISTRATIVE REMEDIES……… 32

CONCLUSION………………………………………………………………… 32

REQUEST FOR HEARING……………………………………………………  35

APPENDIX OF EXHIBITS………………………………………………………37-38

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____
                                        )
CLOW VALVE COMPANY,                     )
a division of McWane, Inc.              )
                                        )
        Plaintiff                       )
                                        )
        v.                              )    Case No.:  JFM 02 CV 3136
                                        )
MAYOR and CITY COUNCIL OF               )
BALTIMORE CITY                          )
                                        )
        Defendant.                      )
_____        )

**MEMORANDUM IN SUPPORT OF**
**MAYOR AND CITY COUNCIL OF BALTIMORE CITY'S**
**RESPONSE TO CLOW VALVE COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT**
**and**
**MAYOR AND CITY COUNCIL OF BALTIMORE CITY'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

Mayor and City Council of Baltimore ("the City"), by Justin J. King, Principal Counsel, Robert D. Anbinder, Assistant Solicitor, and Nicholas Johannson, Assistant Solicitor, pursuant to Fed. R. Civ. Pro. Rule 56 and Local Rule 105(2)(c), hereby files this Memorandum in Support of its Response to Clow Valve Company's Motion for Summary Judgment, and its Cross-Motion for Summary Judgment and says:

**INTRODUCTION**

In its Complaint, Clow contends the City – through its employee Walter Blimline - ordered nearly $600,000 in valves, accepted them, and has failed to pay for them. (Exhibit A.)  Clow has sued the City breach of contract and unjust enrichment.

In this Response to Clow's Motion for Summary Judgment, the City contends that Clow is not entitled to judgment as a matter of law and that Clow's Motion should be denied because:

- There is a dispute of fact as to whether the City ordered the valves at issue. Clow says Walter Blimline placed an order on behalf of the City. The City denies this contention.

- There is a dispute of fact as to whether the City properly and timely rejected the unauthorized shipment of valves. The City says it did. Clow denies this contention.

In this Cross-Motion for Summary Judgment, the City contends it is entitled to judgment as a matter of law because there is no dispute of fact that:

- Walter Blimline is a low-level City of Baltimore employee in the Department of Public Works who derives his authority from his superiors, City contracts and City purchase orders. There is unrefuted evidence that he was not authorized to purchase the subject valves, let alone purchase them with an _expired_ contract and _expired_ purchase order.

- The City's Department of Public Works derives its authority to purchase valves from contracts and purchase orders in specific dollar amounts properly approved by the City's Board of Estimates. Contract BP-99083 and Purchase Order P179565 had expired by their terms in May 2001 and Clow knew but ignored the fact they could not have authorized the subject purchases in September 2001.

- In May 2001, before it filled the alleged valve order, Clow had been awarded Contract BP-01170 to replace the expired Contract BP-99083. This new contract and its Purchase Order were the only documents in effect at the time of the alleged order, and Clow knew but ignored the fact they authorized City valve expenditures only up to $87,500.

- Clow is a sophisticated multi-million dollar company with hundreds of employees and offices across the United States. Its premise-- that the City's carefully constructed procurement process built upon the authority of the Charter, the Board of Estimates, the Department of Finance, the Bureau of Purchases, contracts and purchase orders, expiration dates, specifications and spending limits to which the Company agreed in writing was overridden by the "say so" of a single low level municipal agent via telephone and fax -- is as uncreditable as it is legally insufficient.

3

- Clow admits it made <u>no</u> effort to investigate and confirm the authority of this single City employee on whom it relied for an order far in excess of the amount the Company knew the City was authorized to spend.

- Clow knew it delivered valves totaling more than $500,000 that do not meet the City's specifications as set forth in the Contract.

- The City was not unjustly enriched by its receipt of the valves and there is no evidence it was unjustly enriched.  The City kept the valves only because Clow refused, and continues to refuse, to take them back.

The City asks this Court to find as a matter of law the following:

- That the City ordered no Clow Valves.

- That any valve order found by the Court to have been placed by the City was limited to $87,500 - the amount of the single existing purchase order at the time of the purported order.

- That the City was not unjustly enriched by delivery of the valves.

These points are further explored below.

## **UNDISPUTED FACTS**

On or about, March 22, 1999, through an affidavit executed by General Sales Office Manager Larry J. Whitaker, Clow Valve Company (hereinafter "Clow" or "the Company") submitted its "Bid Proposal" for City Contract BP-99083 for "Baltimore Standard Valves."  (Bid Proposal, Exhibit B; Whitaker Affidavit, Exhibit C.)  The proposal form signed by Clow contained language printed by the City that the "Approximate Contract Expenditure is $200,000.00." (Bid Proposal, Exhibit B.) On May 12, 1999, the City's Board of Estimates approved and authorized $200,000 for the Contract, which it awarded to Clow. (Exhibit D.)

On May 12, 1999, Whitaker then executed the Contract on behalf of Clow, signing his name to a page containing language printed by the City that "The City hereby agrees to pay and the Contractor agrees to accept the sum of $200,000.00."

(Exhibit E.)  The signed Contract also contained a term stating that it was for a term of "TWO (2) YEARS."  ("Special Conditions," Exhibit F.)

On May 21, 1999, the City issued Purchase Order ("P/O") P162235 in the name of Clow in the amount of $100,000, representing the first half of the $200,000 just appropriated by the Board of Estimates. (Exhibit G.)  In 1999 and 2000, the City ordered approximately $91,000 in valves from Clow and issued checks against this P/O to pay for them.  (Exhibit H.)[1]

On May 23, 2000, the City issued Clow P/O P179565 in the amount of $100,000, representing the second half of the $200,000 appropriated by the Board of Estimates. (Exhibit I.)  This P/O stated that it "supercedes Purchase Order 162235" (whose funds had been nearly expended) and refers to Contract BP-99083. (Id.)

On March 6, 2001, a Change Order issued by the Bureau of Purchases brought the total authorized purchase order value of BP-99083 to $140,000. (Exhibit I-A.)

On May 12, 2001, Contract BP-99083 and its P/O expired by their terms.

As the completion of the two-year term of Contract BP-99083 neared, the City solicited bids for its replacement contract for "Baltimore Standard Valves." On or about, April 13, 2001, again through its General Sales Office Manager Larry J. Whitaker, Clow submitted its "Bid Proposal" for City Contract BP-01170 for these valves.  (Bid Proposal, Exhibit J; Whitaker Affidavit, Exhibit K.) The proposal form signed by Clow contained

---

[1] The summary list attached hereto as Exhibit H includes the Purchase Order number, the date of the transaction and the amount of the check issued Clow.  Clow's Motion, in the "Undisputed Facts" portion, twice refers to these transactions, and claims "it appears no written purchase order was in place" for these purchases which were conducted partially by fax.  (Clow Motion, at 3, 4 fn2.) However, as Exhibit G (P/O 162235) and the summary list indicate, a valid Purchase Order was in place. This explains why, as Clow put it, "the City placed and paid for the order without comment or protest."

language printed by the City that the "Approximate Contract Expenditure is $175,000.00." (Exhibit J.)  On May 2, 2001, the City's Board of Estimates approved and authorized $175,000.00 for the Contract, which it awarded to Clow. (Exhibit L.)

