**Clow Valve Company**
**v. Mayor and City Council of Baltimore City**

Deponent: WALTER L. BLIMLINE
April 2, 2003

Page 1

EXHIBIT
P

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3   CLOW VALVE COMPANY,            :

 4              Plaintiff           :

 5   vs.                            :   Case No.:

 6   MAYOR AND CITY COUNCIL OF      :   JFM 02-3136

 7   BALTIMORE CITY,                :

 8              Defendant           :

 9                      ---------------------

10        Deposition of WALTER L. BLIMLINE, called for

11   examination by Counsel for the Plaintiff, having been

12   sworn by Martin J. Giordano, Registered Merit Reporter,

13   and a Notary Public in and for the State of Maryland,

14   taken at The Law Offices of Venable, Baetjer and

15   Howard, 2 Hopkins Plaza, Suite 1400, Baltimore,

16   Maryland, at 11:15 a.m., on Wednesday, April 2, 2003.

17                      ---------------------

18

19

20   Reported by:

21   Martin J. Giordano, RMR
```

IRWIN REPORTING & VIDEO, LLC

410-494-1880

Page 18

1   Q. Well, if you turned the position down, why
2   did you apply for it in the first place?
3   A. Well, the chief of our department wanted to
4   promote me, and, after -- now that I'm -- after it was
5   all said and done, and we talked about it, I decided I
6   didn't want to take the position.
7   Q. Okay.
8   A. It was offered to me.
9   Q. It was offered to you?
10  A. Yes, sir.
11     MR. MANECHE: Mark that as 2.
12  A. By Mr. Williams.
13  Q. Okay.
14     (Whereupon, Blimline Deposition Exhibit
15  No. 2, 5/26/94 letter, Civil Service Commission to
16  Blimline, was marked for identification.)
17     BY MR. MANECHE:
18  Q. Mr. Blimline, would you please take a look at
19  what's marked as Exhibit Number 2, and let me know if
20  you recognize that.
21     (Witness perusing document.)

Page 19

1   A. Okay.
2   Q. Do you recognize it?
3   A. Sure. I recognize it.
4   Q. What is it?
5   A. What -- Civil Service saying that I didn't
6   qualify, but --
7   Q. Okay. It's a notice from the Civil Service
8   Commission saying that your application for the
9   position of Store Supervisor II has been disapproved;
10  is that correct?
11  A. Yeah.
12  Q. Okay. It's dated May 26, 1994?
13  A. Uh-huh.
14  Q. Yet, you say you were offered the position
15  anyway; is that right?
16  A. Well, this was appealed --
17     MR. ANBINDER: Number 2. Please refer to it.
18     THE WITNESS: Pardon?
19     MR. ANBINDER: Just for the record, you
20  gestured, and I'm --
21  A. Exhibition Number 2 -- Exhibit Number 2 was

Page 20

1   appealed, and I qualified.
2   Q. Okay. To whom was it appealed?
3   A. Documentation was sent to Civil Service that
4   I had additional years of experience. That was why I
5   wasn't -- why that was turned down.
6   Q. Okay. So you actually appealed this
7   decision; is that correct?
8   A. Yeah. Well, I -- it -- when you -- I'm
9   saying -- I'm using the word "appeal" in a broad sense,
10  that I supplied documentation that I did qualify, and I
11  would have qualified.
12  Q. Okay. And did you receive a notice from the
13  Civil Service Commission approving you to actually take
14  the exam?
15  A. No.
16  Q. Okay. So they never actually approved you to
17  take the exam for the Store Supervisor II position; is
18  that correct?
19  A. Correct.
20  Q. Okay. So how is it that -- and you never
21  took the exam, then, right?

Page 21

1   A. No.
2   Q. Okay. So you never took the examination for
3   the Store Supervisor II position?
4   A. Again?
5   Q. No is the answer, correct?
6   A. No.
7   Q. Okay. So, if you never received approval to
8   take the examination for the Store Supervisor II
9   position, and, if you never actually took the
10  examination for the Store Supervisor II position, how
11  were you offered the Store Supervisor II position?
12     MR. ANBINDER: Just a second. I'm going to
13  object on the grounds of relevance, but --
14     MR. MANECHE: It's absolutely relevant to his
15  experience.
16     MR. ANBINDER: You can go -- I disagree,
17  but --
18     MR. MANECHE: Okay.
19     MR. ANBINDER: -- go ahead.
20  A. I could prove that I qualified due to
21  experience, and this was what -- the reason why I was

Page 38

1    A.  The reason why I ask the question, I'll get
2  paperwork from Engineering saying that they have a
3  contract, and the contract calls for X amount of
4  valves, and they'd like them to be ordered. Part of my
5  job is to put them on a requisition. In turn, the
6  requisition turns into a purchase order. In turn, a
7  copy of the purchase order is sent to whoever is the
8  lowest bidder on the valves. If that's ordering them,
