**Clow Valve Company**
**v. Mayor and City Council of Baltimore City**

Deponent: **WARREN LEE WILLIAMS**
April 2, 2003

COPY

Page 1

**EXHIBIT Q**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3   CLOW VALVE COMPANY,            :

 4           Plaintiff              :

 5   vs.                            : Case No.:

 6   MAYOR AND CITY COUNCIL OF      : JFM 02-3136

 7   BALTIMORE CITY,                :

 8           Defendant              :

 9                   ---------------------------

10        Deposition of WARREN LEE WILLIAMS, called for

11   examination by Counsel for the Plaintiff, having been

12   sworn by Martin J. Giordano, Registered Merit Reporter,

13   and a Notary Public in and for the State of Maryland,

14   taken at The Law Offices of Venable, Baetjer and

15   Howard, 2 Hopkins Plaza, Suite 1400, Baltimore,

16   Maryland, at 9:34 a.m., on Wednesday, April 2, 2003.

17                   ---------------------------

18

19

20   Reported by:

21   Martin J. Giordano, RMR
```

IRWIN REPORTING & VIDEO, LLC                    410-494-1880

Page 10

1  Q. I'm sorry.
2  A. No. From '93 to '95.
3  Q. '93 to '95. Prior to '93, what position did
4  you hold?
5  A. Transportation Associate II.
6  Q. And for how long did you hold that position?
7  A. 1986 to 1993.
8  Q. Were you Transportation Associate I before
9  that?
10  A. No. Actually, I was a Traffic Investigator
11  II.
12  Q. And for how long did you hold that position?
13  A. 19 -- let me see. 1983 to '86.
14  Q. All right. So that gets us 20 years. How
15  about the other five? What did you do in that --
16  A. Well, I was a Traffic Investigator I, and
17  then I came -- entered the City as a traffic checker in
18  1978.
19  Q. Why did you move from the Transportation
20  Department to the Water Department?
21  A. It was an opportunity for advancement.

Page 11

1  Q. Okay. You felt you had a better opportunity
2  for advancement in the Water Department than in the
3  Transportation Department?
4  A. At that time.
5  Q. Why is that?
6  A. That's what was being offered.
7  Q. Can you tell me just generally your duties
8  and responsibilities in your current position?
9  A. Basically, as chief, I'm responsible for the
10  Maintenance Division, which is comprised of three
11  separate sections -- Water Maintenance Section, Waste
12  Water Maintenance Section, and a Storm Drain Section,
13  in addition to the administrative functions that
14  control all three. Under -- you know, in respect to
15  that, I have subordinates under me that physically
16  oversee those sections certainly.
17  Q. All right. To whom do you report?
18  A. I would report to the bureau head.
19  Q. Who is?
20  A. At this time, Mr. Jay Sakai.
21  Q. Can you spell the last name?

Page 12

1  A. S-A-K-A-I.
2  Q. And who reports to you directly?
3  A. Directly would be the three general
4  superintendents.
5  Q. Who are they? First, let's start with Storm
6  Drain?
7  A. Storm Drain is Mr. Anthony Bressi.
8  Q. Water?
9  A. Water is Mr. August Severn.
10  Q. And Waste Water?
11  A. Is Mr. Louis Owens.
12  Q. Tell me what you do on a day-to-day level. I
13  understand what your duties and responsibilities are,
14  but what do you do when you show up to work every day
15  on a typical day?
16  A. Basically, quite a few meetings for the
17  day-to-day operation of the division. We also
18  interconnect with the engineering sections, you know,
19  throughout the city for projects taking place in all
20  three of those areas. Most of my time is spent with
21  meetings, either outside, or internal meetings that I

Page 13

1  have based on meetings that I've had from the outside.
2  Q. Okay. How closely are you involved, if at
3  all, with procurement?
4  A. I am involved to the extent that I discuss
5  the need for equipment, materials, and supplies with my
6  general superintendents, and I signed -- sign all the
7  VDAs and purchase requisitions.
8  Q. What is a VDA?
9  A. Vendor delivery authorization.
10  Q. Who in the chain of command would be
11  responsible for ordering equipment from a third-party
12  vendor?
