IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| CLOW VALVE COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.  JFM 02-3136 |
| | ) | |
| MAYOR and CITY COUNCIL OF | ) | |
| BALTIMORE CITY | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF CLOW VALVE COMPANY'S COMBINED MEMORANDUM IN
OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT AND IN REPLY
TO CITY OF BALTIMORE'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

Plaintiff Clow Valve Company, a division of McWane, Inc. ("Clow"), by its undersigned

attorneys, hereby files this combined memorandum in opposition to the cross-motion for

summary judgment ("Cross-Motion") filed by the Mayor and City Council of Baltimore City

("the City") and in further support of Clow's summary judgment motion.

**INTRODUCTION**

In moving for summary judgment in its own right and in opposing Clow's summary

judgment motion, the City somewhat incredibly ignores compelling and now clearly undisputed

evidence discussed in detail in Clow's initial summary judgment memorandum.  Specifically, the

City has essentially nothing to say about Walter Blimline's misleading – and, at times,

affirmatively deceptive – conduct following the September 7, 2001 valve order, which the City

still contends was a price quote notwithstanding every other shred of evidence in the summary

judgment record to the contrary.  In fact, the City does not even attempt to address *any* of the

significant events that occurred during the nearly eight months that passed between the time of

the September 2001 order and the April 30, 2002 meeting between Clow and City

representatives regarding the dispute relating to that order.

In summary, the City does not – and, indeed cannot because there is no contradictory

evidence in the record – contest that the following events occurred as described below:

1.      After the September 7, 2001 valve order, Walter Blimline engaged in several conversations with Clow sales representatives, Tom Walston and Shelley Terrell Shepherd, confirming certain specifications for the manufacture of the valves.  (Ex. L (Shepherd dep.) at 28, 30-31, 35-36; ex. B (Walston dep.) at 63, 99-100.)[1]

2.      Shepherd thereafter faxed the first of two order acknowledgement forms to Blimline for his review and asked Blimline to "sign off" on the first part of the valve order.  (Ex. L (Shepherd dep.) at 33; ex. M (9/24/01 fax from Shepherd to Blimline).

3.      Shepherd then faxed the second order acknowledgement to Blimline for his review and signature and, after a follow-up call from Shepherd to remind him to sign the order acknowledgements and return them to Shepherd so that Clow could proceed with the order, Blimline signed both order acknowledgements and returned them to Shepherd.  (Ex. L (Shepherd dep.) at 33, 36; ex. N (order acknowledgments signed by Blimline).)

4.      Blimline requested that the valves he had ordered be manufactured on an expedited basis.  (Ex. L (Shepherd dep.) at 68-69.)

5.      In October of 2001, Clow began delivering the manufactured valves on a rolling basis to the City.  Three different trucking companies unaffiliated with Clow made at least fifteen separate valve deliveries between October 2 and December 18, 2001.  (Ex. I (Def.'s interrogatory responses) at 5-6; Ex. Q (Malloy aff.) at ¶ 3.)

6.      Clow instructed the various truck drivers to "PLEASE CONTACT WALT BLIMLINE 24 HRS PRIOR TO DELIVERY" and listed Blimline's Fulton Avenue office address and telephone number as the only delivery information.  (Ex. Q (Malloy aff.) at ¶ 4; ex. R (Clow invoice no. 98105971 and corresponding packing slip).)  Clow itself did not even know where the City's valves were to be delivered.  (Ex. Q (Malloy aff.) at ¶ 4.)  All fifteen valve deliveries were unloaded

---

[1]     All citations herein to exhibits with letter designations refer to exhibits attached to Clow's initial summary judgment memorandum.  Five additional exhibits attached hereto are designated with number references.

at the DPW yard on Washington Boulevard. (Ex. C (Blimline dep.) at 81; ex. I (Def.'s interrogatory responses) at 6.)

7.      On at least one occasion after he placed the Clow order, Blimline received a telephone call announcing the arrival of a delivery of Clow valves. (Ex. C (Blimline dep.) at 78-79.) The City does not – and, given the undisputed facts regarding the valve delivery instructions, cannot – dispute that Blimline received similar notice of other Clow valve deliveries during the course of the two-and-a-half month delivery process. In fact, the record is clear that other DPW employees – including DPW general superintendent, August Severn – knew that the Clow valve shipments were beginning to arrive in October of 2001. (Ex. 1 (Severn dep.) at 18-19.) With respect to the delivery announcement that Blimline specifically admits having received, rather than refusing the delivery or contacting Clow to inquire why Clow valves were being delivered, Blimline "didn't do anything." (Ex. C (Blimline dep.) at 79.)