On May 2, 2001, Mr. Whitaker then executed the Contract on behalf of Clow, signing his name to a page containing the term that "The City hereby agrees to pay and the Contractor agrees to accept the sum of $175,000.00." (Exhibit M.)  This Contract also contained a term stating that it was for a term of "TWO (2) YEARS."  ("Special Conditions," Exhibit N.)

On May 11, 2001, the City issued Purchase Order P179655 in the name of Clow in the amount of $87,500, representing the first half of the $175,000 just appropriated by the Board of Estimates. (Exhibit O.)

In September 2001, City Store Supervisor Walter Blimline requested that Clow Valve Outside Sales Representative William T. Walston send him price quotations for various types of valves, and signed a document acknowledging his receipt of the quotes.  (Blimline Deposition, at 59-60, 117-18, Exhibit P.)  In October 2001, Clow valves began arriving at the City's Washington Boulevard yard and ended in December 2001.  (Complaint, Exhibit A). In January 2002, Clow Credit Manager Randy Malloy notified one of Blimline's supervisors, the City's head of Utility Maintenance for Water and Waste Water, Warren Williams, that the Company was claiming money due for the valves.  (Williams Deposition, at 29, 59 Exhibit Q.)  Williams investigated the matter, and that month or early the next month, informed Malloy that "the valves were not ordered, and…that it was a mistake, and that they needed to come and get their valves,"  "and that we would not be accepting the valves."  (Id. at 30, 35-36, 59 Exhibit

Q.)  Williams also asked Malloy when Clow would pick up the valves.  (Id. at 36.)   At an April 2002 meeting with Clow representatives, Williams again said that the City "did not order those valves, and did not intend to keep them," and again asked Malloy "to make arrangements to have them picked up." (Id. at 44.)    The City continues holding the valves only because Clow never  picked them up.

Williams testified that Blimline is authorized to place orders for over $1,000 if he is instructed to do so by the General Superintendents. (Williams Deposition, at 18, 43, Exhibit Q; Blimline Deposition, at 51, Exhibit P.)  He testified that Blimlime's authority is "very, very limited as to what he can order without being given specific direction." (Williams Deposition, at 20, 23-24, Exhibit Q.)  There is no evidence that anyone asked Blimline to order these valves.

Blimline testified that before he can purchase goods for more than $1,000, he must have a purchase order. (Blimline Deposition, at 51, Exhibit P.)  Williams said there is "no" discretion as to the amount that can be spent under a City contract— that it is only "*up to the amount of the purchase order*."  (Id.  at 13,16, Exhibit Q.)

Clow admits that the expensive large valves delivered to the City do not meet the exacting specifications required by the parties' contract.  (Vore Deposition, at 85, Exhibit R; Severn Deposition, at 16, Exhibit Y.)    Clow says Walter Blimline authorized it to manufacture and deliver non-conforming valves.  (Walston Deposition, at 63-64, Exhibit S.)   Walter Blimline had no authority to alter the specifications, and the Contract forbids variation of the specifications without a written proposal to, and written approval from, the City's Purchasing Agent.  (General Conditions XXVII, Exhibit N; General Conditions,

§XIX, Exhibit F.)   More than $560,000 in valves are non-conforming.   (Affidavit of August Severn, Exhibit AA.)

Clow is a sizeable company.   It has 450 employees, is headquartered in Oskaloosa, Iowa, and is a division of McWane Incorporated.  (Vore Deposition, at 13-16, 19 Exhibit R.)   The Company has a manufacturing facility and sales office in Corona, California and a warehouse and sales office in Piedmont, South Carolina.  (Id. at 16.)   The total estimated yearly sales for all Clow products are $135 million.  (Id. at 17.)   Virtually all of its sales (95%) are to private entities. (Id. at 17-18.)   Less than five percent of its business is to government accounts, like the City of Baltimore.  (Id. at 18, 23.) The Company's outside sales representative, who took the purported "order" from the City, had never "sold" goods to the City until this "order."  (Walston Deposition, at 47-48, Exhibit S.)

Neither Clow, its Outside Sales Representative nor its Inside Sales Representative considered the Contract terms or the City's spending authority to be important.   (Vore Deposition at 56-57, 79-80, 97-98,101-02, Exhibit R; Walston Deposition at 33, 37-38, 48, Exhibit S; Shepherd Deposition at 23, Exhibit V.)   Despite accepting a City employee's alleged $600,000 order with only $87,500 of spending authority, the Company never investigated the existence or extent of the employee's authority to place that order, and then delivered valves that didn't even meet specifications.  (Walston Deposition, at 48, Exhibit S; Vore Deposition, at 85, Exhibit R.)

Although the City didn't order the valves, it needed some of the smaller ones for its daily use and, as Clow acknowledges, paid the Company for them.[2]  The City stands ready to return the remainder to Clow and has derived no benefit from them.[3]

## I.    THE CITY DID NOT BREACH A CONTRACT WITH CLOW VALVE

### A.    Walter Blimline did not order the valves at issue

The City denies that it ordered the valves at issue in this case.  City Store Supervisor Walter Blimline, charged by Clow with ordering the valves, has no independent authority to order product in an amount over $1,000.00. (Blimline Deposition, at 41-42, Exhibit P.)  A purchase order is required to order more than that amount.  (Id. at 43.)  The purchase order is his authorization to buy the product.  (Id. at 47, 51)    Aware of the significance of a purchase order to the limits of his ordering authority, Blimline never would have ordered valves costing far, far more than the City purchase order then in effect, despite having signed documents the Company purports to be evidence of his purchase.

> **Q:    …What did you think you were signing when you signed that document?**
>
> **A:    Price Quote.**
>
> **Q:    Do you still believe that today?**
>
> **A:    Absolutely.**

---

[2] In its Motion, Clow argues that by paying for the valves it used, the City "ratified" the entire order.  The City denies that this is so.  First, ordering new valves under the valid existing purchase order was unnecessary since the needed sizes were already on the City yard.  Second, using these valves cleared needed space in the yard.  Third, it reduced the amount of the dispute with Clow.  Fourth, it is doubtful that Clow would have filled the order in light of this litigation.  Finally, had the City not paid for the valves it used as was proper, the Company might have charged the City with "conversion."

[3] Clow says "[a]t this late date, the valves cannot be resold for any reasonable value."  Clow Motion, at 3.  Clow contributed greatly to this problem by refusing to accept return of the valves soon after their manufacture date when the City attempted to return them.

**Q:     Okay. Why do you believe that today that you were signing a price quote?**

**A:     That's all I asked the man for.**

(Blimline Deposition, at 117-118, Exhibit P.)

Blimline testified he had never signed for a price quote before, because no one before Clow Valve had ever asked him to.  (Blimline Deposition, at 57, Exhibit P).   He did not consider it unusual that he was asked to do so.  (Id.)   Clow Sales and Marketing Manager Michael Vore acknowledges that Blimline told the Company that he hadn't ordered the valves.  (Vore Deposition, at 112, Exhibit R.)