9  yes, I have done that.
10   Q.  All right. But, from any orders -- I mean,
11 isn't it true that you often call up third-party
12 vendors on the phone and say, hey, so and so, I'd like
13 to order your product; please send it over?
14   A.  Yeah. That's correct. Yes, I have.
15   Q.  All right. Do you also sometimes send a
16 written order to a third-party vendor? And, when I'm
17 using the term "order" in this question, I mean do you
18 fax them a sheet that says, please send me so and so
19 product?
20   A.  Yes.
21   Q.  Okay. With respect to third-party vendors --

Page 39

1  I'm talking about your communications with a third-
2  party vendor; not does the City send them a purchase
3  order or what not. I'm asking you, Walt Blimline,
4  either communicating with a third-party vendor --
5    A.  Right.
6    Q.  -- have -- other than the Mueller order that
7  you described earlier, have you ever ordered valve
8  products on behalf of the City of Baltimore?
9    A.  Could you say that again, please?
10   Q.  Okay. Sure. Using -- let me define the term
11 "order" for the purpose of this question. An order
12 would be you calling up -- Walt Blimline calling up a
13 third-party vendor on the phone and saying, please send
14 me, you know, X number of valves; have them delivered
15 on this date, to this yard, or sending a fax to a third
16 party vendor saying, please send --
17   A.  No.
18   Q.  -- this number of valves on this date to this
19 yard, or any other type of communication you can think
20 of -- e-mail, whatever -- to a third-party vendor
21 saying, please send over this product on this date.

Page 40

1  Have you ever done that with respect to valve
2  products on behalf of the City of Baltimore --
3    A.  No.
4    Q.  -- besides the Mueller transaction?
5    A.  No.
6    Q.  But you've done that with respect to all
7  sorts of other types of products; isn't that right?
8    A.  Yes.
9    Q.  Okay. Is that something you do on a regular
10 basis?
11   A.  Yes.
12   Q.  Okay. That's, in fact, a very significant
13 part of your job, isn't it?
14   A.  Correct.
15   Q.  Okay. What is the largest dollar figure of
16 products you've ever ordered from a third-party vendor
17 using one of those types of communications?
18   A.  Clarify types of communication.
19   Q.  Fax, e-mail, telephone.
20   A.  Purchase order?
21   Q.  You sending a document or making a telephone

Page 41

1  call or e-mail to a third-party vendor.
2    A.  A thousand dollars.
3    Q.  Thousand dollars?
4    A.  (Witness nodding head in the affirmative.)
5    Q.  Okay. Well, you just told me a few minutes
6  ago that the Mueller transaction was $12,000.
7    A.  But here -- see, you don't -- if you let me
8  explain --
9    Q.  Sure.
10   A.  -- when those valves were to be ordered, they
11 were bought -- they were done with what was referred to
12 as emergency procurement.
13   Q.  Okay.
14   A.  Because of the urgent need that they had to
15 be replaced very quickly, I got authorization from the
16 head buyer to -- Mr. Jack Davis, to purchase these
17 valves based on a purchase order number that I provided
18 to him. It is called a confirming purchase order.
19      I arbitrarily couldn't do it without having
20 his authorization. So it was $12,000. That's what
21 they cost, and, when I called him, I gave him the

Page 42

1  purchase order number that was confirming to cover the
2  cost of the valves.
3    Q. So, then, how -- when you say that the
4  largest order that you've ever placed with a third-
5  party vendor was a thousand dollars, were you talking
6  about orders that you placed in the absence of a
7  purchase order?
8    A. Yes.
9    Q. Okay. So your ordering authority in your
10 mind is a thousand dollars for non-purchase order
11 orders?
12   A. Absolutely.
13   Q. Okay. How do you know that?
14   A. That's what -- I'm told that this is -- you
15 can't purchase over a thousand dollars on a direct
16 payment order.
17   Q. Who told you that?
18   A. Ben Meli, our fiscal person downtown.
19   Q. Okay. How long ago did he tell you that?
20   A. That's always been as far as I know.
21   Q. That amount ever increase over time?

Page 43

1    A. No. It's always been a thousand dollars.
2    Q. Been a thousand since the mid '90s?
3    A. Oh, yeah.
4    Q. Okay. With respect to all other orders over
5  a thousand dollars, there has to be a purchase order;
6  is that right?
7    A. That's correct.
8    Q. Okay. What's the largest order you've ever
9  placed with a purchase order in place?
10   A. I believe about $400,000.
11   Q. Okay. What was that order for?
12   A. Valves.
13   Q. With whom did you place that order?