13  A. For physically --
14  Q. For physically placing the order.
15  A. Placing the orders would be the storekeeper
16  supervisor.
17  Q. Who is that in the Water Division?
18  A. Mr. Walter Blimline.
19  Q. Tell me how the process should work when Walt
20  Blimline places an order from start to finish. How
21  does it start at procurement and end up with him

## Page 14

1 placing an order and him receiving the item that he
2 ordered, or items that he ordered?
3     A.  Depends -- basically, each of the general
4 superintendents in conjunction with talking to me
5 decide what is needed for the upcoming fiscal year if
6 it's not an emergency situation.  Based on our needs,
7 the general superintendents will typically meet with
8 the storekeeper supervisor and make arrangements to
9 have requisitions prepared that come up through me, go
10 downtown through the approval process, and ultimately
11 go over to Purchasing.
12     If it's an item that has to go out to bid,
13 then that's all done through Purchasing.  So it's a
14 typical process.  The storekeeper supervisor prepares
15 all the paperwork, submits it to me, and I forward it,
16 you know, downtown.
17     Q.  And then forward it downtown to Purchasing?
18     A.  Well, through -- initially, after my
19 signature -- and I should say the amounts play a part
20 also on who signs what purchase requisitions.
21     Q.  Okay.

## Page 15

1     A.  Up to $25,000, I can sign off.  Anything over
2 $25,000, the bureau head has to sign off.
3     Q.  All right.
4     A.  And certain equipment -- and I would say
5 probably the majority typically goes out on a bid
6 process.  So it goes through the procurement at the
7 bureau level to go to the bureau head before it goes to
8 Purchasing.
9     Q.  Okay.  What happens after it goes to
10 Purchasing, assuming that it's approved?
11     A.  Well, I don't know their specific process.
12 All I know is, if and when it is approved and if it's
13 awarded, we get a purchase order number from Purchasing
14 advising us that X materials can be purchased at this
15 price by this -- with this company.
16     Q.  All right.  How much discretion do you have
17 when a purchase order comes back?  For example, do you
18 have situations where the purchase order says you're
19 authorized to spend X amount of dollars, but we'll let
20 you decide how it's to be spent on what?
21     A.  Pretty much, within ranges of that purchase

## Page 16

1 order.
2     Q.  Okay.  Is there ever any discretion as to the
3 amount you spend?
4     A.  No.  You know, up to the amount of the
5 purchase order.
6     Q.  All right.  You said before that purchases in
7 excess of $25,000 have to be approved by the bureau
8 chief; is that right?
9     A.  Uh-huh.
10     Q.  And that current bureau chief is Jay Sakai?
11     A.  Yes.
12     Q.  How long has he been the bureau chief?
13     A.  I think about the last year and a half.
14 Year, year and a half.
15     Q.  Who was the chief before him -- bureau chief?
16     A.  It was Mr. Amar Sohkey.
17     Q.  Can you spell that name?
18     A.  A-M-A-R, S-O-H-K-E-Y.
19     Q.  And how long was Mr. Sohkey bureau chief?
20     A.  I don't remember the exact dates.  It was
21 after the last election that Mr. Sohkey was named as

## Page 17

1 bureau head.
2     Q.  So was Mr. Sohkey the bureau chief in 2001?
3     A.  Yes.
4     Q.  Was he the bureau chief for some part of
5 2002?
6     A.  Yes.
7     Q.  Until when?
8     A.  I don't remember the exact date he left.
9     Q.  Was it in the summer, or spring, fall?
10     A.  It was going in -- around spring, if I
11 remember correctly.
12     Q.  Okay.  In a typical purchasing process, when
13 the paperwork comes back from Purchasing, and you get a
14 purchase order that says you can spend X number of
15 dollars, what then happens?  Who then gets the
16 paperwork?
17     A.  Well, certainly the storekeeper gets a copy
18 of the purchase order, and because they keep all the
19 paperwork on file for all of our requisition, and
20 pretty much the superintendents, or general
21 superintendents actually, are made aware of what has

Page 18