8.      Clow credit analyst Jill Ferguson called Blimline on November 6, 2001 regarding the status of a past due payment on an invoice from the September 7, 2001 order. (Ex. T (Ferguson dep.) at 18.) Blimline asked Ferguson to fax him a copy of the invoice, and she did so. (*Id.* at 18-19.)

9.      Ferguson called Blimline on November 30, 2001 about the same invoice and others from the September 7, 2001 order. (*Id.* at 19-20.) Blimline advised that he would check the payment status and call Ferguson back on December 3, 2001. (*Id.*)

10.     Not having heard from Blimline on December 3, Ferguson called him again on December 7, 2001. (*Id.* at 23.) This time Ferguson reached Blimline's secretary, Kathy Smith, who asked Ferguson to fax her copies of the past due invoices relating to the September 7, 2001 order. (*Id.*) Ferguson again faxed that information, along with proofs of delivery of the Clow valves. (*Id.*)

11.     Three days later, Blimline called Ferguson and told her that the City had issued payment on the past due Clow invoices (*Id.* at 21, 23.) Another week later, having received no such payment, Ferguson called Blimline. She reached Kathy Smith, who once again asked Ferguson to fax her all of the past due invoices and proofs of delivery of the valves ordered on September 7, 2001, the same information that Ferguson had faxed to Smith ten days earlier. (*Id.* at 23-24.) Ferguson once again complied with Smith's request. (*Id.* at 24.)

12.     Around that same time, Blimline's supervisor, Williams, "found out that the [Clow valves] were being delivered and dropped off at Washington Boulevard." (Ex. J (Williams dep.) at 31.) He did not learn this information from Blimline. (*Id.*) When Williams questioned Blimline about the valves, Blimline told him that "it was a mistake" (*id.* at 30, 32), *i.e.*, that the Clow valves had been "[o]rdered by mistake" (*id.* at 30-31).

13.    Blimline then told Williams that "arrangements were being made for the valves to be picked up." (*Id.* at 32.)  Blimline later admitted that he never made any such arrangements. (*See* ex. C (Blimline dep.) at 71; *see also id.* at 128.)  Williams did not investigate the matter further, nor did he contact anyone at Clow about the "mistake."  (Ex. J. (Williams dep.) at 32-33.)  Instead, he left Blimline to resolve the problem on his own.  (*Id.*)

14.    Clow's credit manager, Randy Malloy, then began calling Blimline regarding the past due valve invoices and the payment thereof that Blimline had promised.  On January 24, 2002, Blimline advised Malloy that he had completed the necessary internal paperwork and that Clow would receive payment in about a week.  (Ex. U (Malloy dep.) at 25.)  When Malloy spoke with Blimline again on January 30, 2002, Blimline again stated that he had completed and transmitted the necessary paperwork and that payment was forthcoming.  (*Id.*)

15.    In fact, in April 2002, the City issued two payments to Clow relating to the September 7, 2001 order before finally refusing to make any further payments on the valves that remain in its possession.  (*See* exs. W, X.)

The City does not challenge *any* of the above, all of which is set forth in nearly identical detail in Clow's initial summary judgment memorandum (at 6-11).  These undisputed and important events occurring over the course of nearly eight months form the very backbone of this case and firmly establish Clow's entitlement to summary judgment.  Rather than addressing these events, the City deliberately ignores them in advancing an overly simplistic argument that its contract documents govern this case, despite the dozens of key communications between the City and Clow that occurred thereafter.

This is not a straightforward contract case that can be resolved by resort to contract documents.  The specific and undisputed post-contract facts of this case that the City refuses to acknowledge preclude such sterile legal analysis here.  Moreover, the City's efforts to shift to Clow the burden of investigating and uncovering the City's own admitted mistakes are unavailing here because the City affirmatively misled Clow by engaging in a course of conduct over several months apparently designed to hide those mistakes, while at the same time

increasing Clow's damages by inducing Clow to continue manufacturing and delivering the valves the City had ordered.

## ARGUMENT

I.     **Clow is entitled to summary judgment even if the Court accepts the City's arguments in support of its summary judgment motion.**

The City offers two main arguments in support of its summary judgment motion. First, the City argues – based on a single excerpt from Blimline's deposition transcript – that the September 7, 2001 valve order was merely a request for a price quote on valves. Second, the City argues that its requirements contracts with Clow and the purchase orders issued thereunder had the effect of limiting Blimline's authority to order valves from Clow.[2] Again, both of these superficial arguments conveniently ignore the bulk of the undisputed evidence of record.