Blimline testified that "sometime the end of October" 2001, he spoke with Clow's Outside Sales Representative, William T. Walston, and "asked him where all these valves were coming—what's the story with all these valves?"  (Blimline Deposition, at 59-60, Exhibit P).  Walston, he said, stated that these were the valves Blimline had ordered, to which Blimline responded, "I never gave you any order…I asked you for price quotes."  (Id.)  As Blimline told his superior, Warren Williams, "I can't order something that I can't pay for."  (Id. at 63.)  Walter Blimline, in fact, could not have ordered $600,000 in valves, knew he could not order them and did not order them because he had neither the legal nor financial authority to order them.

Since a dispute of material fact exists as to the issue of whether Blimline actually placed an order for Clow Valves, the City asks this Court to <u>deny</u> Clow's Motion for Summary Judgment.[4]

_____

[4] Clow works hard to chip away at the credibility of Walter Blimline.  Clow insinuates, for example, that Blimline lied in explaining why his supervisor, Warren Williams, missed a meeting with Clow representatives who visited Baltimore. (Clow Motion, at 13 fn. 10)  There are other explanations for what Clow calls this "false" reason for Williams's absence from the office having nothing at all to do with

However, in light of the absence of Blimline's authority to place an order, and Clow's total failure to fulfill its duty under Maryland law to investigate the nature and extent of his authority, as further set forth below, any order this Court finds Blimline may have placed was of no legal force.  For this reason, judgment should be entered in favor of the City.  The City asks this Court to grant its Motion for Summary Judgment.

**B.    As a matter of law, the City's spending authority under the subject contract and purchase orders had expired <u>before</u> the alleged order was placed.**

Clow contends that the City ordered the valves at issue under Contract BP-99083 and Purchase Order number P179565, originally issued for $100,000 and amended by Change Order to $140,000.[5]  (Complaint, Exhibit A; Contract BP-99083, Exhibit F; P/O P179565, Exhibit I; Change Order, Exhibit J.)  The City could not have legally ordered the valves because the authority of these documents expired <u>before</u> Walter Blimline allegedly placed the order.

Clow certainly was aware of the Contract's expiration.  In March 1999, Clow first entered into the bidding process for Contract BP-99083, which by its terms was for <u>two</u> years.  ("Special Conditions," Exhibit F.)  At that time, Clow General Sales Manager Larry Whitaker executed and submitted to the City, his Company's acknowledgement of the Contract terms.

---

Blimline's credibility.  This includes the possibility that Michael Vore, who quotes Blimline, simply remembers incorrectly. In any event, the fact that credibility is an issue in this case makes it inappropriate to grant Clow's Motion for Summary Judgment.

[5] "BP" stands for "Bureau of Purchases," the City agency that sought and administered the Contract.  The Contract and Purchase Order numbers under which Clow filled the City's alleged order are reflected on Clow's purported Sales Order forms. (Exhibit T.)

**AFFIDAVIT VI**

**This is to certify that the Bidder/Offeror or a person on his behalf has examined and understands the Specifications, including General and Special Conditions, and the Bid Documents.**

(Whitaker Affidavit, Exhibit C.)

Once awarded the Contract, the Company executed the final papers in May 1999.[6]  (Exhibit E.)  Having reviewed the Contract before bidding and ultimately entering into the Contract, Clow was put on notice before it filled the alleged September 2001 order that the City's Contract and purchasing authority expired two years later, in May 2001.

Clow, in fact, agrees that the Contract was effective on May 12, 1999.  (Clow Response to Request for Admissions, No. 4, Exhibit W.)  And, Clow General Sales and Marketing Manager Michael Vore, a 22-year Clow employee and its corporate representative as to matters of sales and marketing, testified the Contract contained a two-year term.[7] (Vore Deposition, at 9, 77, Exhibit R.)  He admits he had no reason to believe the City intended to extend the Contract past May 2001.

> **Q:    Did you have any conversations with anybody from the City of Baltimore prior to September 2001 about the two-year term of this Contract BP-99083?**
>
> **A:    Not that I recall.**
>
> **Q:    Are you aware of anyone else who might have?**

---

[6] Clow's copy of various documents which are attached as Exhibits to this Motion, including Contract BP-99083 attached hereto as Exhibit F, were stamped "Obsolete" by Clow Valve in 2003 as part of an effort "to mark all bid files that were two years and older with 'obsolete.'" (Shepherd Deposition, at 18-19, Exhibit V.)  Clow's Michael Vore says all files were to be rubber-stamped "Obsolete" if they were no longer a current open project.  (Vore Deposition, at 74, Exhibit R.)

[7] As General Sales and Marketing Manager for Clow, Mr. Vore is "[r]esponsible for all sales of Clow Valve Company nationwide, the responsibility of 22 outside sales representatives and three sales offices located across the country."   (Vore Deposition, at 13-14, Exhibit R.)

**A:      No (nods head negatively)**

(Vore Deposition, at 79, Exhibit R.)

If the Company needed even more evidence that Contract BP-99083 expired
<u>before</u> the alleged September 2001 order, it came in May 2001 when Clow bid for and
was awarded the City's replacement contract, BP-01170.    (BP-01170, Exhibit N;
Signature Page, Exhibit M.)    Each Contract put Clow on notice that when the City
began to award a new agreement, the old one was terminated.

**SPECIAL CONDITIONS**

<u>**QUANTITIES**</u>

          *        *        *

**B.      ACTUAL REQUIREMENTS ORDERED MAY BE MORE OR
LESS THAN THOSE ESTIMATED HEREIN. IF, HOWEVER, AT THE
END OF THE PERIOD THAT THE CONTRACT IS LEGALLY IN FORCE,
THE CITY HAS NOT PLACED ORDERS FOR THE AMOUNT OF
MATERIALS, SUPPLIES AND/OR SERVICES ESTIMATED IN THIS
PROPOSAL, *SAID CONTRACT MAY BE DECLARED NULL AND VOID,
IN WHICH CASE IT WILL BE CONSIDERED AS HAVING BEEN
TERMINATED.  THE CITY WILL THEN SOLICIT BIDS FOR A NEW
CONTRACT AT ITS SOLE DISCRETION.***"**

("Special Conditions," Contract BP-99083, Exhibit F. (italics added))
("Special Conditions," Contract BP-01170, Exhibit N. (italics added))

Clow knew the City was soliciting bids for a new Contract to replace BP-99083,
thereby invoking this clause and confirming termination of the old Contract, since the
Company bid for, was awarded and entered into that new Contract, BP-01170.   (Bid
Proposal, Exhibit J; Board of Estimates memo, Exhibit L, Agreement page, Exhibit M).
Clow agrees that the new Contract was effective on May 2, 2001.   (Clow Response to
Request for Admissions, No. 19, Exhibit W.)    And, Clow knew the City had issued it
Purchase Order P179665 in the amount of $87,500 listing the number of the new two-

year Contract since Clow had received it before the alleged September 2001 order. (Exhibit O; Response to Request for Admissions, No. 29, Exhibit W.)