14   A. I didn't place the order. I did the
15 paperwork. The order was --
16   Q. Did you make a telephone call?
17   A. No, no. I -- Engineering told me they needed
18 this many valves under this contract.
19   Q. Right.
20   A. I made up the paperwork, sent it to the head
21 buyer, Jack Davis, who put it out on bid. The bid came

Page 44

1  back. Kennedy Valve got the bid, and that's who got
2  the order.
3    Q. How did Kennedy Valve know what valves to
4  provide?
5    A. Well, it's all in the documentation of the
6  requisition -- what size, how many, and what size
7  valves, and what type of valves.
8    Q. Okay. Who provided that information to them?
9    A. Engineering.
10   Q. Who?
11     MR. ANBINDER: If you -- you know, or you
12 don't know.
13   Q. I'm sorry. You can't get help from the
14 audience.
15   A. I don't know.
16   Q. Okay.
17   A. I don't know who that would have been down
18 there --
19   Q. All right.
20   A. -- but that documentation comes from
21 Engineering.

Page 45

1    Q. Did you ever call up Kennedy Valve in
2  connection with that order and say, "Here is what we
3  need"?
4    A. No. No.
5    Q. All right. So Kennedy just got a piece of
6  paper, and they knew what to do from that point
7  forward?
8    A. Kennedy got a purchase order stating that
9  this is an order based on the bid proposal.
10   Q. Okay. And that was it?
11   A. That was it.
12   Q. Next thing you knew, the valves arrived, and
13 you got a bill?
14   A. Well, then they sent the valves in, and we
15 got the bill.
16   Q. That was it?
17   A. That was it.
18   Q. Never talked to anyone on the telephone at
19 Kennedy --
20   A. No.
21   Q. -- with regard to that order?

Page 46

1   A. No.
2   Q. No one from Kennedy called you to confirm the
3 order for $400,000?
4   A. No. They had a purchase order in hand.
5   Q. Okay. So that was the end of it as far as
6 you were concerned?
7   A. Well, they --
8       (Whereupon, Mr. Severn leaves the room.)
9   A. There was no need for me to talk to them.
10   Q. Okay. How did they know when to deliver the
11 valves, where to deliver them?
12   A. It's sitting right on -- it's right on the
13 purchase order where to deliver them.
14   Q. Is that always the case?
15   A. No.
16   Q. Okay. So, with regard to some purchase
17 orders, there is a need for subsequent telephone
18 conversation, isn't there?
19   A. Yes, because some purchase orders are on a
20 need basis.
21   Q. Okay.

Page 47

1   A. We have a blanket purchase order for a
2 million bags of cement. I call the company whenever
3 we're ready for a delivery --
4   Q. Right.
5   A. -- and we pay for it as it comes in.
6   Q. Okay. So, in the context of a blanket
7 purchase order, the actual order for a specific
8 delivery is placed by you, isn't it?
9   A. Yeah.
10   Q. Okay.
11   A. Now -- no. Hold on. I only fill out the
12 paperwork. If I want to order a million bags of
13 cement, I fill out the paperwork --
14   Q. No. I understand that.
15   A. -- and then it goes to Purchasing, and you go
16 out on bid, and then I get a copy of the purchase
17 order, which gives me authorization to start buying off
18 of that purchase order.
19   Q. Right. So, when you have authorization to
20 start buying off of a purchase order, in order to place
21 a specific order for, let's say, 500 bags of cement,

Page 48

1 then you have to call the vendor and say, send me --
2   A. Deliver it.
3   Q. -- 500 bags of cement; deliver it on X date
4 on X yard, right?
5   A. Right. Correct.
6   Q. Okay. Have you ever done that in connection
7 with a valve order? I mean, you told me about the --
8 let me start over. You told me about the Kennedy Valve
9 transaction.
10   A. Yeah.
11   Q. According to you, there were no telephone
12 calls at all?
13   A. No.
14   Q. It was all done by paperwork, correct?
15   A. Right.
16   Q. Have there ever been any valve orders in
17 which you have been involved that were not done
18 completely by paperwork, that involved telephone calls
19 or some other manner of communication?
20   A. Okay. We have -- we have a contract in place
21 with Clow Valve on as we need basis. Whenever we

Page 49

1 needed the valves, we would call and say, off of this
2 contract number, we need X amount of valves shipped to
3 our Washington Boulevard yard.
4   Q. And you're the one that would make that call,
5 right?
6   A. Yes.
7   Q. Okay. And you did make calls like that,
8 didn't you?
9       MR. ANBINDER: Objection.
10   A. To who?
11   Q. To anyone at Clow.
12   A. No.
13   Q. You never made that type of a phone call to
14 Clow?
15   A. No.
16   Q. Okay. Did anyone ever make that type of a
17 phone call to Clow that you're aware of?