1  been approved so they can then proceed to order as
2  necessary.
3      Q. In a typical case, however, who then takes
4  the ball from that point on? Does the purchase order
5  go to Walt Blimline, and he then places the order, or
6  is there some other hierarchy that gets involved?
7      A. No. Typically he will be instructed to place
8  orders.
9      Q. By whom?
10     A. By the general superintendents.
11     Q. And, in the case of the Water Division, that
12 would be Augie Severn?
13     A. Now, it's Augie Severn, yes.
14     Q. Before Mr. Severn, who would it have been?
15     A. Well, actually, before he was actually made
16 general superintendent, it was a combination of
17 Mr. Severn and Mr. Joseph Bressi.
18     Q. When was Mr. Severn made the actual head of
19 Water?
20     A. I'm not sure. I was off then.
21     Q. Okay. In what time frame, then?

Page 19

1      A. Within the last five months.
2      Q. All right. So, in 2001 and 2002, it would
3  have been this combination of Mr. Severn and Mr. Bressi
4  that you were just talking about?
5      A. Yes. Mr. Severn was more in charge of valve
6  operations.
7      Q. So, for a valve purchase, he would have been
8  the one instructing Mr. Blimline about the purchase?
9      A. He was typically very involved, yes.
10     Q. All right. What would then have happened
11 after Mr. Severn spoke to Mr. Blimline after the
12 purchase order came in and said place the order?
13     A. Typically, the vendor VDA, vendor delivery
14 authorization, would be prepared, and the equipment
15 would be ordered.
16     Q. By Mr. Blimline?
17     A. Uh-huh. Yes.
18     Q. Does the City have any standard operating
19 procedure as to how an order is placed at that stage of
20 the process?
21     A. If they do, I'm not familiar.

Page 20

1      Q. So Mr. Blimline is pretty much on his own at
2  that point; is that right?
3      A. After being given instruction, yes.
4      Q. What type of follow up takes place after
5  Mr. Blimline places the order? Is he then instructed
6  to report to Mr. Severn, for example, or to you?
7      A. No. None that I'm aware of.
8      Q. Is anyone required to follow up with
9  Mr. Blimline at some point after the order has been
10 placed, whether you or Mr. Severn or anyone else?
11     A. I'm not sure I understand what you're asking.
12     Q. Is there any standard procedure in place -- a
13 tickler system, or whatever, that's in place that says,
14 after X number of days, I'm going to check with Walt
15 Blimline to make sure that the order was placed and
16 that it was placed correctly?
17     A. No.
18     Q. What then typically happens after
19 Mr. Blimline places the order and the goods arrive?
20     A. After the goods arrive?
21     Q. Yes.

Page 21

1      A. Well, depending on the arrival site, the
2  paperwork is then sent up to Mr. Blimline to keep track
3  of against the purchase order if it doesn't -- if it
4  doesn't deplete the order so he can keep a running
5  total in case we have to reorder again.
6      Q. So is Mr. Blimline from that point forward in
7  charge of making sure the goods are delivered,
8  delivered on time, and delivered as ordered?
9      A. Not specifically, no. He's one person, and
10 this is a division, so there are other people involved
11 at the yards that have to work in conjunction with
12 Mr. Blimline.
13     Q. But does he oversee that process?
14     A. Not completely, no.
15     Q. Who else other than he would be overseeing
16 the process?
17     A. Well, that's where the superintendents and
18 supervisor would also come into play from each
19 respective yard, and working up through the general
20 superintendent; not just Mr. Blimline.
21     Q. So, at some point after the order was placed,

### Page 22

1  Mr. Severn would be involved again?
2    A. Could be, possibly.
3    Q. But possibly not?
4    A. Correct.
5    Q. Is it possible that Mr. Blimline, from the
6  point of actually placing the order forward, could be
7  the only one responsible for seeing that the order is
8  actually fulfilled as ordered?
9        MR. ANBINDER: Do you understand the