A.     **Even if the Court credits Blimline's patently unbelievable testimony – contrary to every other bit of evidence in the record – that he merely requested a price quote on September 7, 2001, the City's subsequent ratifying conduct renders it liable to Clow for the valves that the City accepted and has retained to this date.**

The City continues to assert as its lead argument that Blimline's September 7, 2001 telephone call to Clow sales representative, Tom Walston, was a request for a price quote, not a valve order. In so asserting, the City relies exclusively on a few lines of testimony taken out of context from Blimline's deposition transcript. (*See* Cross-Motion at 9-10.) Again, the City's argument completely ignores all of the remaining and otherwise undisputed evidence in the record – including the rest of Blimline's own testimony – regarding the September 7, 2001 call.

---

[2]     Of course, this latter argument does not actually entitle the City to summary judgment. On the contrary, it would require the Court to conclude that the City is liable to Clow for a fraction of the purchase price of the valves it ordered. In any event, as set forth herein, the City's alternative argument is equally unavailing.

Specifically, the City never addresses or even acknowledges the following now undisputed facts that render patently unbelievable Blimline's self-serving "price quote" story:

1.      As evidenced by testimony from Blimline's own supervisor, Warren Williams, Blimline asked for and actually received Clow price quotes in July 2001, two months prior to the actual September 2001 order.  (Ex. B (Walston dep.) at 73-76; ex. J (Williams dep.) at 38-39.)

2.      Blimline has no recollection at all of the date when he requested the price quotes from Walston.  (Ex. C (Blimline dep.) at 53-55.)  Moreover, Blimline asked for price quotes only on 16-, 20-, 24-, 30- and 36-inch valves.  (*Id.* at 111.)  However, the order acknowledgement forms that Blimline received in September 2001 reflect, *inter alia*, the prices for four other valve sizes for which Blimline undisputedly had never requested a quote.  (*Id.* at 111-12.)

3.      Blimline received two separate order acknowledgement forms in September of 2001.  Shelly Shepherd asked Blimline to review and "sign off" on these forms confirming the order.  (Ex. M (9/24/01 fax from Shepherd to Blimline).)  Blimline did so and returned the signed order forms to Clow.  (*See* ex. N (order acknowledgements signed by Walt Blimline).)

4.      The forms that Blimline signed are clearly marked as "orders," and they contain specific quantities, delivery dates, and delivery instructions.  (*See id.*)  The order acknowledgement forms also address multiple valves of the same size. (*Id.*)  By contrast, a price quote obviously would address the price for only one valve of the specified size.  The City does not contend otherwise.

5.      Blimline admits that not one of the hundreds or thousands of vendors with which he has dealt has ever asked him to sign and return a price quote.  (*See* ex. C (Blimline dep.) at 57.)

6.      Blimline also admits that he never even read the Clow order forms. (*Id.* at 113-14.)  The contents of the order acknowledgement forms were "immaterial" and "didn't make a difference to [him.]"  (*Id.* at 112.)

7.      Reviewing the order acknowledgement forms today, Blimline admits that he "would have questioned" whether they were price quotes.  (*Id.* at 113.)  In fact, although as an initial matter Blimline contends that these order acknowledgement forms were "price quotes" (*id.* at 117), when pressed, he eventually concedes that they obviously represent "an order" (*id.* at 115).

These facts that the City has elected not to contest or even address render Blimline's "price quote" statement facially unbelievable testimony that may be rejected as failing to create a

genuine dispute of material fact.  *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) (testimony can and should be rejected without trial if, in the circumstances, no reasonable person would believe it").[3]

Furthermore, even if the Court credits Blimline's isolated "price quote" statement, Blimline's and the City's subsequent conduct served to ratify what Blimline later told his boss was a "mistake[n]" order.  (Ex. J (Williams dep.) at 30-32.)  This is true regardless of who made the initial "mistake."  As set forth in detail above and in Clow's initial summary judgment memorandum, after the September 7, 2001 telephone call from Blimline to Walston, Blimline and the City engaged in a course of conduct lasting several months that was wholly inconsistent with a request for a price quote.  On the contrary, this extended pattern of conduct involving Blimline *and other City officials*, objectively and repeatedly demonstrated that Blimline had intended to place a valve order on September 7, 2001, that the City had accepted and retained at least 15 separate shipments of valves pursuant thereto without any objection, and that the City intended to pay for, was preparing to pay for, and had actually begun paying for, the valve order.