In short, the City could not have placed a valid September 2001 order for nearly $600,000 under Contract BP-99083 and Purchase Order P179565, and Clow should not have filled any order for this amount, because - as Clow well knew - the authority of these documents had expired in May 2001, pursuant to the Contract's two-year term. Clow was willfully blind to this knowledge at its peril.[8]

For this reason, judgment should be entered as a matter of law in favor of the City and against Clow on the breach of contract count.

### C.    As a matter of law, the City's spending authority was limited to $87,500-- the amount of the un-expired purchase order.

Should this Court conclude as a matter of law, as Clow urges, that Walter Blimline placed a valve order, the City contends this order was strictly limited to the amount set forth in the only un-expired Contract and purchase order pending at the time.[9]  That amount is $87,500.

The Baltimore City Charter states that "[t]he Board of Estimates shall be responsible for awarding contracts and supervising all purchasing by the City as provided in this section and elsewhere in the Charter." (Charter, (2003 ed.), Art. VI,

---

[8]Had the City simply intended to extend Contract BP-99083 beyond May 2001, it wouldn't have entered into a new one with Clow. There is no evidence, nor any legal authority, under which Clow can reasonably contend that Walter Blimline himself was authorized to extend the term of BP-99083 beyond the Board of Estimates-approved May 2001 expiration date.  As to the matter of Blimline's authority, see Section II of this Memorandum.

[9] As Warren Williams, the City's Chief of Utility Maintenance for Water and Waste Water put it, "we get a purchase order number from Purchasing advising us that X materials can be purchased at this price by this—with this company" to meet the needs of the upcoming fiscal year. (Williams Deposition, at 14-15, Exhibit Q.)

§11(a), Exhibit X.)  The Charter also establishes and enables a "centralized purchasing system" under the Department of Finance—known as the Bureau of Purchases—and gives it broad responsibilities for overseeing and approving procurement of materials needed by the City.  (Id., Article VII, § 17(a), Exhibit X).[10]

The Bureau of Purchases issued the Contracts and purchase orders at issue in this case. (See fn. 5.)  The Contracts contain specific terms governing the relationship between the parties, setting forth how the City intended to purchase the Company's product, and the significance of purchase orders to the City's ability and authority to  do so. [11]

**SPECIAL CONDITIONS**

## SCOPE

**FURNISH AND DELIVER BALTIMORE STANDARD VALVES AND SERVICE FOR THE CITY OF BALTIMORE *IN ACCORDANCE WITH SPECIFICATIONS AND OTHER DOCUMENTS HEREIN*.**

---

[10] Article VII

| | | |
|---|---|---|
| §17 | **Department of Finance; purchasing** | |
| (a) | *Central purchasing system* * | * * |
| (b) | *Department to procure or approve procurement;* | |

*competitive bidding*

The Department shall procure, by purchase, lease or or other acquisition, or *shall approve the procurement of,* all materials, supplies, and equipment, and all services other than professional services, that municipal agencies use ("using agencies")….

(Baltimore City Charter, Art. VII, § 17(b), Exhibit X.)

[11] The documents also set forth specifications for the valves desired by the City.  The City contends that most of the valves shipped by Clow, although not ordered by the City, didn't conform to the specifications.  See Section III of this Memorandum.

## METHOD OF PURCHASING

***PURCHASE ORDERS* OR ORDER RELEASES *WILL BE ISSUED*
FROM TIME TO TIME *IN SUCH QUANTITIES AS MAY BE NEEDED BY
THE CITY.***[12]

(Contract BP 99083, Exhibit F (italics added)).

\* \* \*

## GENERAL CONDITIONS

### XXVI. PAYMENTS

**A.    Materials and/or Equipment: Partial or Full payment will be
made upon receipt and final acceptance of materials and/or
equipment invoiced *as shown on and in accordance with purchase
order.***

(Contract BP-99083, Exhibit F (italics added)).

Contract BP-99083 under which a Purchase and Change Order totaling

$140,000 had been issued by the City, was entered into by Clow in May 1999.[13]  As set

forth above, the City contends the authority of these documents expired in May 2001,

the end of the two-year term specified in Contract BP-99083, which that same month

was replaced by BP-01170 – another two–year Contract.  (Exhibit N.)   At the time of

the alleged September 2001 valve order by Walter Blimline for the City of Baltimore,

BP-01170 was the only un-expired valve Contract between the parties.   The only

purchase order issued under this new Contract was in the amount of $87,500.00.

---

[12] The Dictionary of Purchasing Terms issued by the National Institute of Governmental
Purchasing, Inc. defines "purchase order" as "a purchaser's written document to a vendor formalizing all
the terms and conditions of a proposed transaction, such as a description of the requested item(s),
delivery schedule, terms of payment, and transportation." (5th ed. at 58-59.)

[13] This Purchase Order, stamped by Clow as received on June 5, 2000, contains the 15-digit
Budget Account Number from which the funds could be drawn during the life of the contract. (Exhibit I.)
The Change Order increasing the authorized funds under BP-99093 also specifies the account number
and contains the notation "P.O. [purchase order] value INCREASE:  $40,000.00," indicating the amount of
funds available had increased to $140,000.00.  (Exhibit J.)

(Exhibit O.)  Clow had been issued, and knew of this P/O <u>before</u> the alleged September 2001 order.  (P/O 179665, Exhibit O; Clow Response to Request for Admissions, No. 29, Exhibit W.)

Warren Williams, the City's Chief of Utility Maintenance in its Department of Public Works, Bureau of Water and Waste Water, and one of the officials supervising Walter Blimline, testified that Walter "[Blimline's] authority is very, very limited as to what he can order without being given specific direction."  (Williams Deposition, at 20, 23-24, Exhibit Q.)  Williams said there is "no" discretion as to the amount that can be spent under a City contract— that it is only "*up to the amount of the purchase order*."  (Id. at 13,16, Exhibit Q.)[14]

Despite the significance of purchase orders to the City's purchasing authority, Clow Valve and its sales representatives ignored them.  Outside sales representative Walston who "accepted" and processed the purported City orders, paid no attention to them.

> **Q:    Do you know whether the City of Baltimore had, as of September 2001 any limit to the amount of money which could be spent on Clow Valve product?**
>
> **MR. MANECHE:    Objection. Go ahead.**
>
> **A:    No.**

(Walston Deposition, at 33, Exhibit S.)

Shelley T. Shepherd, the Clow inside sales representative who worked with Walston on the alleged City order, testified that she normally enters a purchase order

---

[14]  Accordingly, Blimline's responsibilities include keeping track of the amount spent "in case we have to order again" off the purchase order.  (Williams Deposition, at 21, Exhibit Q.)

number, but "never" looks at the P/O amount when processing a municipal sales order.

(Shepherd Deposition, at 23, Exhibit V.)

Finally, the man who speaks for the Company on sales issues, Michael Vore, confirms it pays no heed to purchase order amounts.

> **Q:** **Does Clow Valve keep a running total of money spent against a purchase order? And I can be more specific, if you'd like.**
>
> **A:** **Please.**
>
> **Q:** **If the purchase order exists for say $100,000 and a customer purchases $25,000 worth of goods, does Clow somewhere, somehow keep track of how much is left on that purchase order?**
>
> **A:** **No.**[15]

(Vore Deposition, at 101-02, Exhibit R.)