18   A. Not that I'm aware of.
19   Q. Okay. Never spoke with anyone at Clow at
20 all?
21   A. Yeah. I've spoke to people at Clow.

Page 50

1  Q. Okay. When is the first time --
2      MR. KING: Excuse me. Can we go off the
3  record and perhaps just talk to Bob for one minute?
4      MR. ANBINDER: Yeah. I -- there is --
5      MR. KING: I think there is a little
6  misunderstanding, at least from this person's point of
7  view.
8      MR. ANBINDER: The misunderstanding is that
9  deals with order and authority, and I think you're --
10     MR. KING: No. That's not what I'm --
11     MR. ANBINDER: Okay. We're talking about
12 different things, but can I take a break?
13     MR. MANECHE: All right.
14     (Recess taken.)
15     MR. MANECHE: Martin, could you read the last
16 question and answer back?
17     (The record was read as requested.)
18     MR. ANBINDER: Now are you going to clarify
19 in your question, or do you want me to -- we -- I'll
20 put this on the -- try and put this on the record.
21     Counsel had an opportunity to talk during the

Page 51

1  short break to indicate the City's concern that the
2  question might have been unclear as to whether or not
3  it was a hypothetical or not, or whether we're talking
4  about something actual, and Mr. Maneche is aware of
5  that, and I think we'll try and clarify that.
6      MR. MANECHE: Well, I think that it will be
7  clarified by my subsequent questions. If it's not, you
8  all of course are welcome to clarify it on redirect.
9      BY MR. MANECHE:
10     Q. Let me just be certain I understand your
11 testimony, Mr. Blimline, as to what your authority to
12 place orders is. My understanding from what you told
13 me is your understanding is you have authority up to
14 $1,000 to place a direct order for a product or
15 products with a third-party vendor; is that correct?
16     A. That's absolutely correct.
17     Q. Okay. Beyond a thousand dollars, you can
18 only operate pursuant to a purchase order; is that
19 correct?
20     A. That's correct.
21     Q. And then, within the world of purchase

Page 52

1  orders, there are two types of purchase orders; is that
2  right -- there is a specific purchase order for
3  specific products, and then there is what's called a
4  blanket purchase order, which gives you general
5  authority to purchase products on an as-needed basis;
6  is that correct?
7      A. That's correct.
8      Q. Okay.
9      A. And there is a third.
10     Q. What's the third?
11     A. That's the confirming purchase order, which
12 is under -- only used under emergency conditions.
13     Q. All right. Besides the Mueller transaction,
14 have you ever purchased valves on an emergency basis?
15     A. No.
16     Q. Okay. That was on an emergency basis,
17 though, yes?
18     A. Yeah.
19     Q. That's called a confirming order?
20     A. Yes.
21     MR. ANBINDER: It was a confirming purchase

Page 53

1  order.
2      THE WITNESS: Confirming purchase order.
3      MR. MANECHE: Confirming purchase order.
4  Okay.
5      BY MR. MANECHE:
6      Q. Subsequent to your introductory meeting with
7  Tom Walston, when is the next time you recall having
8  any contact with anyone at Clow Valve, either in person
9  or by telephone?
10     A. I remember talking to Tom Walston again. I
11 mean, I remember talking to him again.
12     Q. Do you remember when that was -- the first
13 time you talked to him after that?
14     A. I don't know how long after I talked to him
15 the first time or met him the first time, which I can't
16 remember. I talked to him a couple times. I don't
17 know the sequence of time. I don't know how much time
18 was in between.
19     Q. All right. Do you recall talking to him on
20 the telephone sometime in 2001?
21     A. Pardon me? 2001?

**Page 54**

1  Q. Yeah.
2  A. I'm not -- I'm not sure of dates -- of the
3  dates, but I know I called him. I called him.
4  Q. All right.
5      MR. ANBINDER: The question was: Do you
6  remember?
7  A. Yeah. I called him.
8  Q. Okay. And what do you remember about that
9  telephone call?
10  A. I asked him for price quotes on valves.
11  Q. All right. Did you ask him for price quotes
12  on specific types of valves?
13  A. Yes.
14  Q. All right. Do you remember how many types of
15  valves you asked for price quotes on?
16  A. Five. Five different valves.
17  Q. Five different types of valves?
18  A. Five different sizes of valves.
19  Q. Five different sizes of valves. Okay.
20      Did you ask him for price quotes on a
21  specific quantity of types of valves?

**Page 55**

1  A. No. Just --
2  Q. Just give me a quote on a 30-inch valve?
3  A. Right.