10 question?
11       THE WITNESS: That's -- no. Not completely.
12       MR. MANECHE: Okay.
13       BY MR. MANECHE:
14   Q. From --
15       MR. ANBINDER: You should say so if you don't
16 understand the question.
17       THE WITNESS: Well, I was trying to --
18       MR. ANBINDER: Okay.
19       MR. MANECHE: Okay. Let me rephrase it.
20       BY MR. MANECHE:
21   Q. Let's get clear on the chain of command above

### Page 23

1  Mr. Blimline. You have Mr. Blimline, and, at least in
2  the 2001, 2002 time frame, we had some combination of
3  Mr. Bressi and Mr. Severn above him; is that correct?
4    A. Yes. And Mr. Owens.
5    Q. For Waste Water?
6    A. Yes.
7    Q. Okay. And then above them is you, correct?
8    A. Yes.
9    Q. And then above you, at least now, is
10 Mr. Sakai?
11   A. Right.
12   Q. And before was Mr. Sohkey?
13   A. Yes.
14   Q. Of those people we just named, is it possible
15 that Mr. Blimline could place an order for a product or
16 products with a third-party vendor and from that point
17 forward he would be the highest in that chain of
18 command to then see that the order is fulfilled as
19 ordered?
20   A. It depends, and the reason I say that, his
21 authority is very, very limited as to what he can order

### Page 24

1  without being given specific direction.
2    Q. All right. Let's put that aside for the
3  moment. I'm not talking about whether he has authority
4  to place the order in the first place. Let's assume
5  that the order has been placed.
6    A. Okay.
7    Q. From that point forward, is it possible that
8  he would then be running the show from that end --
9    A. No.
10   Q. Who else would be involved?
11   A. Depending on what was ordered, and where it
12 would come in, anybody from a respective yard would be
13 involved of where the material is being delivered, the
14 paperwork that has to follow, the superintendent who
15 oversees that yard, the storekeeper who may be
16 accepting or taking the materials, equipment, supplies,
17 whatever it may be. So it's not just one person.
18   Q. I understand that. Of the individuals we
19 named, though -- Mr. Blimline, Mr. Owens, Mr. Bressi,
20 Mr. Severn, yourself, Mr. Sakai, and Mr. Sohkey -- once
21 an order is placed, is it possible -- does it happen

### Page 25

1  that Mr. Blimline is then the only person among that
2  group of folks that sees that the order is fulfilled as
3  ordered?
4    A. At that point, yes.
5    Q. In other words, there is no required follow
6  up among any of the other folks; is that right?
7    A. It will be, yes, but not at that point.
8    Q. Okay. At what point?
9    A. Well, again, when payment and when materials
10 are coming in, other people are involved.
11   Q. I understand that. Of the individuals we
12 named -- I'm not -- I'm putting aside the individuals
13 from the other yards. If it's coming into a different
14 yard, I understand there is logistical issues that have
15 to be dealt with.
16   A. Uh-huh.
17   Q. But, of the individuals that I just named, is
18 there any required follow up by Mr. Owens, Mr. Bressi,
19 Mr. Severn, yourself, or the bureau chief?
20   A. You're saying follow up?
21   Q. Yes. After the order has been placed.

Page 26

1  A. After the order has been placed, when payment
2  is due, yes, it would come to me.
3  Q. Okay. The bill comes to you?
4  A. Yeah.
5  Q. Okay. But, in terms of the actual order
6  arriving and the goods conforming to the order, that's
7  Mr. Blimline's job, right, to make sure that that
8  happens?
9  A. Not specifically his, no. That's, again,
10 where other people come into play.
11  Q. Okay. Of the individuals that I named --
12  A. Of the individuals you named, Blimline, yes.
13  Q. Okay. Do you know who Tom Walston is?
14  A. I know him from the meeting we had, yes.
15  Q. You had a meeting with the Clow Valve
16 representatives concerning the valves at issue in this
17 case?
18  A. Yes.
19  Q. When I say "the valves at issue in this
20 case," do you know what I'm talking about?
21  A. Yes, I do.

Page 27

1  Q. Where are those valves currently?
2  A. Washington Boulevard.