The City essentially offers no response to Clow's argument that this extended course of undisputed conduct effectively ratified the September 7, 2001 order (to the extent that any ratification was necessary).  In a single footnote containing no citation to the record or to legal authority, the City merely "denies" that it ratified the order by paying for valves delivered

---

[3]     Additionally, the Blimline deposition testimony surrounding the out-of-context "price quote" statement on which the City exclusively relies shows that even that statement cannot be offered at face value as the City attempts to do here.  Rather, a full and fair reading of Blimline's testimony reveals that Blimline does not know when he asked for the price quote (in fact, as shown above, the remaining evidence in the record demonstrates that he is confusing his July 2001 price quote request with the September 2001 order), that he signed the two order acknowledgement forms without reading them, and that he concedes in hindsight that the forms look like order forms, not price quotes.  (Ex. C (Blimline dep.) at 53-55, 111-17.)  Thus, the City's oversimplified and patently unbelievable "price quote" argument is inconsistent even with Blimline's own deposition testimony, on which the argument is exclusively based.

pursuant thereto. (Cross-Motion at 9 n.2.) To the extent that this footnote constitutes an opposition to Clow's primary summary judgment argument, it fails for several reasons.

Most notably, the City fails to acknowledge that its ratification of the September 7, 2001 order occurred in three separate and independent ways, two of which preceded its initial payments for the valves. First, the City failed to repudiate the order even long after it clearly had knowledge of the order. Both Blimline and his supervisor admit that they did nothing upon learning that the valves were being delivered pursuant to the "mistake[n]" order. (Ex. C (Blimline dep.) at 79; ex. J (Williams dep.) at 32-33.) Indeed, the City does not point to any credible evidence of repudiation[4] – let alone timely repudiation – of the September 2001 order at any point during the two-and-a-half-month valve manufacturing process. *See Maddux v. Bevan*, 39 Md. 485, 502 (1874) ("If the principal has received the proceeds, and does not disavow the acts of his agent, as soon as he can, after notice thereof, he makes them his own."); *Young v. Anne Arundel County*, 146 Md. App. 526, 597, 807 A.2d 651, 693 (he who does not promptly repudiate an allegedly invalid contract "may be deemed to have ratified the contract because of his silence and failure to act"), *cert. denied*, 372 Md. 432, 813 A.2d 259 (2002). Had the City

---

[4]    Although the City does not so assert in opposition to Clow's ratification argument, the City does contend that it "seasonably rejected" the valves when Blimline advised Walston that he had not intended to place an order, but rather had intended to ask Walston for a price quote. (Cross-Motion at 28.) Blimline incorrectly testified that this conversation occurred at the end of October 2001 (ex. C (Blimline dep.) at 59), and the City blindly champions this mistaken testimony in its Cross-Motion. However, as Clow explained in detail in its initial summary judgment memorandum (Clow Mem. at 9 n.7), all of the other evidence in the record clearly indicates that this conversation occurred in December, at which point the City could no longer "seasonably reject[]" the completely manufactured and delivered valves. Most notably, the fax that Blimline admittedly received from Clow in response to his statement to Walston that he had not placed the order is dated December 20, 2001. (Ex. C (Blimline dep.) at 60; ex. S (12/20/01 fax to Blimline).) Once again, the City completely ignores Clow's argument on this point and the undisputed fact that all of the remaining relevant evidence in the record once again contradicts Blimline's testimony. In fact, if Blimline were correct that this conversation occurred in October, it would mean that he intentionally withheld the key information he discussed with Walston from his supervisor for at least two months thereafter. (*See* ex. J (Williams dep.) at 31-32 (testifying that Blimline first advised him of the "mistake[n]" Clow order in December of 2001).)

repudiated the valve order at any point during those ten weeks while Clow was manufacturing the City's valves, the City could have halted the manufacturing process, correspondingly reducing the amount of damages Clow has suffered in this case.