The City is entitled to judgment as a matter of law in this matter because it could not have ordered Clow Valves in an amount approaching nearly $600,000 when, as Clow fully knew, at the time of the alleged order in September 2001, the City had authorized only $87,500 for valve purchases. Clow was willfully blind, at its peril, to its knowledge of the limited amount of the City's purchasing authority. Any valve order this Court finds the City placed should be limited to the amount of the City's duly authorized purchasing limit of $87,500.

---

[15]Vore said purchase order amounts were not important to Clow because "we know that municipal customers of ours will run fast and loose with their purchase orders, contracts, whatever that they write and order what they need, and then deal with the dollars on a later date." (Vore Deposition, at 96, Exhibit R.) This attitude, of course, runs counter to the specific language of its City contracts.

## II.    CLOW VALVE MADE NO EFFORT TO INVESTIGATE THE EXTENT OF THE AUTHORITY OF THE EMPLOYEE ALLEGEDLY ORDERING THE VALVES

Clow Valve knew of, and executed, every document pertinent to its bid and the resulting contract.  It was fully involved and aware of the entire procurement history of this matter.  Still, the Company chose to disregard virtually every contractual reference to the manner in which the City authorizes and limits its expenditures, relying instead on the alleged actions of a single low-level municipal employee ordering six times the permitted amount, as support for its contention that the City breached the Contract.  Its claim that the employee was authorized to conduct these transactions and, as described in the next section of this Memorandum, that he was authorized to alter the contractual specifications for the valves, fails as a matter of law.

The primary Maryland case on the authority of municipal employees is Gontrum v. Mayor and City Council of Baltimore in which a law and a sewer department employee made certain representations regarding the government's planned imminent acquisition of a homeowners' property for a street. 182 Md. 370 (1943). In reliance on these statements, the homeowners signed a "right of way" agreement, allowing the City to put a sewer on their property. Id. at 373-74. After waiting nine years for it to acquire the property they filed suit against the municipality.  Id. at 374.  In resolving the matter, the Court of Appeals first found that the employees did not work for an agency involved in street openings and could not have provided an opinion on which the homeowners should have relied.  Id.

What the Gontrum Court called the "more cogent reason" for the homeowners' failure to recover is particularly pertinent to the Clow case.

It is a fundamental principle of law that all persons dealing with the agent of a municipal corporation are bound to ascertain the nature and extent of his authority. *Dillon's Municipal Corporations*, 5th Ed., Sec. 777. A municipal corporation is not bound by a contract made in its name by one of its officers or by a person in its employ, although within the scope of its corporate powers, if the officer or employee had no authority to enter into such a contract on behalf of the corporation. 38 *Am. Jur., Municipal Corporations*, p. 83.

Section 1268 of *McQuillin's Municipal Corporations*, 2d Ed., states that **"The general rule is well settled and is constantly enforced that one who makes a contract with a municipal corporation is bound to take notice of limitation of its powers to contract and also of the power of the particular officer or agency to make the contract."**

182 Md. at 375 (emphasis added).

According to <u>Gontrum</u>, the issue in the Clow case – a government employee's authority to order goods - is to be construed after considering the "definitions and limitations" of the employee's authority.

Although a private agent, acting in violation of specific instructions, yet within the scope of a general authority, may bind his principal, **the rule, as to the effect of a like act of a public agent, is otherwise**. The city commissioner, upon whose determination to grade and pave, the contract was made, was the public agent of a municipal corporation, clothed with duties and powers, specially defined and limited, by ordinances bearing the character and force of public laws, ignorance of which can be presumed in favor of no one dealing with him on matters thus conditionally within his official discretion.

***

A municipal corporation cannot be held liable for the unauthorized acts of its agents although done *officii colore*, without some corporate act of ratification or adoption; and, **from considerations of public policy, it seems more reasonable that an individual should occasionally suffer from the mistakes of public agents or officials, than to adopt a rule, which, through improper combinations and collusion, might be turned to the detriment and injury of the public**.

<u>Id.</u> at 375-76, <u>quoting</u> <u>Baltimore v. Eshbach</u>, 18 Md. 276 (1862)(emphasis added).

Gontrum also cites long-standing principles guiding the resolution of matters of this nature.

> **No principle of the law relating to municipal corporations is more firmly established than that those who deal with their agents or officers must, at their peril, take notice of the limits of the powers both of the municipality and of those who assume to act as its agents and officers; and in no State has this principle been more frequently applied or more rigidly enforced than in Maryland.**

182 Md. at 376, quoting State v. Kirkley, 29 Md. 85, 110 (1869)(emphasis added).

There is no dispute of fact that despite having in its possession every relevant document setting forth the limits of Walter Blimline's authority, Clow was willfully blind to every term of those documents pertinent to this matter.

Clow General Sales and Marketing Manager Michael Vore testified Clow practice left to its outside sales representatives the duty of determining which government employee can provide orders. (Id., at 102.)  The Company gave them no instructions on this matter. (Id. at 61.)

Walston, the Clow Outside Sales Representative who processed the alleged City orders, acknowledged no one from the City ever identified Walter Blimline as the person who bought Clow products for the City.[16]  He said he deduced that from the circumstances of a meeting in February 2001 when he discussed with Blimline a possible City valve purchase.[17] (Id. at 46-47, Exhibit S.)  The alleged September 2001 sale was his first to the City of Baltimore. (Id. at 47-48.)

---

[16]  Walston started in that position in November 2000, less than one year before the alleged orders.  (Walston Deposition, at 9, Exhibit S.)  His territory included Virginia (to Richmond), Maryland, Delaware, Pennsylvania (to State College), and New Jersey.  (Id. at 19.)  At the time of the alleged orders, Baltimore City was the only government to which he sold.  (Id. at 20-21, 23.)

[17]  It is noted that at the time of this meeting, Contract BP-99083 and its $140,000 purchase order had not expired.  They expired in May 2001.

Walston says he took Blimline at his word when Blimline said he had an order. (Id. at 52.)  He says Blimline was asked for and provided him a Purchase Order number.[18] (Id. at 56, 65.)    Walston says he never asked Blimline to provide the actual document, but testified it wasn't important because Blimline had provided the number. (Id. at 67-68.)  Walston also testified he made <u>no</u> independent investigation of <u>any</u> of the matters at issue in this case.

> **Q:**    **Would it be important to you as the Clow outside sales representative to know if a contract between Clow Valve and the City of Baltimore had expired?**
>
> **MR. MANECHE:  Objection.  Go ahead.**
>
> **A:**    **No.**
>
> **Q:**    **And why not?**
>
> **A:**    **I would say that would be the business of the City, not mine.**
>
> **Q:**    **Would it be correct to say that you would not make any independent investigation on your own of whether or not the contract had expired?**
>
> **MR. MANECHE:  Objection.  Go ahead.**
>
> **A:**    **No.**
>
> **Q:**    **You would not conduct an investigation of your own to determine whether the contract had expired?**
>
> **MR. MANECHE:  Objection.**
>
> **A:**    **No, I would not.**
>
> **Q:**    **And would you conduct an investigation of your own to determine whether an order you received was within the contract limits -- excuse me -- was within the purchase order limits of the City of Baltimore's purchasing order?**

---

[18] This number is reflected on the purported Sales Order documents. (Exhibit T.)