4  Q. Okay. What else did you speak to him about
5  during that particular conversation?
6  A. That was -- that was it.
7  Q. And you don't recall when that conversation
8  occurred?
9  A. No, I don't.
10  Q. Do you recall if it was at or around, before
11  or after the time of the World Trade Center attack?
12  A. (Witness shaking head in the negative.)
13  Q. No recollection at all?
14  A. No.
15  Q. What did Mr. Walston state to you during that
16  conversation?
17  A. That he'd get back to me with a quote.
18  Q. And did he?
19  A. No.
20  Q. He never did?
21  A. Well, he did. Yes, he did, but it was a

**Page 56**

1  couple weeks later. And I'm not positive it was a
2  couple weeks. It could have been ten days, or eight
3  days, or seven days, but it was a little while
4  afterwards. He called me back, and he asked me if I
5  got the price quotes, and I said, "No."
6  Q. And that was the end of it?
7  A. He said that he would get Shelley to fax me
8  the -- oh! He said Shelley told him that she faxed
9  them to me. I said, "Well, I never got them."
10  Q. Okay. Did you eventually get them after
11  that?
12  A. He said that he would have Shelley fax them
13  to me that day, and me to sign the fax that I received
14  the price quotes, and send it back to him.
15  Q. Is that something that other vendors have
16  asked you to do -- to sign price quotes and return them
17  to them?
18  A. No.
19  Q. Didn't you think that was unusual -- that
20  request?
21  A. No. No. I really didn't.

**Page 57**

1  Q. Okay. And you complied?
2  A. Thought never entered my mind.
3  Q. Did you comply with the request?
4  A. Yeah.
5  Q. Has any other vendor ever asked you to do
6  that -- to sign a price quote and return the signed
7  price quote back to them? Anyone. It doesn't have to
8  be a valve vendor.
9  A. Not to my knowledge.
10  Q. Okay. After you signed the price quote, as
11  you say, and returned it to Shelley, then what
12  happened?
13  A. What do you mean? I don't know what you
14  mean.
15  Q. What was your next contact with Clow, or
16  their contact with you?
17  A. The next contact with Clow?
18  Q. Yes.
19  A. I don't recall. I don't know how all the --
20  after that, that I heard from him.
21  Q. Okay. At some point during the process, you

Clow Valve Company
v. Mayor and City Council of Baltimore City

Deponent: WALTER L. BLIMLINE
April 2, 2003

Page 58

1 realized that Clow had understood that you had placed
2 an order for the valves; isn't that right?
3    A. Yes, but I don't know exactly how long after
4 that conversation with him.
5    Q. Okay. Certainly you realized by the time the
6 Clow valves started arriving that they understood that,
7 isn't that correct?
8    A. I didn't become aware of it until, I'm
9 thinking, October.
10   Q. So, sometime in October, you realized that
11 Clow Valve had understood that you had placed an order
12 for valves; is that correct?
13   A. Say that again.
14   Q. At some time during the month of October of
15 2001, you came to the realization that Clow Valve
16 understood that you had placed an order for valves;
17 isn't that correct?
18   A. Well, I never came to the realization. This
19 is what they said.
20   Q. But you at some point -- let me -- listen
21 carefully to my question. I'm not trying to trick you

Page 59

1 here. At some point during the month of October of
2 2001, you understood -- you came to the realization
3 that Clow Valve understood that you had placed an order
4 for valves; isn't that correct?
5      MR. ANBINDER: Objection, but you can answer
6 that.
7    Q. You understood at some point during that
8 month that they thought you ordered the valves, right?
9    A. I -- what -- I didn't know or understand that
10 until I talked to Tom Walston, when I called him up and
11 asked him where all these valves were coming from.
12   Q. Okay. When was that?
13   A. That was sometime in end of October.
14   Q. Okay. So you called Tom Walston and said,
15 "What are all these valves doing arriving at the yard?"
16 Is that right?
17   A. I think it was sometime the end of October.
18   Q. Okay. You called Tom Walston? You called
19 him?
20   A. Yeah. I called Tom Walston.
21   Q. All right. What did you ask him?

Page 60

1    A. I asked him where all these valves were
2 coming -- what's the story with all these valves.
3    Q. All right. And what did he say to you?
4    A. He said, "Well, that was the order you gave
5 me."
6    Q. And what did you say then?
7    A. I said, "I never gave you any order." I
8 said, "I asked you for price quotes."
9       He said, "Oh, no. You gave me an order."
10      I said, "I gave you an order? How?"
11      He said, "Over the phone."
12   Q. All right.