3  Q. Have you seen them physically sitting there?
4  A. I've seen some of them, yes.
5    MR. ANBINDER: I think you can see them from
6  here, all stacked up.
7    MR. KING: I thought they were on a truck in
8  Iowa.
9    BY MR. MANECHE:
10  Q. The meeting that you just mentioned, when did
11 that occur?
12  A. Let's see. April.
13  Q. Last April?
14    MR. ANBINDER: Don't guess.
15  A. No. Don't -- I honestly don't remember the
16 exact date. I know it was in April.
17  Q. You don't remember if it was 2001 or 2002?
18  A. 2002.
19  Q. Okay. That was the first time you met Tom
20 Walston?
21  A. Yes.

Page 28

1  Q. Had you heard of him before that?
2  A. Not that I recall.
3  Q. Had you had any dealings prior to that time
4  with Clow Valve Company -- you personally?
5  A. Mr. Malloy.
6  Q. Okay. You dealt with Mr. Malloy before --
7  A. I've had conversation with him regarding
8  these valves.
9  Q. Okay. You have to let me finish the question
10 before you answer.
11  A. Okay.
12  Q. So you had conversations with Mr. Malloy
13 before the April 2002 meeting concerning the valves
14 that are the subject of this case?
15  A. Yes.
16  Q. Had you had any dealings with Mr. Malloy or
17 anyone else from Clow Valve prior to that time that you
18 just mentioned?
19  A. Prior to April?
20  Q. I'm sorry. Prior to discussions you had with
21 Mr. Malloy.

Page 29

1  A. Not that I recall.
2  Q. Okay. You don't ever recall having any
3  dealings with Clow Valve relating to any other valve
4  orders?
5  A. No. Not --
6  Q. Do you recall the first time you spoke to
7  Mr. Malloy?
8  A. I don't recall the date. I recall speaking
9  to him regarding his concern for payment.
10  Q. Can you tell me what you remember of that
11 conversation?
12  A. Basically they were concerned about payment
13 for valves that they had shipped, and I told him I
14 would look into it and get back to him.
15  Q. All right. Was there a follow-up telephone
16 call?
17  A. Yes, there was, and that's what led to our
18 meeting.
19  Q. So there were two telephone calls, and then
20 the meeting?
21  A. At least two calls. May have been one.

Page 34

1  April of 2002, you had no contact with Clow Valve; is
2  that correct?
3     A. No. We did have contact. We spoke in
4  January.
5     Q. Okay. So your first telephone call was in
6  January?
7     A. Probably -- sometime in January, yeah. I
8  don't recall exactly when.
9     Q. Who called who?
10    A. Mr. Malloy called me.
11    Q. Sometime in January?
12    A. Yes.
13    Q. Was that the conversation you described
14  earlier where you said he informed you that the payment
15  was due, and you said you'd look into it?
16    A. Yes.
17    Q. Did you mention to him at that time that
18  there had been a mistake made?
19    A. I -- I don't think so. Not at that first
20  phone call.
21    Q. Why did you not mention that there had been a

Page 35

1  mistake made when you knew that from Mr. Blimline?
2     A. Because I wanted to confirm we were talking
3  about the same valves and the same order that
4  Mr. Malloy was referring to. I wanted to confirm.
5     Q. Okay. You had a subsequent conversation with
6  Mr. Malloy after this January --
7     A. Yes.
8     Q. -- conversation?
9     A. Yes.
10    Q. When did that occur?
11    A. I'm not exactly sure. It was either the end
12  of January, beginning of February, because we had
13  scheduled a meeting for February.
14    Q. All right. During that conversation, did you
15  tell Mr. Malloy that a mistake had been made?
16    A. Yes.
17    Q. What did you tell him specifically?
18    A. Specifically, I don't remember the exact
19  words.
20    Q. Do you recall telling him who had made the
21  mistake?

Page 36

1     A. I just told him it was a mistake made, and,
2  from information I was receiving, it appeared to me
3  that the mistake was on Clow Valve's side --
4     Q. Do you recall --
5     A. -- and that we would not be accepting the
6  valves.
7     Q. Okay. You recall specifically telling him
8  that?
9     A. Yeah. As a matter of fact, I asked him when
10  they would pick them up.
11    Q. What's the nature of your daily interaction