Second, the City does not dispute that it accepted and retained fifteen separate valve shipments over the course of two-and-a-half months without any objection. This is clear ratification of the September 2001 order, and the City offers no argument to the contrary. *See Citizens Bank of Maryland v. Maryland Indus. Finishing Co., Inc.*, 338 Md. 448, 464 n.9, 659 A.2d 313, 320 n.9 (1995) ("One way for a principal to ratify an act by conduct is to accept a benefit that it would not have received but for the previously unauthorized act."). That the City undisputedly and repeatedly accepted the benefits of the September 2001 order is a further and independent basis for finding ratification here.[5]

Moreover, the City's truncated argument that its payment of the first two Clow invoices did not ratify the September 7, 2001 order is based on an entirely false premise – *i.e.*, that "[a]lthough the City didn't order the valves, it needed some of the smaller ones for its daily use and, as Clow acknowledges, paid the Company for them." (Cross-Motion at 9.) In fact, as set forth in the first two invoices that the City paid on April 15 and April 30, 2002, the City paid Clow for a total of 23 valves (seventeen 10-inch valves and six 12-inch valves). (*See* ex. R (9/24/01 invoice); ex. W (4/30/02 in full payment of 9/24/01 invoice); ex. 2 (10/1/01 invoice);

---

[5]    The City also contends that Blimline's supervisor, Williams, repudiated the September 7, 2001 order during a telephone conversation with Clow credit manager, Malloy, in late January or early February 2002 – nearly four months after the first Clow valve shipment and more than a month after the last of at least fifteen shipments – at which time Williams advised Malloy that the valves had been ordered by "'mistake'" and that Clow "'needed to come and get their valves.'" (Cross-Motion at 29.) This was clearly too little, too late to constitute an effective repudiation of the September 7, 2001 custom valve order. *See Huppman v. Tighe*, 100 Md. App. 655, 664, 642 A.2d 309, 313 (1994) ("A repudiation must be made timely . . . and in a definite, positive, and unequivocal manner.").

ex. V (4/15/02 check in full payment of 10/1/01 invoice)). However, as of a year-and-a-half later, the City still had not used thirteen of the seventeen 10-inch valves for which it had paid Clow in April of 2001. (*See* ex. 3 (12/2/02 letter from M. Maneche to R. Anbinder) at 1.) Therefore, it is simply not true that the City's April 2001 payments were intended to cover only those valves that the City had used at that time. The City's payment extended well beyond those valves that it had actually used, and that part payment of the September 7, 2001 order is an additional and independent basis for concluding that, as a matter of law, the City ratified the order. *Smith v. Merritt Savings and Loan, Inc.*, 266 Md. 526, 538, 295 A.2d 474, 481 (1972) ("[T]he principal cannot ratify a transaction in part and repudiate it as to the rest. The principal must either adopt the whole transaction or none at all.").

    **B.**    **The City's subsequent ratification of the allegedly unauthorized September 7, 2001 order also overcomes any limitations set forth in the City's contract documents.**

    For the same reasons, the City's heavy reliance on its requirements contracts and the purchase orders issued thereunder as dictating the full extent of its liability to Clow is misplaced. Regardless of the actual extent of Blimline's authority to place the September 7, 2001 order, the City's subsequent ratification thereof by three independent means – failure to repudiate, acceptance and retention of the goods, and partial payment thereof – overcomes any lack of contract or purchase order authority that might have otherwise rendered Blimline unable to bind the City to the extent of the valve order he placed with Clow. *Citizens Bank of Maryland*, 338 Md. at 464 n.9, 659 A.2d at 320 n.9 (noting that ratification serves to bind a principal to a "previously unauthorized act" of its agent).

    Relying exclusively on a 60-year-old case, *Gontrum v. Mayor & City Council of Baltimore*, 182 Md. 370, 35 A.2d 128 (1943), the City argues that it was incumbent on Clow to

investigate the scope of Blimline's authority to place the September 7, 2001 order, and that

Clow's failure to do so adequately absolves the City from any liability for Blimline's placement

of an order in excess of his express authority. Again, resolution of this issue has no bearing on

whether Clow is entitled to summary judgment based on the City's ratification of an allegedly

unauthorized order. Indeed, ratification assumes a lack of authority.

Moreover, the *Gontrum* case has no application here. *Gontrum* deals expressly with the

authority of a municipal employee to enter into contracts on behalf of the municipality. 182 Md.

at 375-76, 35 A.2d at 130-31. Blimline's authority to bind the City to a contract to purchase

Clow valves is not at issue here. It is undisputed that the City had entered into a valid, written

requirements contract to purchase valves from Clow at the time of the September 7, 2001 order.

It is also undisputed that prior to the order, the City had issued a specific purchase order pursuant

to that contract authorizing the City's Department of Public Works ("DPW") to purchase Clow

valves. Finally, it is undisputed that Blimline was the individual generally authorized to place

such orders on behalf of the DPW.[6]

Rather, the authority-related issue that the City is raising in this case is the extent to

which Blimline could place an order on behalf of the City *in excess of* the amounts specifically

listed in the contract and corresponding purchase order. *Gontrum* does not speak to that issue.