**MR. MANECHE:  Objection.**

**A:    No, I would not.**

**Q:    And is that because you think the City would know what its authority was?**

**A:    That would be the business of the City.**

**Q:    And is it correct that you had never received any instruction on such matters from Clow Valve Company?**

**MR. MANECHE:  Objection.**

**BY MR. ANBINDER:**
**Q:    Correct?**

**A:    Yes**

(Walston Deposition, at 37-38, Exhibit S.)

Walston admits he <u>never</u> investigated the authority of Walter Blimline, whose very authority (or lack thereof) is at the center of this case.

**Q:    In September of 2001 when the valve issue, valve order arose, was it your belief that Walter Blimline was authorized to place that order?**

**A:    Yes.**

**Q:    And what exactly did you base that belief on?**

**A:    During one of our meetings he told me he would be ordering valves.**

**Q:    Was there anything that led you to believe, besides that, that he had the authority of his supervisors to place the order.**

**MR. MANECHE: Objection. Go ahead.**

**A:    I don't know.**

(Id. at 90-91, Exhibit S.)

<div align="center">*     *     *</div>

**Q:**     **…Did you ever investigate to try to confirm whether Walter Blimline was the person you should be dealing with for the City of Baltimore to sell valves?**

**MR. MANECHE:**     **Objection. Go ahead.**

**A:**     **No.**

**Q:**     **Did you know, as of September 2001, who if anyone might have been Mr. Blimline's superiors?**

**MR. MANECHE:**     **Who might have been or who were?**

**MR. ANBINDER:**     **Who were.**

**A:**     **No.**

(Id.,at 48.)

For their part, Walston and Clow blame Walter Blimline for the problems, saying Blimline never told Clow he had no authority to place the alleged order.[19]  (Id. at 98; Plaintiff's Answers to Interrogatories, No.6, Exhibit U, Clow Motion, at 6-7.)   That argument could support the City, which contends Blimline never placed the order and had no need to demonstrate his authority.   Primarily, it underscores the thinness of Clow's legal position in which the Company seeks to shift onto the municipal agent the burden of demonstrating his authority, contrary to Maryland law which places it on the party (Clow) relying on the municipal agent's representations. See Gontrum, 182 Md. 370.

The undisputed facts make clear that a) Clow Valve delegated to Outside Sales Representative Walston, its duty of locating the City agent authorized to place orders,

---

[19]  For example, Clow states "At no time Blimline did respond to Walston's sales solicitations by saying that he was not the appropriate or authorized person to make purchases for the City." (Clow Motion, at 7.)

without providing any instruction   b) Walston made no effort whatsoever to determine whether reliance on this particular municipal agent was justified for an order of this magnitude,[20] c) Clow was willfully blind to contract terms and purchasing limits with which it had agreed and about which it had long been on notice, and which would have avoided this dispute, and d) Clow deliberately and wholly failed "to ascertain the nature and extent" of the purported agent's authority" as required by Maryland law.  182 Md. at 375 (citation omitted).   "[O]ne who makes a contract with a municipal corporation is bound to take notice of limitation of its powers to contract and also of the power of the particular officer or agency to make the contract."  Id.

"Everyone dealing with officers and agents of a municipality is charged with the knowledge of the nature of their duties and the extent of their powers, and therefore such a person cannot be considered to have been deceived or misled by their acts when done without legal authority."    Inlet Associates v. Assateague House Condominium Ass'n., 313 Md. 413, 437 (1988), quoting Lipsitz v. Parr, 164 Md. 222, 228 (1933).

The Clow Valve facts are a textbook example of why the courts should not "adopt a rule, which, through improper combinations and collusion, might be turned to the detriment and injury of the public."  Id. at 375-76, quoting Baltimore v. Eshbach, 18 Md. 276 (1862)(emphasis added).   Under these circumstances, the City is not liable, and cannot be liable, for the sales orders allegedly placed by Walter Blimline, a City agent without authority.

---

[20]  Walston says that as of September 1, 2001, right before the alleged order was placed, the City of Baltimore was the only government customer to which he sold valves. (Walston Deposition, at 20-21, 23-24 Exhibit S.)

III.    **MOST OF THE VALVES SHIPPED BY CLOW VALVE DO NOT CONFORM WITH SPECIFICATIONS SET FORTH IN THE CONTRACT**

Specifications for the valves desired by the City are set forth within the Contract. (Exhibit F.) Clow acknowledges that these specifications do not include a device known as an "indicator barrel," which indicates whether the valve is open or closed.[21]  (Vore Deposition, at 85, Exhibit R; Severn Deposition, at 16, Exhibit Y.)   Despite this admission, all 16" to 36" inch valves contain this indicator barrel, totaling more than $560,000 in non-conforming goods, virtually the entire disputed amount. (Severn Affidavit, Exhibit AA.)   Outside Sales Representative Walston claims Walter Blimline specifically requested it this way.  (Walston Deposition, at 63-64, Exhibit S.)

The City denies this claim, but even if true, as a matter of law, Clow knew or should have known that Blimline was not authorized to alter the specifications of the product.[22]   Again, this matter is governed by the Contract which restricts the ability of a vendor to change the specifications of a product.

---

[21]    August Severn, General Superintendent of the Bureau of Water and Waste Water, Water Maintenance Division, says "we would not have spec'd that indicator on there, because it's open faced. The gears are open, and we don't spec anything with open-face gears.  Everything is closed-face gears. The indicator is an open-faced gear which wouldn't be in our specs.  (Severn Deposition, at 17, 19-20, Exhibit Y.)  Clow's Engineering Manager, Jerry Bottenfield, says that the indicator barrel could leave the stem exposed, causing rocks or objects to get into the stem which could make the valve difficult to turn. (Bottenfield Deposition, at 35-37, Exhibit Z.) The City didn't have this in its specifications, and wouldn't have ordered it.

[22] Blimline says he knows nothing about valves or valve specifications. (Blimline Deposition, at 74, Exhibit P.)

**SPECIAL CONDITIONS**

**SCOPE**

**FURNISH AND DELIVER BALTIMORE STANDARD VALVES AND SERVICE FOR THE CITY OF BALTIMORE *IN ACCORDANCE WITH SPECIFICATIONS* AND OTHER DOCUMENTS HEREIN.**

(Contract BP-99083, at 8, Exhibit F.(italics added))

.       Walston testified that the Contract didn't matter to him.

> **Q:    Would it have been important to you to know whether or not the barrel indicator was actually part of the City's specifications?**
>
> **MR. MANECHE:    Objection. Go ahead.**
>
> **A:    No.**
>
> **Q:    Is that because if Walt Blimline wanted it, then you would provide it?**
>
> **A:    Yes.**

(Walston Deposition, at 65-66, Exhibit S.)