13   A. I said, "I don't think so."
14   Q. Was there any more to that conversation that
15 you recall?
16   A. He said, "I'll send you a copy of the order
17 you gave me over the phone," and he faxed me a copy of
18 it.
19   Q. What did you do after you received the fax of
20 the order that he said you placed over the telephone?
21   A. Well, I went up to see Mr. Williams.

Page 61

1    Q. You did? When was that?
2    A. Either had to be the end of October, or
3 sometime in November. It might have been even later.
4 I'm not positive of the dates.
5    Q. All right. If Mr. Williams testified that,
6 in fact, you didn't tell him about this until sometime
7 in 2003, is that possible?
8      MR. ANBINDER: Objection.
9      MR. MANECHE: I'm sorry. I'm sorry. I got
10 the year wrong. 2002.
11     BY MR. MANECHE:
12   Q. If Mr. Williams told you that, in fact, you
13 didn't tell him about this until sometime in 2002, is
14 that possible?
15   A. I don't know.
16   Q. You don't know?
17   A. I don't know. I don't know. I just can't
18 remember the dates. I just can't remember.
19   Q. So it is possible, then, that it could have
20 been 2002 before you told him about this mix-up; is
21 that correct?

16 (Pages 58 to 61)

IRWIN REPORTING & VIDEO, LLC

410-494-1880

Page 62

1  A. I don't know. I can't answer that. I don't
2  know.
3  Q. So you don't recall when you told him?
4     MR. ANBINDER: Objection.
5  Q. Isn't that what you just said? You don't
6  recall the date?
7  A. I don't know the specific date. I don't
8  know. I really don't know.
9  Q. Okay.
10 A. I thought it -- I thought it was November.
11 Maybe it wasn't November. I -- it could have been
12 December. It could have been January. I don't
13 remember exactly.
14 Q. Could it have been even later than January?
15    MR. ANBINDER: Objection.
16 A. I don't know. I really don't know.
17    MR. ANBINDER: He's made that rather clear.
18 A. I don't know.
19 Q. So it could have been; yes?
20 A. I don't know.
21 Q. If you don't recall when you spoke with

Page 63

1  Warren Williams first about this mix-up with the Clow
2  Valve order, do you recall what you told him?
3  A. Yeah. I remember telling him that -- in
4  fact, I showed him the paper that Mr. Walston sent me.
5  Q. Okay.
6  A. I think I showed him that paper.
7  Q. All right. What did he say?
8  A. He asked me if I ordered them. I said, "No."
9  I said, "I can't order something that I can't pay for."
10 Q. Was there any more to the conversation?
11 A. I don't -- I really don't know. It's just
12 been so long, I can't remember.
13 Q. Okay. So you don't recall whether
14 Mr. Williams said, "Take care of the problem. Call --"
15 A. He might have. I don't remember.
16 Q. You don't remember anything he said after
17 that?
18 A. No. He could have said that. I don't know.
19 Q. So what did you do then? What did you do
20 after you received the fax copy of the order from Clow
21 Valve and then took it to Mr. Williams, as you say,

Page 64

1  although you don't recall the date? What did you then
2  do?
3  A. In the -- at that particular time, we got
4  another order of valves in for our contractor under one
5  of those purchase orders like I was telling you about.
6  Q. Was it an order that came from Clow?
7  A. I'm not positive.
8  Q. Okay. Some other order came in?
9  A. Kennedy valves and Clow valves have the same
10 name on them. Kennedy valves are made by Clow Valve.
11 Q. Okay. Well, that's your opinion.
12    MR. ANBINDER: Well, that's --
13    MR. MANECHE: Actually, that's --
14    MR. ANBINDER: That's what you're asking him.
15    MR. MANECHE: No. I didn't ask him that at
16 all. He's volunteering information at this point.
17 There is no question pending, but --
18    MR. ANBINDER: He's trying to work out the
19 confusion in his mind. I think he's still trying to be
20 responsive.
21    BY MR. MANECHE:

Page 65

1  Q. So I guess what you're trying to say is that,
2  at some point thereafter, an order of valves came in,
3  and you're not sure whether they were Clow valves or
4  Kennedy valves because they're similarly marked?
5  A. They're marked with the same name.
6  Q. Okay. Well, that -- whether that's true or
7  not, you thought that they -- it could be either a
8  Kennedy valve or a Clow valve; is that right?
9  A. Yeah.
10 Q. Okay. And you don't recall exactly which one
11 it was?
12 A. Right.
13 Q. Okay.
14    MR. ANBINDER: Just move your hand so you
15 don't block your words.
16    THE WITNESS: Oh!
17    BY MR. MANECHE:
18 Q. Okay. So, as I understand the sequence of
19 events as you describe them, you received the fax copy
20 of the order from Clow. You took it to --
21    MR. ANBINDER: Objection as to the term