12  with Walt Blimline?
13       MR. ANBINDER: I'm sorry. Could you repeat
14  the question?
15    Q. Do you have daily interaction with Walt
16  Blimline?
17    A. Not every day, no.
18    Q. Do you work in the same physical office as
19  him?
20    A. Same floor.
21    Q. Do you speak to him on a regular basis?

Page 37

1     A. Typically, yes.
2     Q. How long have you known Mr. Blimline?
3     A. I've only known him since around 2000.
4     Q. Since that time, do you know whether
5  Mr. Blimline has ever been disciplined or reprimanded
6  based on conduct at work?
7     A. I'm not aware.
8     Q. Do you have any specific knowledge of what
9  Mr. Blimline was told prior to placing the order for
10  the Clow valves involved in this case in terms of what
11  his authority was to place that order?
12       MR. ANBINDER: Objection to the use of the
13  term "order" since that's at issue -- in contention
14  here, but otherwise --
15       MR. MANECHE: I believe -- well, okay. I
16  believe Mr. Williams just used the term himself in
17  responses, but that's okay.
18       MR. ANBINDER: But Mr. Williams used the term
19  in a vernacular sense. He's not an attorney. You're
20  an attorney, and it has a certain legal ramification,
21  so I just want to make sure that the record is clear

Page 42

1  A. My storekeepers, had I had any. I only had
2  one storekeeper, Mr. Blimline.
3  Q. Okay. So he would have been in charge of
4  actually checking the inventory as well?
5  A. Yes.
6  Q. How does he know how much inventory to keep
7  in the City's stockpiles for a given product?
8  A. Again, that's where Mr. -- the general
9  superintendents and/or superintendents would have
10 direct conversation with Mr. Blimline regarding those
11 needs.
12 Q. Okay. So Mr. Severn, or possibly Mr. Bressi
13 would have had a conversation with Mr. Blimline and
14 said, we need X number of 36-inch valves, X number of
15 30-inch valves; check the inventory; make sure we've
16 got that?
17 A. Conceivably, yes.
18 Q. How else might it have occurred?
19 A. The superintendents also of the respective
20 yards, they could have conversations either with
21 Mr. Severn or Mr. Bressi, or could have had direct

Page 43

1  conversation with Mr. Blimline.
2  Q. All right. Are you aware of any such
3  specific conversations with regard --
4  A. No.
5  Q. -- to the Clow valves in this case?
6  A. No.
7  Q. So, once Mr. Blimline would have had this
8  conversation with whomever about inventory, would he
9  then have the authority to determine which valves
10 should be ordered and which shouldn't?
11 A. If he were given the instruction to place the
12 order, yes.
13 Q. You mentioned that there was a meeting
14 scheduled with the Clow Valve representatives in
15 February of 2002?
16 A. Meeting was scheduled.
17 Q. When did the meeting actually occur?
18 A. That's the meeting that actually occurred in
19 April. The day they came, or arrived, unfortunately I
20 was called away by my bosses, and that meeting had to
21 be rescheduled, and that's when it wound up being

Page 44

1  rescheduled for April.
2  Q. All right. Who attended that meeting?
3  A. Myself, Mr. Severn, Mr. Bressi, Mr. Blimline,
4  Mr. Malloy, Mr. Vore, and Mr. Walston.
5  Q. And where did the meeting occur?
6  A. At Park Terminal.
7  Q. Where is that?
8  A. 2331 North Fulton.
9  Q. Was anyone in particular designated as a
10 spokesman on behalf of the City at that meeting?
11 A. I pretty much took that role.
12 Q. All right. What did you say?
13 A. Essentially, after introductions, I explained
14 to Mr. Malloy that, based on the information I had
15 gotten from Mr. Blimline and with the general
16 superintendents I had in attendance, that we -- we, the
17 City, felt we did not order those valves, and did not
18 intend to keep them. As a matter of fact, I asked,
19 again, Mr. Malloy to make arrangements to have them
20 picked up.
21     I did tell him that, in that we had an

Page 45

1  existing contract with Clow Valve, I would be willing
2  to accept valves that we could legitimately use within
3  our system up to the amount of the contract, which I