On the other hand, *Gontrum* does specifically support the argument that Clow is advancing in

---

[6]    In its Cross-Motion, the City actually asserts that "no one from the City ever identified Walter
Blimline as the person who bought Clow products for the City." (Cross-Motion at 21.) If by that
statement the City means to suggest that that Blimline is not the individual designated to place water
valve orders on behalf of the City, that suggestion is clearly false according to Blimline, his supervisor,
and the City itself. (*See, e.g.*, ex. C (Blimline dep.) at 48-49; ex. J (Williams dep.) at 13, 43; ex. I (Def.'s
interrogatory responses) at 13.)

support of summary judgment – that an "act of ratification or adoption" can render a municipality liable for the otherwise "unauthorized acts of its agents." *Id.* at 376.[7]

## II. The City's recent conduct in soliciting bids from outside vendors to supply the City with most of the same valves it purchased from Clow further reveals that it has been unjustly enriched.

The City argues in conclusory fashion that it has not been unjustly enriched by receiving and retaining nearly $600,000 worth of valves manufactured to its specifications. To the extent that this facially illogical argument has any appeal, that appeal quickly vanishes in the light of the City's own conduct.

First, it is undisputed that the City has actually used some of the valves it purchased from Clow in 2001. The City clearly could have used most or all of the other Clow valves it purchased as well. Just last month, the City solicited bids from outside vendors to supply the City with, *inter alia*, 6- to 24-inch gate valves identical to Clow valves now sitting in the Washington Boulevard DPW yard. (See ex. 4 (6/4/03 City of Baltimore solicitation of bids) at 13.) Rather than using the very same valves undisputedly in its possession that Clow manufactured, the City – seemingly for tactical litigation reasons – has elected to purchase the same valves from another vendor.[8] That the City has solicited bids for 6- to 24-inch valves identical to those it purchased from Clow demonstrates unequivocally that the City needs those

---

[7]  Finally, it bears emphasizing that the requirements contracts and corresponding purchase orders on which the City so heavily relies are not nearly as iron-clad as the City characterizes them. First of all, the contracts themselves are expressly "REQUIREMENTS TYPE CONTRACT[S]." (Ex. H ("Special Conditions" page from the City's requirements contract).) As a result, the dollar figure attached to a particular contract is necessarily and specifically stated as an "estimate" of the amount of goods to be purchased thereunder. (*See* ex. F (5/12/99 Agreement); ex. G (5/2/01 Agreement).) Indeed, the City itself does not even treat these "estimate[s]" as limits on its purchasing authority. As the City admits with respect to this case, it issued purchase orders totaling $240,000 pursuant to a $200,000 contract with Clow dated May 12, 1999. (*See* Cross-Motion at 5.)

[8]  The City's refusal to use to those Clow valves in its possession in favor of purchasing the same valves from another vendor also reveals that the City could have mitigated Clow's damages in this case, but consciously elected not to do so.

valves and, therefore, that they have value to the City. Accordingly, there can be little doubt that the City was unjustly enriched when it received and retained the 6- to 24-inch valves manufactured by Clow. *See SSDS, Inc. v. Mayor and City Council of Baltimore*, 2000 WL 718388, at *2 (4th Cir. June 5, 2000).

With respect to the 30- and 36-inch valves, the City's recent solicitation of bids indicates that the City has moved from using gate valves to using butterfly valves since it purchased 30- and 36-inch valves from Clow. That the City no longer uses 30-inch or larger gate valves does not alter the unjust enrichment analysis here because it is undisputed that at the time of the September 7, 2001 order, the City had not yet specified the purchase or use of butterfly valves. Moreover, gate valves and butterfly valves are essentially interchangeable. (*See* ex. P (Vore dep.) at 133-34.) Additionally, the City's move from 30-inch or larger gate valves to butterfly valves in those sizes serves to emphasize Clow's argument that the 30- and 36-inch gates valves that the City purchased from Clow in 2001 are now obsolete and cannot be resold to other purchasers. (*See* ex. O (Bottenfield dep.) at 53-54; ex. P (Vore dep.) at 133-34.)

In response to its solicitation of bids last month, the City received three bids to supply the quantities of valves the City needs. Those bids range from $425,859.00 to $503,529.32. (Ex. 5 (2003 Bid Tabulation Form).) They further reveal that with respect to the largest and most hotly contested valves involved in this case (the 30- and 36-inch valves), the City is currently seeking nearly identical quantities of valves as compared to those it purchased and received from Clow (and still has in its possession):

| Valve size | Quantity purchased from Clow in 2001 | Quantity solicited for bids in 2003 |
|---|---|---|
| 30-inch | 12 | 10 |
| 36-inch | 12 | 10 |

(*Compare* ex. K (handwritten 9/7/01 order confirmation) *with* ex. 5 (2003 Bid Tabulation Form).)