August Severn, the City's General Superintendent who controlled the City and Baltimore County valve operation, says another reason the delivered valves also don't meet the City's specifications because "[t]he stem that you operate the valve with…is probably about a foot high."  (Severn Deposition, at 36, Exhibit Y.)

Nearly all the money Clow seeks in this litigation arises from the alleged sale of valves that do not conform to the specifications of its City contract.  Clow knew modifications of the specifications from Blimline, if any, ran counter to the contract and were unreliable and unauthorized representations.  Clow also knew that the Contract required any modification of specifications to first be proposed <u>in writing to</u>, and

approved <u>in writing by</u>, the City Purchasing Agent.  (General Condition XIX, Exhibit F; General Condition XXVII, Exhibit N.)

For this reason, the Court should deny Summary Judgment to Clow.  If it grants Summary Judgment in favor of Clow, it should reduce the amount of damages to Clow by the amount of the nonconforming valves as set forth in the Affidavit of August Severn in Exhibit AA.

Since the City should not be held responsible for goods that do not conform to its specifications and which were not requested in writing of, and approved in writing by the City Purchasing Agent as required by the Contract, the Court should grant the City's Motion for Summary Judgment.

## IV.    THE CITY SEASONABLY REJECTED THE VALVES

As set forth above, the City denies any financial responsibility for the valves at issue, or that any contract was formed by Walter Blimline's alleged actions.  If the City is found responsible, the City contends its liability is capped at $87,500, the amount of the purchase order duly issued by the Bureau of Purchases under the authority of the Board of Estimates.   The City denies that there could be any greater contractual liability because, as stated above, it had neither the financial nor legal authority to enter into it. The City further contends that it rejected the goods within a reasonable time and repudiated any contract that may have been formed.

Walter Blimline testified that in October 2001, he informed Clow's Outside Sales Representative, Walston, that "I never gave you any order…I asked you for price quotes."  (Blimline Deposition, at 59-60, Exhibit P.)  In January 2002, Clow informed Walter Blimline's supervisor, Warren Williams, that Blimline had ordered valves which

were delivered and still unpaid.  (Williams Deposition at 29, 59, Exhibit Q.)  This was the first time someone from the City other than Blimline was notified of the alleged order. Williams promptly investigated the matter and informed Clow Credit Manager Malloy in late January or in early February 2002 that "the valves were not ordered, and…that it was a mistake, and that they needed to come and get their valves,"  "and that we would not be accepting the valves."  (Id. at 30, 35-36, 59 Exhibit Q.)  Williams also asked Malloy when Clow would pick up the valves.  (Id. at 36.)  Williams repeated the demand at the April 2002 meeting in Baltimore with Clow representatives.  (Id. at 44.)

"[A] reasonable time for taking any action depends on the nature, purpose and circumstances of such action."   (Md. Commercial Law Code Ann. §1-204(2)(2002)). Whether or not an action is taken within a "reasonable time" is normally a question of fact.  Environmental Elements Corporation v. Mayer Pollock; 497 F.Supp 58 (Md. 1980).

If this Court determines the City ordered the valves, the City contends it properly and seasonably rejected the valves and/or repudiated the purported contract. Accordingly, Clow's Motion for Summary Judgment should be denied.


## V.    AS A MATTER OF LAW, THE CITY WAS NOT UNJUSTLY ENRICHED BY THE ALLEGED ORDER

Unjust enrichment is an equitable solution to a problem created by the non-existence of a formal contractual relationship between the parties. See Mass Transit Administration v. Granite Construction Company, 57 Md. App. 766 (1984)("When there is an express contract dealing specifically with the services rendered, quantum meruit is unavailable….The general rule is that no quasi-

contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.")

There were clearly contracts between the parties governing the relationship and business dealings between the parties.  Accordingly, this Court need not reach unjust enrichment.  Should the Court consider this issue, then the City contends it was not unjustly enriched as a matter of law.

Clow Valve contends the City must pay for the valves because it was unjustly enriched by their delivery.  Clow is wrong as a matter of law.

To establish a claim of unjust enrichment, Plaintiff must demonstrate:

1.    A benefit conferred upon the defendant by the plaintiff;

2.    An appreciation or knowledge by the defendant of the benefit;and

3.    The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

County Commissioners of Caroline County, MD v. J. Roland Dashiell & Sons, Inc., 358 Md. 83, 95 (2000), citing Everhart v. Miles, 47 Md. App. 131, 136 (1980).

Clow cannot establish these elements.  Clow conferred no benefit upon the City by delivering and refusing to accept the return of valves the City neither ordered nor wanted nor needed and which nearly entirely do not meet specifications.  The City neither appreciates nor is aware of any benefit it has yet derived from their delivery.  Clow has provided no evidence of any such benefit.  Holding such a large number of valves, in fact, has been a detriment, requiring the City to exercise care over them, and losing the use of valuable storage space.  Further, most of the valves do not meet City

specifications.   (Severn Affidavit, Exhibit AA.)   The City stands ready to return the valves to Clow just as it attempted eighteen months ago.

In its Motion, Clow heavily relies upon the case of <u>SDSS, Inc. v. Mayor and City Council of Baltimore,</u> an unreported *per curiam* Opinion that may well be of dubious precedential value.[23]   2000 U.S. App. LEXIS 12270 (4th Cir.   June 5, 2000).   Regardless, the primary distinguishing fact between the instant case and SDSS is the nature of the services at issue.   In <u>SDSS</u>, Baltimore City Public School "employees accepted and participated in the extensive preparation work" of a computer network. (<u>Id.</u> at *8.)   Similarly, in <u>Konig v. Mayor and City Council of Baltimore</u>, relied upon by the Fourth Circuit in SDSS, the City was forced to pay a contract "for completing construction and installation of water filtering equipment." (Id. at *5-*6, <u>citing</u> <u>Konig</u>, 128 Md. 465 (1916)).   In both cases there were discernable, appreciable and non-disgorgeable services and benefits to the municipality and its citizens.   Not so with the Clow Valves that sit, awaiting return to their maker.

The City contends that it was not unjustly enriched by the circumstances of this case and asks that its Motion for Summary Judgment be granted.   In the alternative, the City contends that the matter of the City's alleged "enrichment" is in dispute and inappropriate for resolution at summary judgment and asks, therefore, that Clow's Motion for Summary Judgment be denied.

---

[23] Local Rule 36(b) of the U.S. Court of Appeals for the Fourth Circuit states that "In the absence of unusual circumstances, this Court will not cite an unpublished disposition in any of its published opinions or unpublished dispositions."  U.S.C.S. Ct App 4th Cir, Local R 36(c) (2003).