### Page 74

1  A. Because they work with them out in the field.
2  Q. Do you consider yourself knowledgable at all
3  about valves?
4  A. No.
5  Q. Do you have any knowledge of what types of
6  specifications Baltimore City valves should have?
7  A. No.
8  Q. Okay. You don't know, for example, the
9  number of turns that a Baltimore City valve has?
10  A. No. I have no idea.
11  Q. Okay.
12  MR. MANECHE: Can we go off the record for a
13  second?
14  (Luncheon recess -- 12:41 p.m.)
15  (Afternoon session -- 1:17 p.m.)
16  (Whereupon, Mr. King is not present, and
17  Mr. Severn is now present.)
18  BY MR. MANECHE:
19  Q. Mr. Blimline, before the lunch break, you
20  mentioned a gentleman named Nick Nicolitis.
21  A. Nick Nicolitis.

### Page 75

1  Q. Nicolitis. Can you spell his last name?
2  A. I don't know how he spells it.
3  Q. Okay. You said Mr. Nicolitis is a
4  consultant?
5  A. Yes.
6  Q. To whom?
7  A. To the Engineering Department for the City of
8  Baltimore.
9  Q. But he's not a City of Baltimore employee, is
10  he?
11  A. No, he's not.
12  Q. For whom does he work? Do you know?
13  A. Who he works directly under? I don't know.
14  Q. And you had dealt with him prior to the time
15  he called up and asked you to call Clow for a price
16  quote, right?
17  A. He didn't tell me to call Clow. He told me
18  to get --
19  Q. He just told you to get a price quote?
20  A. Right.
21  Q. Okay. And it was your decision, then, to

### Page 76

1  call Clow; is that right?
2  A. Yeah, because we had a contract in place with
3  them.
4  Q. Did you call anybody else for --
5  A. No, I did not.
6  Q. -- a price quote?
7  A. No, I did not.
8  Q. What does Mr. Nicolitis do, to your
9  knowledge, other than calling you occasionally asking
10  you to get price quotes?
11  A. I'm under the understanding Mr. Nicolitis is
12  involved in the specifications, dealing with the
13  Department of Public Works as far as the various items
14  that are used in the everyday operation, like valves
15  and meters and whatever.
16  Q. Is he an engineer as far as you know?
17  A. That, I do not know.
18  Q. How would Mr. Nicolitis know, if at all, what
19  the City's valve inventory was?
20  A. Well, I don't know if he would know directly
21  what the inventory would be, but he would be aware of

### Page 77

1  potential contracts or what would be needed.
2  Q. Okay. Would Mr. Nicolitis have to get
3  authority from anyone before calling you and asking you
4  to inquire about prices for valves?
5  A. I don't have that knowledge.
6  Q. How long have you been dealing with
7  Mr. Nicolitis?
8  A. A couple years.
9  Q. Do you have any idea where his office is
10  located?
11  A. No, I do not.
12  Q. Is it in Baltimore City?
13  A. He actually works for a company called
14  Russell Corrosion.
15  Q. Okay. And you don't know where they're
16  located?
17  A. No, sir, I don't. I have that information
18  back at the office, but I --
19  Q. Do you recall, Mr. Blimline, how many valve
20  shipments came in from Clow Valve in 2001?
21  A. No, I don't.

Page 114

1  A. No, sir, I didn't.
2  Q. Okay. How about where it says "new order" at
3  the top of the document? Did you see that when you
4  signed it?
5  A. No, sir, because I thought it was what I
6  asked for, and I had never seen a Clow Valve quote on
7  any letter form head before, so I had just assumed that
8  this was what they looked like.
9  Q. Okay. But did you actually see the language
10 at the top of Page 2 --
11 A. No, sir. I didn't pay any attention to it.
12 Q. Okay. I think I know your answer, but let me
13 finish the question anyway. Did you actually see the
14 language at the top of Page 2 of Exhibit 5 that said
15 "new order" when you signed the document?
16 A. No, sir.
17 Q. Okay. Did you see the information to the
18 right of that that said "sales order number" when you
19 signed the document?
20 A. No, I did not.
21 Q. You just didn't pay attention to that

Page 115

1  information; is that correct?
2  A. That's correct.
3  Q. Okay. If you had seen it at the time, would
4  it have caused you to question whether this was a quote
5  or an order?
6  MR. ANBINDER: Objection.
7  A. Absolutely.
8  MR. ANBINDER: Objection, but --
9  (Whereupon, Blimline Deposition Exhibit
10 No. 6, 12/20 fax with attachments, Terrell to Blimline,
11 was marked for identification.)
12 BY MR. MANECHE:
13 Q. Mr. Blimline, please take a look at what's
14 been marked as Exhibit 6, and let me know whether
15 you've seen that document before.
16 A. Yes, I have.
17 Q. What is that? What was Exhibit 6?
18 A. I know what it -- yeah. I see what it is,
19 yes.
20 Q. What is it?