4  believe was 130,000 at that time, and I had asked
5  Mr. Severn to go through the list of the valves and
6  pick out those that we couldn't use within our system.
7  Q. Did he do that?
8  A. Yes, we did, and we gave Mr. Malloy a list of
9  what we felt we could use.
10 Q. Do you recall how many valves were on the
11 list, or what the dollar figure was?
12 A. I really don't remember the exact number.
13 Q. Okay. Was it anywhere near the 130,000
14 figure that you just mentioned?
15 A. Yes.
16 Q. What happened at the conclusion of that
17 meeting?
18 A. Mr. Malloy indicated to me he didn't think
19 his company, Clow Valve, would accept that, but he did
20 say he would go back and talk to his superiors and get
21 back to me and let me know, and I said, "Fine."

**Page 58**

1  appears either at the top or the bottom of that page?
2    A.  I'm not sure.
3    Q.  Don't recognize the handwriting?
4    A.  I'm not sure.
5    Q.  Okay. Let me show you what's been marked as
6  Exhibit 3 and ask if you recognize that?
7    A.  No.
8    Q.  Do you know whose handwriting that is on
9  Exhibit 3?
10   A.  No.
11   Q.  Okay.
12      MR. MANECHE: Take a five-minute break?
13      MR. ANBINDER: Sure.
14      (Recess taken.)
15      BY MR. MANECHE:
16   Q.  Mr. Williams, in earlier testimony, you
17  described, I believe, two telephone conversations that
18  you said you had with Mr. Malloy prior to the April
19  2002 meeting with Mr. Malloy and others; is that
20  correct?
21   A.  Yes.

**Page 59**

1    Q.  And you recall that the first telephone
2  conversation was in January of 2002?
3    A.  I believe so, yes.
4    Q.  All right. And then there is a subsequent
5  conversation maybe late January, early February of
6  2002?
7    A.  Yes.
8    Q.  Is it your testimony that, during the first
9  of those two telephone conversations, you informed
10  Mr. Malloy that there had been a mistake with regard to
11  the Clow Valve order, as you used the term?
12   A.  No. In the first conversation, that's when I
13  told him I would look into it.
14   Q.  All right. And then, in the second
15  conversation, what did you then tell him?
16   A.  I believe that's when I made him aware that I
17  was advised there has been a mistake and we never
18  ordered or requested Clow Valve to fabricate those
19  valves.
20   Q.  And that was either in late January or
21  February --

**Page 60**

1    A.  Yeah.
2    Q.  -- of 2002?
3    A.  I believe so.
4    Q.  And, when you say you told Mr. Malloy that
5  you were advised of the issue, that was advice that was
6  coming from Mr. Blimline?
7    A.  Basically, yes.
8    Q.  Anyone else?
9    A.  Well, just conversation that, you know, it
10  would have been Mr. Blimline.
11   Q.  Who made that telephone call? Did you call
12  Mr. Malloy, or did he call you?
13   A.  He called me the first time. I believe I
14  called him the second time, I think. I'm not 100%
15  sure.
16   Q.  So the time in which you informed him of the
17  mistake, as you say, would have been the second
18  telephone call, correct?
19   A.  Correct.
20   Q.  And that call, you believe you initiated?
21   A.  I believe so.

**Page 61**

1    Q.  Did you call Clow's 800 number to make that
2  call?
3    A.  I don't remember. I think, if I remember
4  correctly, I had a direct number to Mr. Malloy.
5    Q.  Okay. Are you aware of whether the City
6  maintains records of outgoing long-distance phone calls
7  from your office?
8    A.  I'm not sure. They may.
9    Q.  Was it during that second telephone
10  conversation that you arranged what eventually became
11  April 2002 meeting?
12   A.  Actually -- well, yes. We initially went for
13  February. I think it may have been middle of February
14  sometime, and, as I stated, that I got called away
15  unfortunately, and that didn't take place, and that's
16  what resulted in the April meeting.
17   Q.  Were there any subsequent telephone
18  conversations that you had with Mr. Malloy after that
19  late January or early February 2002 telephone call?
20   A.  Not that I remember.
21   Q.  So the next conversation that you remember