The City's blatant effort to purchase most of the very same valves it purchased from Clow and now refuses to pay for – and its apparent willingness to pay hundreds of thousands of dollars to another valve vendor for these identical valves – at the same time that this matter is proceeding to summary judgment adds further insult to Clow's injury and raises substantial concerns regarding the City's motives in this case.  At a minimum, it tips the equities even further in Clow's favor in the unjust enrichment analysis.

In an attempt to avoid application of the unjust enrichment doctrine here, the City endeavors to distinguish the strikingly similar and highly persuasive *SSDS* case by arguing that in *SSDS* (and *Koing v. Mayor and City Council of Baltimore*, 128 Md. 465 (1916), cited therein), the City had received "appreciable and non-disgorgeable" benefits that constituted unjust enrichment.  (Cross-Motion at 31.)[9]  The same is clearly true here.  As shown above, the City actually needs the valves that Clow delivered to the City in 2001 and that the City has since retained.  If the City did not have a need for such valves, it would not be currently soliciting bids for identical or similar valves from other valve manufacturers.  Furthermore, as a practical matter, these Clow valves are now "non-disgorgeable" because they cannot be resold to another

---

[9]    The City correctly notes that *SSDS* is an unpublished decision from the Fourth Circuit, and then states that *SSDS* "may be of dubious precedential value."  (Cross-Motion at 31.)  While *SSDS* may not be technically "precedential," it is clearly highly persuasive in its factual similarity to this case and its cogent treatment of the same unjust enrichment issue before the Court.  This Court regularly adopts the persuasive reasoning of unpublished opinions from the Fourth Circuit, particularly in the absence of controlling published authority.  *See*, *e.g.*, *Fritschle v. Andes*, 25 F. Supp. 2d 699, 704 (D. Md. 1998); *Hosley v. Collins*, 90 F.R.D. 122, 125 & n.9 (D. Md. 1981); *see also Healthsouth Rehab. Hosp. v. American Nat'l. Red Cross*, 101 F.3d 1005, 1008 n.1 (4th Cir. 1996) (following "persuasive" reasoning contained in unpublished Fourth Circuit opinion despite its lack of "precedential authority" under Fourth Circuit Local Rules).  Despite its technical criticism of *SSDS*, the City offers no contrary authority whatsoever, whether published or unpublished.

customer given their age and special manufacture.  (*See* ex. O (Bottenfield dep.) at 30-31, 43-44; ex. P (Vore dep.) at 118-22.)

**III.    The City's argument that the valves it received and retained do not meet City specifications is a recently contrived and insignificant complaint that this Court should summarily reject.**

It was not until discovery in this case that the City began asserting that the valves Clow supplied in 2001 did not meet its specifications.  The particular specification variance that the City is now claiming for the first time is the addition of an external "barrel" open/close indicator to certain valves that Clow manufactured.  (Cross-Motion at 26.)  Clow added these barrel indicators at the specific request of Walt Blimline.  (Ex. B (Walston dep.) at 63.)

That the City did not raise any objection to the barrel indicators until the discovery stage of this lawsuit speaks volumes regarding the insignificance of this purported specification issue.  The presence of an external barrel indicator on a valve, particularly on a larger valve, is obvious to anyone who sees the valve.  It therefore would have been obvious to any DPW employee receiving the Clow valves being delivered during that 10-week period in late 2001 that the valves had barrel indicators.  If, as the City now contends, its specifications do not call for the addition of an external barrel indicator, the presence of such external indicators on the Clow valves being delivered in late 2001 should have been particularly evident.[10]  Nonetheless, it is undisputed that no one from the City ever communicated to Clow at any time during the manufacturing and delivery process – at which time the alleged error could have been corrected – that the valves were out of specification.

---

[10]     DPW general superintendent, Severn, stated at his deposition that the presence of the barrel indicators was apparent to him when the initial valve deliveries arrived in October of 2001 and that "[j]ust looking at the valves with that indicator on it would tell me that that's something we would not spec." (Ex. 1 (Severn dep.) at 18.)