## VI.    CLOW FAILED TO EXHAUST ITS ADMINISTRATIVE REMEDIES

Section XXXVII of the General Conditions of Contract BP-01170, the contract in

existence at the time of the alleged order, should take this matter out of federal court

and place it within the Bureau of Purchases in Baltimore City:

**XXXVII        AUTHORITY OF THE CITY PURCHASING AGENT:**

**A.    The parties to this contract agree that the City Purchasing Agent is hereby vested with the power and authority to determine the amount or quantity, quality and acceptability of the work, materials, supplies and services provided under this contract.  The City Purchasing Agent shall decide any and all questions which may arise regarding the Offeror's obligations and the fulfillment of the contract terms.**

**B.    The City Purchasing Agent shall act as the Referee if any dispute arises between the Offeror and City regarding this contract.  The determination of the City Purchasing Agent may be appealed on the record to a court of competent jurisdiction in Baltimore City.  Final payment by the City will not be made unless and until all issues in dispute have been fully and finally settled and/or adjudicated.**

Summary Judgment should be granted in favor of the City in this matter because

by filing the instant litigation, Clow failed to exhaust its administrative remedies by first

seeking relief through the City Purchasing Agent as required by the Contract, and

because, pursuant to this term, jurisdiction is to lie in Baltimore City.

## <u>CONCLUSION</u>

In its Motion for Summary Judgment, Clow Valve Company uses colorful

language to express its views that the City ordered the valves.  But the only important

colors in this case are the black and white of the contracts, purchase orders, law and

other documents that resolve every one of the disputed issues in favor of the City.[24]

---

[24] It is notable that considering this is a *contract* matter, Clow's Motion fails to attach or even cite the *contracts* at issue for evidence of its claims.

32

These documents specifically spell out the term of the Contracts, the limits of the Purchase Orders, valve specifications, the method of modifying the contract and the extent and limits of the authority of the municipal agent on whom the Company relies.

To its detriment and contrary to law, Clow policy and practice chose to ignore each and every one of these documents or to ever rely on anyone other than Walter Blimline, a low level government employee with whom it chose to deal entirely until such time as payment never came.  Why this was so is legally unimportant.[25]  What matters is that Clow made certain decisions and choices that failed to protect it or impose liability on the City of Baltimore.

Defendant, Mayor and City Council of Baltimore City, respectfully requests this Court to enter Summary Judgment in its favor and against Plaintiff, Clow Valve Company.

<div style="margin-left:40%;">

_____/s/_____

JUSTIN J. KING
Bar No.: 00819
Principal Counsel
(signed by Robert D. Anbinder,
with permission of Justin J. King)
Department of Law
Room 81
100 N. Holliday Street
Baltimore, Maryland 21202
(410) 396-3945
**Fax: (410) 547-1025**


_____

ROBERT D. ANBINDER

</div>

---

[25] For example, Clow says "the City of Los Angeles routinely exceed such estimates" listed on a requirements contract.  (Clow Motion, at 21 fn 14.)  This is obviously irrelevant to Clow's contractual dealings with the City of Baltimore.  In any event, Clow misses the point (as perhaps it must in order to prevail), that it is the City's purchase orders that followed Clow's execution of the contract, which set "specific limits on the amount of valves that the City may or will purchase thereunder."  (Id.)

Bar No.: 10885
Assistant City Solicitor,
Department of Law
Room 81
100 N. Holliday Street
Baltimore, Maryland 21202
(410) 396-3204
**Fax: (410) 547-1025**


_____/s/_____
NICHOLAS JOHANSSON
Bar No.: 27067
Assistant City Solicitor,
(signed by Robert D. Anbinder,
with permission of Nicholas Johansson)
Department of Law
Room 81
100 N. Holliday Street
Baltimore, Maryland 21202
(443) 984-1473
**Fax: (410) 547-1025**


Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

CLOW VALVE COMPANY,       )
a division of McWane, Inc.    )
                            )
      Plaintiff         )
                            )
      vi.           )     Case No.:  JFM 02 CV 3136
                            )
MAYOR and CITY COUNCIL OF    )
BALTIMORE CITY            )
                            )
      Defendant.   )

---

**REQUEST FOR HEARING**

Mayor and City Council of Baltimore City, by its attorneys, hereby requests this Court to set its Cross-Motion for Summary Judgment and Response to Clow Valve Company's Motion for Summary Judgment for a hearing.


                                                    /s/
                                   ROBERT D. ANBINDER
                                   Assistant Solicitor


                                   Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CLOW VALVE COMPANY,<br>a division of McWane, Inc. | ) <br> ) <br> ) <br> ) |
|     Plaintiff | ) <br> ) |
|     vii. | )     Case No.:  JFM 02 CV 3136 <br> ) |
| MAYOR and CITY COUNCIL OF<br>BALTIMORE CITY | ) <br> ) <br> ) |
|     Defendant. | ) |

## ORDER

Upon the foregoing Cross-Motion for Summary Judgment filed by the Mayor and City Council of Baltimore City, Defendant, and opposition thereto by Clow Valve Company, it is this＿＿＿＿day of ＿＿＿＿＿＿＿＿＿＿＿, 2003, by the United States District Court for the District of Maryland,

**ORDERED** that the Cross-Motion of the Mayor and City Council of Baltimore City, Defendant, for Summary Judgment be and is hereby

**GRANTED** in favor of the Mayor and City Council of Baltimore City, Defendant, in the above-entitled matter.

**IT IS FURTHER ORDERED** that judgment be entered in favor of the Mayor and City Council of Baltimore City, Defendant, and against Plaintiff, Clow Valve Company.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
**JUDGE**

## APPENDIX OF EXHIBITS

| EXHIBIT LETTER | DESCRIPTION |
| --- | --- |
| A | CLOW COMPLAINT |
| B | CLOW BID PROPOSAL (BP-99083) |
| C | WHITAKER AFFIDAVIT (BP-99083) |
| D | BOARD OF ESTIMATES APPROVAL (BP-99083) |
| E | CLOW AGREEMENT/SIGNATURE PAGE (BP-99083) |
| F | CONTRACT BP-99083<br>(Notice of Lengthy Exhibit) |
| G | PURCHASE ORDER P162235 (BP-99083) |
| H | PURCHASE ORDER P162235 SUMMARY (BP-99083) |
| I | PURCHASE ORDER P179565 (BP-99083) |
| I-A | CHANGE ORDER P179565  (BP-99083) |
| J | CLOW BID PROPOSAL (BP-01170) |
| K | WHITAKER AFFIDAVIT  (BP-01170) |
| L | BOARD OF ESTIMATES APPROVAL (BP-01170) |
| M | CLOW AGREEMENT/SIGNATURE PAGE  (BP-01170) |
| N | CONTRACT BP-01170<br>(Notice of Lengthy Exhibit) |
| O | PURCHASE ORDER P179655 (BP-01170) |
| P | WALTER BLIMLINE DEPOSITION |
| Q | WARREN WILLIAMS DEPOSITION |
| R | MICHAEL VORE DEPOSITION |
| S | WILLIAM T. WALSTON DEPOSITION |

| | |
|---|---|
| T | SIGNED PRICE QUOTES |
| U | CLOW ANSWERS TO INTERROGATORIES |
| V | SHELLY T. SHEPHERD DEPOSITION |
| W | REQUEST FOR ADMISSIONS/CLOW RESPONSES |
| X | BALTIMORE CITY CHARTER |
| Y | AUGUST SEVERN DEPOSITION |
| Z | JERRY BOTTENFIELD DEPOSITION |
| AA | AUGUST SEVERN AFFIDAVIT |