21 A. It said it's an order.

Page 116

1  Q. Okay. Have you seen the cover page before?
2  A. Yes, sir, I have.
3  Q. Okay.
4  A. No. No, I haven't, until just now.
5  Q. Okay. So you've never seen Page 1 of
6  Exhibit 6 before today?
7  A. Say that again.
8  Q. You've never seen Page 1 of --
9  A. No.
10 Q. -- Exhibit 6 before today?
11 A. No.
12 Q. Is that because, as you said before, your
13 secretary's practice is to remove the cover pages of
14 faxes when she delivers them to you?
15 A. Yes.
16 Q. What happens to those cover pages after she
17 removes them?
18 A. I don't know what she does with it.
19 Q. What's your secretary's name?
20 A. Kathy Smith.
21 Q. How long has she been your secretary?

Page 117

1  A. Three years. Two years. Two years.
2  Q. Was she your secretary in 2001?
3  A. Yes.
4  Q. For the entire year?
5  A. I believe so.
6  Q. Mr. Blimline, let me show you again, because
7  I think I sort of rushed you through what was
8  Exhibit 4, and I think when I showed it to you and
9  asked you what it was, you said it was an order. Is
10 that right?
11 A. Well, I can read -- see it says it's an
12 order.
13 Q. Okay. And that's your signature at the
14 bottom, right?
15 A. Yes, sir.
16 Q. Okay. Thanks. What did you think you were
17 signing when you signed that document?
18 A. Price quote.
19 Q. Do you still believe that today?
20 A. Absolutely.
21 Q. Okay. Why do you believe that today that you

Page 118

1 were signing a price quote?
2    A.  That's all I asked the man for.
3    Q.  But do you understand -- looking at the top
4 of Exhibit 4, do you --
5    A.  I understand what it says.
6       MR. ANBINDER:  Wait, wait.  Wait until he
7 finishes the question.
8    Q.  Do you see it says "new order"?
9    A.  I see that.
10   Q.  And has a new order number at the top?
11   A.  I see that.
12   Q.  You didn't see that when you signed it the
13 first time; is that correct?
14   A.  That's correct.
15   Q.  And, if you had seen it, it would cause you
16 to question whether it was a price quote or an order?
17   A.  Absolutely.
18      (Whereupon, Blimline Deposition Exhibit
19 No. 7, 12/6/01 message, Kathy to Walt, was marked for
20 identification.)
21      BY MR. MANECHE:

Page 119

1    Q.  Mr. Blimline, have you seen Exhibit 7 before,
2 or do you recall whether you have?
3       (Witness perusing document.)
4       MR. ANBINDER:  Just take your time.
5    A.  I guess.  I don't know.  I can't remember.
6    Q.  Do you remember --
7    A.  I might have seen it.  I don't know.  I mean,
8 that was '01 -- December of '01.  I could have seen it.
9 I couldn't swear to it.  All right.
10   Q.  All right.  Is this your secretary's
11 handwriting?
12   A.  That's hers.
13   Q.  Okay.  Kathy, the signature at the bottom is
14 her -- Kathy Smith?  Do you see where it says "received
15 by Kathy"?
16   A.  It looks like it.
17   Q.  Okay.  You don't recall anyone from Clow
18 Valve named Joe calling you regarding an invoice in
19 December of 2001?
20   A.  That's a possibility.
21   Q.  It's possible, but you don't recall?

Page 120

1    A.  I don't recall.
2    Q.  Mr. Blimline, have you ever been reprimanded
3 for placing an unauthorized order on behalf of the City
4 of Baltimore?
5    A.  No.
6    Q.  Have you ever placed an unauthorized order on
7 behalf of the City of Baltimore?
8    A.  No.
9       (Whereupon, Blimline Deposition Exhibit
10 No. 8, 9/20/84 memo, Babusci to Blimline, was marked
11 for identification.)
12      BY MR. MANECHE:
13   Q.  Mr. Blimline, please look carefully at
14 Exhibit Number 8, and let me know if you know what that
15 is.
16   A.  Yes, I do.
17   Q.  What is it?
18   A.  It was a letter when I worked at Highway
19 Department saying I, unauthorized, ordered materials.
20   Q.  Is that true?
21   A.  No.

Page 121

1    Q.  It's not?
2    A.  It's not.
3    Q.  Okay.  Why not?
4    A.  Well, the reason why it's not true, and part
5 of the reason why I'm saying that is I refused to sign
6 that.
7    Q.  I understand, and we'll get to that, but why
8 don't you tell me why it's not true first.
9    A.  Well, when I transferred from -- I didn't
10 transfer.  The whole department did.  We were under
11 Public Works.  We all got transferred under Highways.
12 According -- or it was -- when we got transferred,
13 everybody assumed their duties were the same as they
14 were prior to going under Highways, and I used to order
15 the frames and covers, and I did it, and this is what
16 happened, and then I was called down there to say that
17 now this isn't the case, and I should do it the way
18 they wanted it to be done.
19   Q.  So who did you plead your case to at that
20 time?
21   A.  Mr. Babusci.