Even at the April 30, 2002 meeting between representatives from the City (including Blimline and Williams) and Clow, no one from the City ever asserted that the valves Clow had manufactured and delivered were inconsistent with City specifications in any way. This is particularly striking given that August Severn, the DPW employee who raised the barrel indicator specification issue at his deposition (ex. 1 (Severn dep.) at 16-18) and who offered himself as particularly knowledgeable regarding City valve specifications, attended that April 30, 2002 meeting. (Ex. J (Williams dep.) at 43-44.) Rather, it was not until after the filing of this lawsuit that the City, through its attorneys, began to claim that the presence of the barrel indicators constituted a specification variance.

In any event, the variance is immaterial and easily remedied. The barrel indicators do not affect the performance of the valves, and they can be easily removed at any time. (Ex. 6 (Bottenfield dep.) at 37-38.) Were the barrel indicators of any actual concern to the City, it would have removed them or asked Clow to do so. It never did.

## IV.    The City's "exhaustion of administrative remedies" argument, raised for the first time in its Cross-Motion, has been waived and, in any event, is entirely misplaced.

The City's penchant for conjuring up new arguments at the last minute is further evident in its argument that Clow failed to exhaust certain "administrative" remedies set forth in the May 11, 2001 contract that the City argues governs this case. Failure to exhaust administrative remedies – particularly where, as here, such failure does not affect the Court's jurisdiction – is an affirmative defense. *Young v. National Ctr. For Health Svcs. Research*, 828 F.2d 235, 238 (4th Cir. 1987). As such, Fed. R. Civ. P. 8(c) placed on the City the burden of raising this defense in its answer to the Complaint. *Dole v. Williams Enters, Inc.*, 876 F.2d 186, 189 (D.C. Cir. 1989) ("our understanding of affirmative defenses, buttressed by years of experience under the Federal Rules of Civil Procedure, is that these defenses place the burden on the party raising them to

affirmatively plead the claim in order to bring them into the action" (footnote omitted)).  The City did not assert the affirmative defense of exhaustion of administrative remedies in its answer in this case.  (*See* Answer at 5-6.)  Indeed, the City never once raised this issue until filing its cross-motion for summary judgment.  The City has therefore waived this affirmative defense by failing to assert it in its answer.  *See Dole*, 876 F.2d at 189 ("A party's failure to plead an affirmative defense . . . generally 'results in the waiver of that defense and its *exclusion from the case*'" (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1278) (emphasis in *Dole*)).

Moreover, the contract provision on which the City relies does not even apply to the issues Clow has raised in this case.  According to the provision that the City quotes, the City Purchasing Agent is to act as " the Referee" in the event that a "dispute arises between [Clow] and the City regarding th[e May 11, 2001] contract."  (Cross-Motion at 32.)  In seeking summary judgment, Clow is not asking the Court to resolve a dispute regarding the City's May 11, 2001 contract, a point that apparently continues to allude the City.  On the contrary, Clow's summary judgment arguments based on the legal and equitable theories of ratification and unjust enrichment arise completely outside the May 11, 2001 contract.

To the extent that the City is raising in this Court issues concerning the proper interpretation, application and scope of the May 11, 2001 contract – and it clearly does raise such issues in its Cross-Motion – the City is the party that violated this contract provision by failing to raise these issues in the first instance before the City Purchasing Agent.[11]  Having unclean hands itself, the City cannot now assert that Clow should have initially asserted its claims against the City with the City's own Purchasing Agent when the City itself elected to forego such action.

## CONCLUSION

For the reasons set forth above, as well as the reasons stated in Clow's initial summary judgment memorandum, the Court should grant Clow's summary judgment motion and should deny the City's cross-motion for summary judgment.

Respectfully submitted,

_____/s/_____

Otho M. Thompson
Mark D. Maneche
Venable, Baetjer and Howard, LLP
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland  21201
(410) 244-7400

Jayna Partain Lamar
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2618
(205) 254-1000

*Attorneys for Plaintiff Clow Valve Company, a division of McWane, Inc.*

---

[11]    Indeed, the City could have referred this matter to the City Purchasing Agent following the April 30, 2002 meeting between Clow and the City during which the City first raised these contract-related issues.  It did not do so.

BA2/219716.01                                        18

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of July, 2003, copies of Plaintiff Clow Valve

Company's Combined Memorandum in Opposition to Cross-Motion for Summary Judgment and

in Reply to City of Baltimore's Response to Motion for Summary Judgment was transmitted by

electronic filing to:

        Robert D. Anbinder, Esquire
        Assistant City Solicitor
        Department of Law
        Room 81
        100 North Holliday Street
        Baltimore, Maryland 21202


                        /s/
                Mark D. Maneche